# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| TERRY BEVILL, | § | |
| | § | |
| *Plaintiff,* | § | Civil Action No. 4:19-cv-00406 |
| v. | § | Judge Mazzant |
| | § | |
| CITY OF QUITMAN, TEXAS et al., | § | |
| | § | |
| *Defendants.* | § | |

## <u>MEMORANDUM OPINION & ORDER</u>

Pending before the Court are Defendant Wood County's Motion for Summary Judgment (Dkt. #148), Defendant Tom Castloo's Motion for Summary Judgment (Dkt. #149), Judge Jeffrey Fletcher's Motion for Summary Judgment (Dkt. #150), Defendant James Wheeler's Motion for Summary Judgment (Dkt. #152), Defendant's (David Dobbs) Motion for Summary Judgment (Dkt. #153), Defendant James Wheeler's Motion to Strike Summary Judgment Evidence (Dkt. #167), and Judge Fletcher's Unopposed Motion for Leave to File Sur Surreply (Dkt. #177).

Having considered the motions and relevant pleadings, the Court finds that Defendant Wood County's Motion for Summary Judgment (Dkt. #148), Defendant Tom Castloo's Motion for Summary Judgment (Dkt. #149), Judge Jeffrey Fletcher's Motion for Summary Judgment (Dkt. #150), Defendant James Wheeler's Motion for Summary Judgment (Dkt. #152), Defendant's (David Dobbs) Motion for Summary Judgment (Dkt. #153), Defendant James Wheeler's Motion to Strike Summary Judgment Evidence (Dkt. #167), and Judge Fletcher's Unopposed Motion for Leave to File Sur Surreply (Dkt. #177) should be **DENIED**.

## BACKGROUND

Plaintiff Terry Bevill ("Bevill") formerly served as the Captain of the Quitman Police Department ("Quitman PD") and as an instructor at the Kilgore Police Academy.  In 2017, during

his employment with Quitman PD, Bevill's friend, David McGee ("McGee"), was arrested and

charged with facilitating and/or permitting the escape of an inmate from the Wood County Jail and

with tampering with government records while McGee was employed as an administrator at Wood

County Jail.  McGee's arrest and indictment garnered significant attention in the Wood County

area.

Fearing he could not receive a fair trial in Wood County, McGee reached out to Bevill and

asked him to sign an affidavit in support of a motion to transfer venue.  Bevill shared McGee's

concerns, so he spoke with McGee's lawyer about the affidavit.  On June 2, 2017, Bevill signed

an affidavit on McGee's behalf and provided two reasons for why McGee's motion should be

granted: (1) pretrial publicity and (2) alleged personal relationships between Sheriff Tom Castloo

("Castloo"), Wood County District Attorney James Wheeler ("Wheeler"), and State District Judge

Jeff Fletcher ("Fletcher").  Of particular relevance, Bevill attested:

> I believe it will not be possible for DAVID MCGEE to get a fair and impartial trial
> in Wood County, Texas due to the pre-trial publicity involved in this case and the
> personal relationships between the Sheriff, the District Attorney, and the Presiding
> Judge in this matter.  I am very familiar with the close relationships between these
> influential persons, and DAVID MCGEE will be greatly prejudiced having a trial
> in Wood County.
>
> It is not possible for David McGee to obtain a fair and impartial trial in Wood
> County, Texas because there is a dangerous combination against Defendant
> instigated by influential persons that a fair and impartial trial cannot be obtained.

(Dkt. #157, Exhibit 10 at p. 6).  That same day, McGee's attorney filed the motion to change venue

with Bevill's affidavit along with affidavits from McGee and Mayra McGee.  Bevill did not sign

his affidavit in his capacity as an officer at Quitman PD, and he did not speak with anyone at

Quitman PD about signing the affidavit.

Bevill's decision sent a spark through his local community.  While Castloo denies ever

speaking to Wheeler about McGee's case, Wheeler evidently sent a text message to Castloo with

a picture of the affidavit just hours after Bevill filed it (Dkt. #158, Exhibit 9).  Castloo then sent

the affidavit to Quitman City Secretary Greg Hollen ("Hollen") with the message "Here it is"

(Dkt. 158, Exhibit 10).  Castloo was angered by Bevill's affidavit, and he believed that Bevill had

attacked his integrity by filing it (Dkt. #158, Exhibit 3).  Castloo and Hollen met that weekend at

a local fishing tournament, but Castloo again does not recall whether the men discussed the

affidavit (Dkt. #158, Exhibit 3).

The affidavit also garnered the attention of Wheeler and Fletcher.  After Bevill filed his

affidavit, Wood County DA Investigator Jerry Hirsch ("Hirsch") stated that he was called into

Wheeler's office where Fletcher was waiting (Dkt. #159, Exhibit 18).  During that meeting,

Wheeler and Fletcher were discussing Bevill's affidavit, and at one point, Fletcher announced his

intention that he wanted to file a perjury charge against Bevill because he did not deserve a "free

pass" for writing it (Dkt. #159, Exhibit 18).

Following this exchange, Hirsch said he was then called to another meeting with Wheeler

and City of Quitman Mayor David Dobbs ("Dobbs") (Dkt. #159, Exhibit 18), which appears to

have occurred on June 5.[1]  There, Wheeler asked Dobbs if Bevill's affidavit was the official

position of the City of Quitman (Dkt. #158, Exhibit 5).  Wheeler further explained that he saw

Bevill's affidavit as "career limiting," and he thought that Quitman PD should have never hired

Bevill (Dkt. #160, Exhibit 2).  Furthermore, Wheeler showed Dobbs a video where he tried to

insinuate that Bevill was a dirty cop (Dkt. #160, Exhibit 2).  Wheeler also apparently stated that

he thought Bevill's affidavit was a "significant problem" because it could be considered

exculpatory evidence.  Fletcher, meanwhile, did not attend the meeting with Wheeler.  But, on

---

[1] On the morning of June 5, Hollen emailed Quitman City Attorney Jim McLeory to notify him that he would "debrief our DA meeting" (Dkt. #160, Exhibit 11).  Besides this reference, there is no evidence in the record that Wheeler or Hollen met with Dobbs.  And Hirsch even testified that that Wheeler and Dobbs did not frequently meet in his office (Dkt. #159, Exhibit 18).

June 5, Fletcher wrote in his personal journal:

> In something I have never seen or heard of . . . a Quitman Police Captain named Terry Bevill signed an affidavit stating that me, Sheriff (Tom Castloo), and the DA (Jim Wheeler) are in a 'dangerous conspiracy' and our close personal relationship prevents a former jail [c]aptain (David McGee) from getting a fair trial.  Completely baseless and a total pile of crap.  *QPD is about to be terminated as a department due to the scurrilous insubordination by a police officer*

(Dkt. #158, Exhibit 13) (emphasis added).

Hollen emailed Quitman City Attorney Jim McLeroy ("McLeroy") and Quitman's outside counsel the next day (Dkt. #160, Exhibit 25).  Hollen noted that he and Dobbs felt several Quitman PD policies were "pertinent," to which, Quitman's counsel responded with a copy of an administrative-leave document that could be used for Bevill (Dkt. #160, Exhibit 25).  A few days later, on June 8, 2017, Quitman PD Chief Kelly Cole ("Cole") attended a meeting at Quitman City Hall with Dobbs, Hollen, and McLeroy (Dkt. #158, Exhibit 8 at p. 6).  Normally, Cole was responsible for all personnel decisions within his department.  The three men, however, presented Cole with Bevill's affidavit and documents that would place Bevill on administrative leave pending an investigation into his conduct (Dkt. #158, Exhibit 8 at pp. 6–7).  Cole then presented Bevill with the administrative-leave documents, and Bevill was suspended while his conduct was investigated (Dkt. #158, Exhibit 14).

The City of Quitman eventually hired an outside attorney to investigate Bevill's actions. After conducting the investigation, Dobbs determined that Bevill should be fired for filing his affidavit (Dkt. #158, Exhibit 8 at p. 17).  Namely, the City found that Bevill violated two Quitman PD policies, which were:

> Chapter 11.20.2 – Members of the Department shall not take part or be concerned, either directly or indirectly, in making or negotiating any compromise or arrangement for any criminal or person to escape the penalty of law.  Employees shall not seek to obtain any continuance of any trial in court out of friendship for the Defendant or otherwise interfere with the courts of justice.  This section shall

not be construed as preventing an employee from cooperating with the city attorney or the prosecuting attorney in altering any charge, or other action, in the furtherance of justice in any case he/she may be concerned with as the arresting or investigating officer.

Chapter 12 (code of conduct standard 4.9) – Peace officers shall at all times conduct themselves in a manner which does not discredit the Peace Officer profession or their employing agency.

(Dkt. #149, Exhibit 2).  Dobbs approached Cole and told him to present Bevill with a termination letter, which Cole voiced his objections to (Dkt. #158, Exhibit 8 at p. 17).  Cole fired Bevill on June 21, 2017.

On June 22, Wheeler, Castloo, and Fletcher attended a Quitman City Council meeting. During the meeting, Castloo expressed frustrations with the lack of response by the City of Quitman in response to Bevill's affidavit.  Notably, Castloo stated that, while the City of Quitman had "taken some steps" by firing Bevill, "more steps need to be taken" to restore trust in the City of Quitman (Dkt. #158, Exhibit 3 at pp. 9–10).

McGee's case ultimately went to trial, and he was found guilty.  At the trial's conclusion, Fletcher issued a warrant for Bevill's arrest on the grounds that he committed aggravated perjury by filing his affidavit.  Fletcher set a $20,000 bond and implemented bond conditions that included Bevill having to forfeit his firearms, abstain from alcohol, submit to drug testing, and obtain written permission to leave Wood County (Dkt. #159, Exhibit 21).  For sixteen months, Bevill's case remained pending, and he eventually was no billed on the charges.

Based on his arrest and termination from Quitman PD, Bevill brought suit against the City of Quitman, Texas, Castloo, Dobbs, Wheeler, Fletcher, and Wood County, Texas under 42 U.S.C. § 1983 (Dkt. #38).  Bevill specifically alleged that Castloo, Wheeler, Fletcher, Dobbs, and the City of Quitman conspired to commit First Amendment retaliation against him.  Bevill also alleged a claim of First Amendment retaliation against Mayor Dobbs and the City of Quitman directly, and

a claim against Wood County for having a policy in place that allowed for First Amendment retaliation.

Castloo, Wheeler, and Fletcher filed a motion to dismiss, raising the defense of qualified immunity and arguing that Bevill failed to allege sufficient facts supporting a conspiracy.[2] *Bevill v. City of Quitman, Tex.*, No. 4:19-CV-406, 2020 WL 1065430, at \*4 (E.D. Tex. Mar. 5, 2020). The Court denied their motions.  *Id.* at \*10.  Thereafter, the relevant defendants appealed, and the Fifth Circuit affirmed.  *Bevill v. Fletcher*, 26 F.4th 270, 284 (5th Cir. 2022).  As a preliminary matter, the Fifth Circuit concluded that Bevill adequately pleaded facts demonstrating the violation of his constitutional rights, and that his rights were clearly established; therefore, Castloo, Wheeler, and Fletcher were not entitled to qualified immunity.  *Id.* at 275–283.  Furthermore, the Fifth Circuit determined that Bevill sufficiently pleaded facts in support of a conspiracy claim.  *Id.* at 284.

On December 20, 2022, Defendants Wood County, Texas, Castloo, Fletcher, Wheeler, and Dobbs filed respective motions for summary judgment (Dkt. #148); (Dkt. #149); (Dkt. #150); (Dkt. #152); and (Dkt. #153).  Defendants, besides Wood County, assert (1) there is no evidence of a conspiracy and (2) qualified immunity applies to Bevill's First Amendment retaliation claims. On January 10, 2023, Bevill responded to Defendants (Dkt. #157); (Dkt. #158); (Dkt. #159); (Dkt. #160); and (Dkt. #161).  Defendants and Bevill then exchanged reply and sur-reply briefing (Dkt. #165);  (Dkt. #166);  (Dkt. #168);  (Dkt. #169);  (Dkt. #170);  (Dkt. #172);  (Dkt. #173); (Dkt. #173); (Dkt. #174); (Dkt. #175).

---

[2] Neither Dobbs nor the City of Quitman filed a motion to dismiss.

In addition, the parties filed two motions pertinent to this Order.[3]  Wheeler filed a motion to strike certain summary judgment evidence presented by Bevill (Dkt. #167), which Bevill responded to (Dkt. #179).  Lastly, Fletcher filed a motion for leave to file a sur sur-reply brief in support of his motion for summary judgment (Dkt. #177).

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment.  *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981) (citations omitted).  The substantive law identifies which facts are material.  *Anderson*, 477 U.S. at 248.  Typically, the party moving for summary judgment has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Id.* at 247.

However, a qualified immunity defense "changes the nature of the summary-judgment burden, how and when the burden shifts, and what it takes to satisfy the burden."  *Joseph v. Bartlett*, 981 F.3d 319, 329 (5th Cir. 2020); *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).  The doctrine of qualified immunity protects government officials from suit "unless their conduct

---

[3] The Court is aware that Bevill has filed another motion seeking to exclude certain evidence regarding Dobbs's alleged "advice of counsel" defense.  The Court does not find such evidence probative to the qualified immunity defense that Dobbs raises, as explained below.  Thus, the Court will address Bevill's motion in a different order.

violates a clearly established constitutional right." *DePree v. Saunders*, 588 F.3d 282, 287 (5th Cir. 2009) (citations omitted). This immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* A plaintiff seeking to defeat qualified immunity must show: "(1) a violation of a constitutional right" and "(2) that the right at issue was clearly established at the time of the violation." *Id.* When a defendant asserts qualified immunity in a motion for summary judgment, "[t]he plaintiff must show that there is a genuine dispute of material fact and that "the plaintiff's version of those disputed facts . . . constitute a violation of clearly established [constitutional] law." *Joseph*, 981 F.3d at 330. Still, the court is to "view[] the facts in the light most favorable to the nonmoving party and draw[] all reasonable inferences in its favor." *Id.* Moreover, the court must consider all of the evidence but refrain from making any credibility determinations or weighing the evidence. *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

Despite their previously futile efforts on appeal, Castloo, Fletcher, and Wheeler reassert that qualified immunity applies to Bevill's claims for First Amendment retaliation given the now undisputed facts of this case. Even if qualified immunity does not apply though, they argue that Bevill has not presented sufficient facts for his conspiracy claim. In tandem with these efforts, Dobbs, for the first time in this case, claims qualified immunity with respect to Bevill's claims against him for First Amendment retaliation and conspiracy to commit First Amendment retaliation. Finally, Wood County argues that Bevill has failed to produce sufficient facts that establish it is liable for the actions of its officials. The Court addresses the viability of Bevill's claims below, but it first turns to the relevant objections made to certain pieces of summary judgment evidence.

## I.     Evidentiary Objections

Wheeler, Wood County, and Castloo have objected, or seek to strike, certain pieces of evidence offered in Bevill's responses to Defendants' motions for summary judgment.  Rule 56 of the Federal Rules of Civil Procedure provides that, if a party asserts a fact is genuinely disputed, he must support that assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." FED. R. CIV. P. 56(c)(1)(A).   "Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible, the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017) (cleaned up) (citations omitted). And the party submitting the evidence must show it "will be possible to put the information into an admissible form." *Campos v. Steves & Sons, Inc.*, 10 F.4th 515, 522 (5th Cir. 2021).   Given these standards, the Court examines the evidentiary challenges here.

### A.   Declaration of Lance Wyatt

Wheeler, Castloo, and Wood County move to strike and/or object to the declaration of Lance Wyatt, which Bevill submitted in response to the motions for summary judgment, because they aver it is not competent summary judgment evidence.[4]   Defendants argue that Wyatt's declaration is impermissible testimony because Wyatt has not demonstrated he has personal knowledge of the matters he attests to.  Wyatt's declaration is attached to a fact-finding document from the Texas Workforce Commission (Dkt. #158, Exhibit 26).   The Workforce Commission

---

[4] "Attacks on the competency of evidence to support a summary judgment motion should be made in an objection under Rule 56(c)(2) of the Federal Rules of Civil Procedure rather than in a motion to strike." *In re TK Boat Rentals, LLC*, 411 F. Supp. 3d 351, 373 (E.D. La. 2019) (citing *Cutting Underwater Techs. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 515 (5th Cir. 2012)).

conducted an investigation into an unemployment benefits claim made by Bevill against the City of Quitman after he was fired (Dkt. #158, Exhibit 26). As part of that investigation, the Workforce Commission recorded statements from both parties, and Hollen told the administrative body that Wheeler "said he would not take anymore [sic] cases from the City" due to Bevill's affidavit (Dkt. #158, Exhibit 26). Citing this document, Wyatt states in his declaration that, "it is clear that the City of Quitman cited to the TWC that District Attorney Wheeler had threatened not to take any more cases from the City as a basis for why Bevill's actions adversely affected the City" (Dkt. #158, Exhibit 26). Defendants argue Wyatt's declaration cannot be considered because he has not reviewed the testimony from Hollen for the City of Quitman regarding his interactions with the Texas Workforce Commission (Dkt. #158, Exhibit 26). They also contend that the Texas Workforce Commission document is hearsay, which Wyatt cannot base his declaration on.

Be that what it may, the Court does not need to consider Wyatt's declaration for purposes of this Order—it can consider the Texas Workforce Commission document alone because it can be presented in an admissible form at trial. More specifically, the document would fall under the public-records exception to hearsay, which provides that a "record or statement of a public office" is admissible if (1) "it sets out . . . in a civil case, factual findings from a legally authorized investigation" and (2) "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." FED. R. EVID. 803(8); *see also Giesler v. Ruiz Food Products, Inc.*, No. 4:08-CV-344, 2009 WL 3261565, at *6 (E.D. Tex. Oct. 8, 2009) (finding report from Texas Workforce Commission to be admissible summary judgment evidence because it falls under hearsay exception for public records). In addition, Hollen's statement about Wheeler's threat is an opposing party statement, so it does not present a hearsay issue as to Wheeler. *See* FED. R. EVID. 801(d)(2)(a). Therefore, the Court will consider the document alone

and does need to opine on Wheeler, Castloo, and Wood County's objections to Wyatt's declaration.[5]

### B. Miles Tucker and Angela Albers's Declarations

Wheeler, Castloo, and Wood County also object to Bevill's use of Miles Tucker ("Tucker") and Angela Albers's ("Albers") declarations on different grounds.  Tucker previously worked in law enforcement in Wood County, and Albers worked in the Wood County District Attorney's Office with Wheeler.

In their declarations, Tucker and Albers speak generally about the close relationships between Fletcher, Castloo, and Wheeler based on their prior experiences with them (Dkt. #158, Exhibits 15–16).  However, Tucker and Castloo also testify about some specific instances of misconduct they suffered while in government service in Wood County.  Tucker, for example, testifies that Castloo had a personal vendetta against him based on a prior transgression while Tucker worked in the Wood County Sheriff's Department.  Based on this experience, as well as his knowledge of Castloo, Wheeler, and Fletcher, he believes Bevill was likely retaliated against.  Similarly, Albers testifies that she previously had to rebuff sexual advances from Wheeler while she worked in the Wood County District Attorney's office.  Because of this, Albers said she feared Wheeler's retaliation, so she started to make covert recordings of private conversations with Wheeler.  In those recordings, Albers says that Wheeler admitted that he and Fletcher had various plans to retaliate against people they had political vendettas against.  Therefore, it is her opinion that Bevill was also likely retaliated against.

---

[5] The Court does not need to address whether the document is properly authenticated at this stage.  At summary judgment, evidence is admissible so long as the document could be presented in an admissible form at trial.  *See Lee*, 859 F.3d at 355.  Wood County and Castloo made similar objections to the document on the grounds it was not properly authenticated.  *See* (Dkt. #166 at p. 3).  The Court overrules those objections.  *See Maurer v. Indep. Town*, 870 F.3d 380, 384 (5th Cir. 2017) ("At the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form.").

Wheeler argues that the two declarations' statements on prior bad acts are subject to Federal Rule of Evidence 404(b), and therefore, inadmissible.  Defendants also offer that the statements regarding likely retaliation are also impermissible lay opinion testimony on matters outside the witnesses' personal knowledge or experience.  Along with those concerns, Defendants contend the declarations provide conclusory allegations, are based on hearsay, and are irrelevant.  To counter, Bevill argues that he is seeking to admit the Defendants' prior acts primarily for the purposes of *Monell* liability on the part of Wood County.  He also argues Defendants' prior bad acts are admissible under Rule 404(b) because they demonstrate motive, intent, or opportunity, and Defendants' other objections should be overruled.

To the extent Bevill is offering the prior bad acts for purposes of Wood County's liability, the Court overrules the objections.  Specifically, the Court will consider Albers and Tucker's declarations as it relates to specific instances of misconduct they testify to. Also, after reviewing the declarations, the Court finds that Albers and Wheeler's declarations are admissible lay opinion testimony with respect to the statements regarding the close relationships of Defendants.  *See* FED. R. EVID. 701.  Lastly, the Court will not consider the previous instances of misconduct referred to by Albers and Tucker in deciding the conspiracy claim against Defendants.  So, it overrules the objections as moot.

### C.  Other Evidentiary Objections

Castloo and Wood County also lodge general hearsay objections to some of Bevill's exhibits, including certain emails offered by Bevill, an internal investigation report performed by the City of Quitman's outside counsel when it interviewed Bevill after he filed his affidavit, and

the June 5, 2017, entry from Fletcher's journal.  After carefully considering the relevant law, and the parties' arguments, the Court overrules these objections.[6]

## II.     Conspiracy to Commit First Amendment Retaliation: Dobbs, Fletcher, Wheeler, and Castloo

Moving on to the merits of Defendants' motions for summary judgment, the Court first starts with the motions presented by Wheeler, Castloo, Fletcher, and Dobbs, and their arguments that they are entitled to summary judgment on Bevill's claim of conspiracy to commit First Amendment retaliation.  Each motion presents slightly different arguments, but the common overlap between the motions is two-fold: (1) there is no factual support to Bevill's allegations of a conspiracy to commit First Amendment retaliation against them and (2) they are entitled to qualified immunity.  Additionally, Wheeler alone argues that he is entitled to absolute immunity, and if he is not, the Eleventh Amendment bars Bevill's conspiracy claim against him in his official capacity.

For a conspiracy claim under section 1983, a plaintiff must prove "(1) the existence of a conspiracy involving state action and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." *Armstrong v. Ashley*, 60 F.4th 262, 280 (5th Cir. 2023) (quoting *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990)).  The Court proceeds to analyze both elements of Bevill's claim—starting with whether there was a violation of a constitutional right.  *Shaw v. Villanueva*, 918 F.3d 414, 419 (5th Cir. 2019) (explaining that a conspiracy claim may not lie if there is no deprivation of a civil right)

---

[6] Castloo and Wood County also argue that certain newspaper articles offered by Bevill are inadmissible hearsay.  The Court does not rely on this evidence in deciding Defendants' present motions.  So, those objections are also overruled as moot.

### A.  Conspiracy Claim

#### i.    Violation of a Constitutional Right

In this case, Bevill claims that Dobbs, Wheeler, Castloo, and Fletcher caused Cole to fire Bevill for exercising his First Amendment rights.   Thus, to establish his First Amendment retaliatory-discharge claim, Bevill must show that "(1) he suffered an adverse employment decision, (2) he spoke as a citizen on a matter of public concern, (3) his interest in the speech outweighs the government's interest in the efficient provision of public services, and (4) the protected speech motivated the adverse employment action."  *Bevill*, 26 F.4th at 275–76.  The first and fourth elements of the claim are not at issue.  Bevill suffered an adverse employment action by being fired, and he was fired because of his affidavit.  Nevertheless, Wheeler and Dobbs aver that Bevill cannot satisfy the second and third elements of his claim.[7]  The Court disagrees.

#### a.    Bevill spoke as a citizen on a matter of public concern.

On the second element of a First Amendment retaliation claim, two inquiries are relevant. *Gibson v. Kilpatrick*, 838 F.3d 476, 481–82 (5th Cir. 2016).  A public employee must first show he was speaking as a private citizen and not as an employee.  *Id.* at 481.  If he spoke as citizen, the public employee's speech is protected so long as his speech "raised a matter of public concern." *Id.* at 482.

Wheeler and Dobbs do not dispute that Bevill spoke as a citizen when he filed his affidavit, and as the Court and the Fifth Circuit concluded earlier in this case, the record still reflects that he did so.  The facts that informed the Court and Fifth Circuit's analysis have not meaningfully changed after discovery.  *See Bevill*, 26 F.4th at 276–279 (finding Bevill did not speak as an employee because, among other reasons, "Bevill sought on his own accord to help a friend outside

---

[7] Fletcher and Castloo do not contest that there has been a constitutional deprivation, but because the discussion is relevant to their qualified immunity defenses, the Court analyzes Defendants' motions together.

of the workplace.  He did not inform anyone at QPD that he intended to submit the affidavit").

However, Wheeler argues that Bevill's affidavit fails on the second inquiry—that is, his speech

did not raise a matter of public concern.

"Speech involves matters of public concern 'when it can be fairly considered as relating to

any matter of political, social, or other concern to the community, or when it is a subject of

legitimate news interest; that is, a subject of general interest and of value and concern to the

public.'"  *Lane v. Franks*, 573 U.S. 228, 241, 134 S. Ct. 2369, 2380 (2014) (internal quotation

marks omitted) (quoting *Snyder v. Phelps*, 562 U.S. 443, 453, 131 S. Ct. 1207, 1216 (2011)).

Public concern is determined by examining the whole record and looking at the speech's content,

form, and context.  *Id.*  Whether speech touches on a matter of public concern is a question of law.

*Buchanan v. Alexander*, 919 F.3d 847, 853 (5th Cir. 2019).

Broadly speaking, the Fifth Circuit has noted that "[t]estimony in judicial proceedings 'is

inherently of public concern.'"  *See Kinney v. Weaver*, 367 F.3d 337, 367 n.35 (5th Cir. 2004) (en

banc) (quoting *Johnston v. Harris Cnty. Flood Control Dist.*, 869 F.2d 1565, 1578 (5th Cir. 1989)).

But, even if the Court focuses on the specific content, context, and form of Bevill's speech, the

Court reaches the same conclusion.  Bevill provided sworn testimony through an affidavit during

a criminal proceeding, which undoubtedly means the context and form of his speech support a

finding that he spoke on a matter of public concern.  *See Lane*, 573 U.S. at 241 (holding that "the

form and context of the speech—sworn testimony—in a judicial proceeding—fortify" the

conclusion that plaintiff's testimony was on a matter of public concern).  As for the content of

Bevill's speech, Bevill testified that Wheeler, Castloo, and Fletcher's personal relationships

inhibited the fairness of McGee's criminal trial.  And, in the Fifth Circuit, "[i]t is well[-]established

that speech exposing or otherwise addressing malfeasance, corruption[,] or breach of the public

trust . . . touches upon matters of public concern." *Graziosi v. City of Greenville Miss.*, 775 F.3d 731, 738 (5th Cir. 2015).  Therefore, the content of Bevill's speech also translates to a finding that he spoke on a matter of public concern.  In turn, Bevill's speech would seemingly be protected under the First Amendment.

However, without citing any precedent, Wheeler and Dobbs argue that Bevill did not speak on a matter of public concern because the record demonstrates that Bevill only signed the affidavit at McGee's request and did so because he was only concerned that McGee would not receive a fair trial.  In other words, he was only concerned with *McGee's* interests—not exposing wrongdoing in Wood County.  The argument goes that, since Bevill had a personal interest in speaking for McGee's benefit, Bevill's speech is unprotected under the First Amendment.

How, and to what extent, an employee's personal interest plays a role in the public-concern analysis is not quite clear under Fifth Circuit precedent.  Occasionally, cases suggest that an employee's interest or motivation in speaking has no impact in the determination.  *See Denton v. Morgan*, 136 F.3d 1038, 1043 (5th Cir. 1998) (citations omitted) ("Neither the accuracy of the speech, nor the motivation of the speaker, plays a role in determining whether the expression involves a matter of public concern."); *Kinney*, 367 F.3d at 361 ("The weight of the First Amendment interest is, of course, not measured solely by the instructors' own personal gain, if any, from speaking.  It is, rather, a function of the social value of that speech.").  But, despite those cases, the Fifth Circuit has seemingly rejected the notion that a speaker's motive is always irrelevant.  *Chavez v. Brownsville Indep. Sch. Dist.*, 135 F. App'x 664, 670 n.1 (5th Cir. 2005) (collecting cases) ("In so far as *Denton* stands for the proposition that the speaker's motivation, *i.e.,* whether the speech is the result of a personal dispute or whether it arises out of civic concern, is always irrelevant to our First Amendment analysis, it is clearly an outlier in our jurisprudence.").

16

In *Chavez*, an unpublished opinion, the Fifth Circuit reviewed "mixed speech" cases where an employee had multiple motivations for speaking. *Id.* at 670–73. The *Chavez* court noted that some panels of the Fifth Circuit analyzed a speaker's motivation under the employer-employee framework, while others recognized that motive impacts the context, content, and form inquiry. *Id.* Ultimately, it found three different ways to analyze how an employee's motive figures into First Amendment protection, but "no single approach" predominated the line of cases. *Id.* at 673. More recently, in *Harris ex rel. Harris v. Pontotoc County School District*, the Fifth Circuit emphasized the critical inquiry in mixed-motive cases is whether the individual spoke "*predominantly* as a citizen . . . ." 635 F.3d 685, 692 (5th Cir. 2011) (emphasis in original) (citation and internal quotation marks omitted).

After carefully considering the cases cited in *Chavez*, as well as *Harris ex rel. Harris*, the Court sees little consistency in the analytical frameworks employed. But, if the Court can glean any principle from this wide swath of cases, it is that when "the speech in question merely touches on an element of personal concern in the broader context of a matter of public concern . . . a court is not precluded from concluding that an employee's speech as a whole addresses a matter of public concern." *Salge v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 186 (5th Cir. 2005) (citation omitted). In that vein, the Court concludes that Bevill still spoke on a matter of public concern here.

Essentially, Wheeler and Dobbs argue that Bevill's speech is not entitled to constitutional protection because it served the benefit of his friend. But they pay no mind to the fact that Bevill (1) did not speak as an employee and (2) the content, context, and form of his speech support that he spoke on a matter of public concern. Moreover, while Bevill certainly spoke at his friend's invitation, he also spoke because he personally believed that Wheeler, Castloo, and Fletcher could not discharge their public duties in a faithful way. *See* (Dkt. #158, Exhibit 6) (internal

investigation report by City of Quitman) ("Mr. McGee indicated that he did not believe a fair trial could be obtained in Wood County and Captain Bevill shared that concern with him.").  At bottom, then, their argument boils down to a simple proposition: Bevill's speech cannot be constitutionally protected merely because he was interested in his friend's criminal case.  But the Court has not found a case where a speaker's motive taints otherwise protected speech, and Defendants have not attempted to cite one themselves.  On the contrary, relevant precedent suggests the opposite.  *See Markos v. City of Atlanta, Tex.*, 364 F.3d 567, 572 (5th Cir. 2004) ("[T]he defendants argue that Markos' speech was primarily intended for the private purpose of protecting his reputation and, based upon this Court's opinions in *Teague* and *Bradshaw,* is thus not entitled to First Amendment protection . . . *Bradshaw* and *Teague* do not support the proposition that motivation is the new litmus test for the matter of public concern analysis, displacing the [the content, context, and form] factors.").  To be sure, the Court acknowledges that Bevill might have had a motivation to help his friend obtain a fair trial, but that simply is insufficient to overcome that the content, context, and form of Bevill's speech tip towards First Amendment protection.  *See id.* at 574 ("[T]he fact that . . . Markos' motivations were partially private is not enough to remove this speech from the realm of public concern.").  Thus, the Court still finds that Bevill's speech is protected.

Wheeler and Dobbs's other arguments are equally unpersuasive.  By way of example, they argue that Bevill's speech was not on a matter of public concern because it violated Quitman PD policies (Dkt. #152 at p. 22).  But employer policies bear no weight on whether an employee spoke on a matter of public concern.  *See Salge*, 411 F.3d at 185 ("Whether the speech in question violates an employer's policy has no relevance to whether the subject matter of the speech is on a matter of public concern.").  Further, Wheeler contends that Bevill's speech did not touch on a matter of public concern because he gave an *opinion* that McGee could not receive a fair trial based on his

knowledge of, and experience with, Castloo, Wheeler, and Fletcher.  Bevill's testimony coming in the form of an opinion does not change the nature of his speech.  *See Kinney*, 367 F.3d at 341–42, 367 (holding police officers testified on a matter of public concern when they gave *opinion testimony* that Kerrville Police Department officers had used excessive force and that Kerrville Police Department failed to implement proper policies).

Consequently, the Court's stance has not changed.  The record establishes that Bevill spoke as a citizen on a matter of public concern.

### b.  Bevill's interest in his speech outweighs the government's interest.

Next, the Court considers whether Quitman PD "had an adequate justification for treating [Bevill] differently from any other member of the general public."  *Garcetti v. Ceballos*, 547 U.S. 410, 418, 126 S. Ct. 1951, 1958 (2006).  Engaging in this inquiry requires the Court to "strike a balance between 'the interests of [Bevill], as a citizen, in commenting upon matters of public concern and the interest of [Quitman PD], as an employer, in promoting the efficiency of the public services it performs through its employees.'"  *Graziosi*, 775 F.3d at 740 (quoting *Pickering v. Bd. of Ed. of Tp. High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563, 568, 88 S. Ct. 1731, 1734–35 (1968)).  In this context, relevant government interests include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary."  *Id.* (internal bracket omitted) (quoting *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S. Ct. 2891, 2899 (1987)).  However, the "more central a matter of public concern is to the speech at issue, the stronger the employer's showing of counter-balancing governmental interests must be."  *Coughlin v. Lee*, 946 F.2d 1152, 1157 (5th Cir. 1991).

As it did earlier in this case, the Court finds that Bevill's interests outweighed his employer's interest here.  Bevill's interest in speaking about potential malfeasance among public

officials in Texas's criminal justice system is undoubtedly high, and Defendants have not identified an interest that would overcome Bevill's right to speak.  *See Bevill*, 26 F.4th at 279 n.4 (quoting *Breaux v. City of Garland*, 205 F.3d 150, 157 n.10 (5th Cir. 2000)) ("Fifth Circuit precedent indicates that testimony about potential malfeasance in Texas's criminal justice system 'outweighs the government's interest in efficiency.'").   Therefore, Bevill has established a violation of his constitutional rights.

### ii.    Evidence of a Conspiracy

Because Bevill has established a deprivation of his constitutional rights, the Court turns to whether there is a genuine dispute of material fact as to whether a conspiracy existed among Defendants to retaliate against Bevill.  *Armstrong*, 60 F.4th at 280 ("In order to prevail on a section 1983 conspiracy claim, a plaintiff must establish (1) the existence of a conspiracy involving state action and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy.").  "A conspiracy may be charged under section 1983 as the legal mechanism through which to impose liability on all of the defendants without regard to who committed the particular act . . . ."  *Hale*, 45 F.3d at 920.  To prove the existence of a conspiracy, the plaintiff "must bring forward 'facts tending to show that the defendants entered into an agreement to deprive him of his rights.'"  *Imani v. City of Baton Rouge*, 614 F. Supp. 3d 306, 373–74 (M.D. La. 2022) (internal brackets omitted) (quoting *Leggett v. Williams*, 277 F. App'x 498, 501 (5th Cir. 2008)).

A conspiracy may be proven by direct or circumstantial evidence.  *Mack v. Newton*, 737 F.2d 1343, 1350 (5th Cir. 1984) (citations omitted).  Evaluating this evidence, the Court must be mindful of certain principles:

> Since conspiracies . . . are rarely evidenced by explicit agreements, the determination of whether a conspiracy existed almost inevitably rests on the inferences that may fairly be drawn from the behavior of the alleged conspirators. At a minimum, their actions, to support a finding of a conspiracy, must suggest a commitment to a common end.  The circumstances must be such as to warrant a

> jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.

*Id.* (cleaned up) (quoting *Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1043 (2d Cir. 1976)).  While direct evidence of an agreement is not required, plaintiffs "must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective." *Hinkle v. City of Clarksburg, W.Va.*, 81 F.3d 416, 421 (4th Cir. 1996) (citations omitted).  Circumstantial evidence can include "that the alleged conspirators did or said something to create an understanding, the approximate time when the agreement was made, the specific parties to the agreement, the period of the conspiracy, or the object of the conspiracy." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 295 (3d Cir. 2018) (cleaned up) (citation omitted).

Since the existence of a conspiracy "may involve questions of motive or intent, summary judgment is often inappropriate in a section 1983 conspiracy case." *Montgomery v. Hughes*, 716 F. Supp. 261, 263 (S.D. Miss. 1988).  "Therefore, a party can only overcome an allegation of conspiracy at summary judgment when 'the moving parties' submissions foreclose the possibility of the existence of certain facts from which it would be open to a jury to infer from the circumstances that there had been a meeting of the minds.'" *Baker v. Benton Area Sch. Dist.*, 418 F. Supp. 3d 17, 52–53 (M.D. Pa. 2019) (quoting *Anderson*, 477 U.S. at 249).  That said, "a mere scintilla of evidence is insufficient to present a question for the jury, and there must be a conflict in substantial evidence to create a jury question." *Mack*, 737 F.2d at 1350 (cleaned up) (citation omitted).  Namely, "a jury may not rest its verdict on speculation and conjecture . . . and the jury's freedom to draw inferences from the evidence does not extend so far as to allow a wholly unreasonable inference or one which amounts to mere speculation and conjecture." *Id.* (cleaned up) (citations omitted).

For their part, Defendants argue that there is no evidence of any agreement, direct or otherwise, between them that Bevill should be fired for filing his affidavit.  Specifically, Defendants deny ever communicating to each other that Bevill should be fired for his affidavit.  However, viewing the evidence in the most favorable light to Bevill, the Court finds sufficient circumstantial evidence in the record to create a genuine dispute of material fact for the jury.

As a starting point, there is evidence that Wheeler, Castloo, and Fletcher shared a close working relationship (Dkt. #161, Exhibit 2) (testimony of Angela Albers) (noting Castloo, Fletcher, and Wheeler's close working relationship); (Dkt. #157, Exhibit 2) (testimony of Miles Tucker) (attesting to close relationships of Wheeler and Fletcher).  Of course, friendship alone is insufficient for a finding of conspiracy, *see Morales v. Carrillo*, No. EP-19-CV-217-KC-ATB, 2022 WL 4075254, at *9 (W.D. Tex. Sept. 2, 2022), but it is probative in the consideration.  *See United States v. Harris*, 932 F.2d 1529, 1534 (5th Cir. 1991) (citation omitted) ("[E]vidence of a pre-existing relationship between parties is relevant in determining whether they were engaged in a conspiracy.").  On top of this, Wheeler, Castloo, and Fletcher all viewed Bevill's affidavit as damning on their credibility in some way—suggesting a possible motivation to retaliate against Bevill for his speech.  *Cf. Montgomery v. Walton*, 759 F. App'x 312, 315 (5th Cir. 2019) (dismissing conspiracy claim in part because there was no "common motive" for why Defendants would retaliate against plaintiff).  With that being said, the Court turns to the evidence here.

After Bevill filed his affidavit, there is evidence that Defendants discussed Bevill's affidavit, including communications linking Defendants to one another.  For example, Wheeler and Castloo texted about the affidavit, and Castloo forwarded the affidavit to Hollen just shortly thereafter with the message, "Here it is," implying that the two spoke about the affidavit (Dkt. #159, Exhibit 10).  Hollen and Castloo then had the opportunity to meet the following day

22

at a local fishing tournament and discuss the affidavit in greater detail.  Meanwhile, Fletcher and Wheeler had a private meeting on the matter as well.  At Fletcher and Wheeler's meeting, Fletcher even went so far as to state that Bevill should be arrested for his actions (Dkt. #159, Exhibit 18). Thereafter, Wheeler met with Dobbs and asked Dobbs if Bevill's affidavit was the official position of the City of Quitman (Dkt. #158, Exhibit 5).  Wheeler further explained that he saw Bevill's affidavit as "career limiting," and he thought that Quitman PD should have never hired Bevill (Dkt. #160, Exhibit 2).  While it is unclear whether Wheeler said anything else in the meeting, there is evidence that Wheeler also threatened to withhold his support for Quitman PD if Bevill was not terminated.  For example, in the Texas Workforce Commission document, Hollen reported that Bevill was terminated in part because "the District Attorney said he would not take anymore [sic] cases from the City" (Dkt. #160, Exhibit 20).  Fletcher did not attend the meeting with Wheeler.  But, puzzlingly, on June 5, Fletcher wrote in his personal journal:

> In something I have never seen or heard of . . . a Quitman Police Captain named Terry Bevill signed an affidavit stating that me, Sheriff (Tom Castloo), and the DA (Jim Wheeler) are in a 'dangerous conspiracy' and our close personal relationship prevents a former jail [c]aptain (David McGee) from getting a fair trial.  Completely baseless and a total pile of crap.  *QPD is about to be terminated as a department due to the scurrilous insubordination by a police officer*

(Dkt. #158, Exhibit 13) (emphasis added).

After Dobbs's meeting with Wheeler, Hollen emailed McLeroy and Quitman's outside counsel the following morning (Dkt. #158, Exhibit 25).  Hollen noted that he and Dobbs felt several Quitman PD policies were "pertinent," to which, Quitman's counsel responded with a copy of administrative leave document that could be used for Bevill (Dkt. #158, Exhibit 25).  Later that week, Hollen and Dobbs met with Cole and told him to place Bevill on administrative leave (Dkt. #160, Exhibit 8).   Furthermore, before the City of Quitman ended its investigation into Bevill's conduct, Hollen emailed Dobbs and the City's attorney, McLeroy, and asked when

"Mayor [Dobbs] should reconnect with the DA, Sheriff, etc. and should we divulge regarding our actions?" (Dkt. #160, Exhibit 18).

From this evidence, the jury could infer that the individual Defendants reached an agreement, expressly or tacitly, that Bevill should be fired for filing his affidavit.  Defendants shared multiple conversations on Bevill's affidavit, including Dobbs and Wheeler's specific conversation about Bevill's position with Quitman PD. Combining this evidence with Fletcher, Castloo, and Wheeler's notable relationships, and weighing the evidence in Bevill's favor, the Court believes there is a genuine dispute of material fact, and the jury must weigh the credibility of the witnesses on whether an agreement existed to terminate Bevill from his job.  *Compare Thomas v. City of New Orleans*, 687 F.2d 80, 83 (5th Cir. 1982) (finding sufficient evidence of a conspiracy for First Amendment retaliation where there was evidence that defendants met privately and discussed plaintiff's allegations of wrongdoing in police department before plaintiff was fired); *with Montgomery*, 716 F. Supp. at 266 (granting summary judgment where no evidence that (1) alleged co-conspirators talked with defendant that deprived plaintiff of constitutional right about the plaintiff, (2) alleged co-conspirators had any relationship besides employment, or (3) alleged co-conspirators had plan to injure plaintiff).  Therefore, the Court finds that Bevill's conspiracy claims can proceed to the jury.

### B.  Qualified Immunity

Even if there is a genuine dispute as to whether a conspiracy existed to terminate Bevill, Defendants assert they are entitled to qualified immunity.  Once again, as the Court decided earlier in this case, Wheeler, Fletcher, and Castloo are not entitled to qualified immunity on the underlying First Amendment claim.  As for Dobbs, the Court finds that Bevill has overcome the defense at this juncture.

24

Once an official asserts the defense of qualified immunity, the plaintiff must show that (1) the official violated a statutory or constitutional right and (2) the specific right was "clearly established" at that time. *Bevill*, 26 F.4th at 275 (citing *Benfield v. Magee*, 945 F.3d 333, 337 (5th Cir. 2019)).  Bevill has established his constitutional rights were violated.  The question is, thus, whether the contours of his rights were clearly established.

"To answer that question in the affirmative, [the Court] must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Cooper v. Brown*, 844 F.3d 517, 524 (5th Cir. 2016) (quoting *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011)) (en banc)).  But "this does not mean that 'a case directly on point' is required." *Id.* (quoting *Morgan*, 659 F.3d at 372).  Rather, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *Morgan*, 659 F.3d at 372).

"The central concept is 'fair warning.'" *Id.* (quoting *Morgan*, 659 F.3d at 372; *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012)).  "The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Id.* (quoting *Newman*, 703 F.3d at 763).

With respect to the allegations of a conspiracy, the Court finds that there is a genuine dispute of material fact on whether Castloo, Dobbs, Fletcher, and Wheeler are entitled to qualified immunity.  If Defendants were engaged in a conspiracy to influence, and ultimately cause, Bevill's termination from Quitman PD, he would be free from Defendants engaging in this behavior.  As the Fifth Circuit concluded earlier in this case, by the time Bevill was fired on June 21, 2017, it was clearly established that a plaintiff should "be free from governmental officials' exerting their

power or influence over a third-party employer to cause the plaintiff to be terminated for exercising his First Amendment rights." *Bevill*, 26 F.4th at 282–83.  Under Bevill's version of the facts of this case, Defendants influenced Bevill's employer—Quitman PD—to terminate him.  As such, the Court concludes that Defendants are not entitled to qualified immunity on this ground. Castloo, Wheeler, and Fletcher attempt to change the framework at the summary judgment stage and have the Court proceed under a different analytical approach.  It will not.  Defendants were not free to use their positions to cause Bevill to be terminated from his employment.

Dobbs avers, however, that Bevill cannot demonstrate that Bevill's rights were violated because "termination of an officer who voluntarily appeared in court to assist a friend in a criminal proceeding, in contravention of a City policy, was certainly not clearly established as unlawful" (Dkt. #153 at p. 25).  What Dobbs misses though is that Bevill is not required to point to a case with such rigid factual analogies.  *See Cooper*, 844 F.3d at 524.  Instead, existing precedent must have sufficiently put the contours of the right at issue at the time Bevill was terminated in June of 2017.  *See id.*  And such precedent existed.

In 2014, the Supreme Court established that "[t]ruthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes." *Lane*, 573 U.S. at 238.  Of course, there is no debate at this stage that Bevill's testimony was outside the scope of his ordinary duties as a police officer.  So, Dobbs should have known that Bevill's speech was as a citizen.  Furthermore, as early as 2004 in *Kinney v. Weaver*, the Fifth Circuit signaled that "[t]estimony in judicial proceedings 'is inherently of public concern.'" 367 F.3d at 368 n. 35 (collecting cases); *see also Miles v. Beckworth*, 455 F. App'x 500, 505 (5th Cir. 2011) (citations omitted) ("Beckworth contends that Miles's First Amendment retaliation claim is not based on clearly established federal law.  Prior cases, however, have established that testimony

in judicial proceedings are inherently of public concern for First Amendment purposes.").  That Bevill testified on a matter of official misconduct should have further denoted the value of Bevill's speech under the First Amendment.  *See Kinney*, 367 F.3d at 369 ("Given that it is well-established in the jurisprudence of both the Supreme Court and this court that official misconduct is of great First Amendment significance . . . it would have been objectively unreasonable for an officer to conclude that Kinney's and Hall's testimony was anything other than highly valuable speech.").  Lastly, in *Kinney*, the Fifth Circuit made its position clear that, "It is plain that the government cannot harry the employer of an ordinary citizen who gave unwelcome testimony, seeking to have the employee fired in retaliation."  *Id.* at 370.  More specifically, for decades, this Circuit has consistently "condemned retaliation against court testimony, including retaliation against employees who gave testimony adverse to their employers' interests."  *Id.* at 369 (citations omitted).

In light of the foregoing, the Court finds that Wheeler, Fletcher, Castloo, and Dobbs should have known their behavior was in violation of clearly established law under the facts that Bevill has put forward evidence for.  In other words, assuming that Bevill is correct that a conspiracy existed—which the Court finds there is a genuine dispute of material fact about—the behavior would be a violation of Bevill's clearly established First Amendment rights.

Dobbs claiming that he relied on Quitman PD policies in making his recommendation to fire Bevill also does not absolve his conduct in the face of clearly established law.  *See Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 284 (5th Cir. 2003) (citing *Barker v. Norman*, 651 F.2d 1107, 1120 (5th Cir. 1981) ("Davis and Criswell claim that they enforced the school policy in good faith, and as such, their actions were objectively reasonable.  However, if Davis and Criswell knew or should have known at the time they acted that their actions would infringe on Kirke and

Johnson's clearly established rights, their actions are unconstitutional despite their sincere subjective belief that they were acting in good faith."). Dobbs also briefly asserts his actions were objectively reasonable because he relied on the advice of counsel in determining that Bevill should be fired as well. The Court is skeptical that Dobbs's reliance on counsel's advice would otherwise entitle him to qualified immunity. *See In re Cnty. of Erie*, 546 F.3d 222, 229 (2d Cir. 2008) (citation omitted) ("The question of whether a right is 'clearly established' is determined by reference to the case law extant at the time of the violation . . . This is an objective, not a subjective, test, and reliance upon advice of counsel therefore cannot be used to support the defense of qualified immunity."); *Crowe v. Lucas*, 595 F.2d 985, 992 (5th Cir. 1979) ("Reliance on advice of counsel does not serve as an absolute defense to a civil rights action."). Even assuming that the advice of counsel does play a role in the analysis, these are not the circumstances under which Dobbs could invoke it. *But see Brassell v. Turner*, 468 F. Supp. 2d 854, 860 (S.D. Miss. 2006) (cleaned up and citations omitted) ("[M]ost courts recognize that *where the law is unclear*, a police officer is immune if the officer consulted with and relied upon the advice of a county attorney.") (emphasis added). As such, there is no entitlement to qualified immunity here.

### C.  Wheeler's Other Arguments Regarding Conspiracy Claim

Individually, Wheeler also argues that Bevill's claim fails for two more reasons. First, Wheeler claims that prosecutorial immunity applies to his actions. Second, he argues that the Eleventh Amendment bars claims against him in his official capacity. Neither argument is applicable.

#### i.    Wheeler is not entitled to prosecutorial immunity.

As to Wheeler's claim of prosecutorial immunity, the Supreme Court has established that prosecutors are "immune for a civil suit for damages under § 1983." *Imbler v. Pachtman*, 424 U.S. 409, 430, 96 S. Ct. 984, 47 L.Ed.2d 128 (1976). However, prosecutors are not entitled to

immunity simply based on their title, instead courts are to look to the "'functional nature of the activities' of which the plaintiff complains." *McGruder v. Necaise*, 733 F.2d 1146, 1148 (5th Cir. 1984) (citations omitted); *accord Imbler*, 424 U.S. at 431, *Kalina v. Fletcher*, 522 U.S. 118, 126, 118 S. Ct. 502, 139 L.Ed.2d 471 (1997).   It is the prosecutor's burden to establish that the "functional nature of the activities" are protected by prosecutorial immunity.   *Buckley v. Fitzsimmons*, 509 U.S. 259, 274, 113 S. Ct. 2606, 125 L.Ed.2d 209 (1993).

This functional approach "distinguishes between investigatory actions and advocatory ones, with only the latter due absolute immunity." *Wearry v. Foster*, 33 F.4th 260, 266 (5th Cir. 2022) (citations omitted), *cert. denied*, No. 22-857, 2023 WL 3440595 (U.S. May 15, 2023).   "At its core, the advocatory function is one that is 'intimately associated with the judicial phase of the criminal process.'" *Id.* (quoting *Imbler*, 424 U.S. at 430).   But a prosecutor's actions in trial are not the only ones protected; the courts have recognized that "the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom." *Id.* (internal quotation marks omitted) (citations omitted).   "This includes a prosecutor's decision on which witnesses to call and what other evidence to present, and an out-of-court effort to control the presentation of a witness'[s] testimony . . . ." *Mowbray v. Cameron Cnty., Tex.*, 274 F.3d 269, 276 (5th Cir. 2001).   And it also includes the decision of which criminal cases to pursue, and which ones to not.   *Oliver v. Collins*, 904 F.2d 278, 281 (5th Cir. 1990).

Taking this authority, Wheeler argues that he is entitled to absolute immunity for any alleged conduct relating to what prosecutions he chose to pursue or not pursue under the circumstances (Dkt. #152 p. 34).   In other words, assuming Wheeler even did threaten not to take

cases from Quitman if Bevill were not fired, he is immune for making any decisions related to that conduct.  And thus, according to Wheeler, Bevill's conspiracy claim fails.

This argument misses a crucial distinction in the case Bevill is making.  Wheeler is not being sued for his failure to pursue certain criminal cases in Wood County.  Bevill alleges that Wheeler conspired with other officials to retaliate against him and have him terminated from his position at Quitman PD.  At first glance then, the Court does not see how Wheeler's actions are directly intertwined with his prosecutorial role of what cases to take, and which ones to not.  *See Culbertson v. Lykos*, 790 F.3d 608, 627 (5th Cir. 2015) (in case where allegations made that prosecutor caused another employer's termination, court noted that prosecutor's actions were "not the most obvious fit for absolute prosecutorial immunity").

But, in support of his argument, Wheeler relies on two cases from two circuit courts of appeals that warrant discussion.  In one case, *Harrington v. Almy*, the plaintiff, a police officer, sued two prosecutors for violation of his civil rights after he was demoted at the police department. 977 F.2d 37, 39 (1st Cir. 1992).  The plaintiff had been accused of sexually abusing children, but ultimately the charges were dropped against him.  *Id.*  When he was reinstated to his position, the prosecutors in his jurisdiction refused to prosecute any cases that the plaintiff was the arresting officer for.  *Id.*  Under these facts, the First Circuit held that the prosecutors were entitled to absolute immunity because the "conduct of the District Attorney's Office complained of here— 'District Attorney Almy's refusal to prosecute cases brought by Officer Harrington'—is squarely within the scope of" the decisions a prosecutor makes—including what cases to prosecute and what witnesses he finds credible.  *Id.* at 40–41.  Wheeler's other case, *Roe v. City and County of San Francisco*, involved an analogous situation. 109 F.3d 578, 580 (9th Cir. 1997).  The officer there was reassigned after the district attorney's office deemed the officer an uncredible witness,

refused to take any cases from that officer without evidence that corroborated the officer's version of events. *Id.* at 584. The Ninth Circuit found absolute immunity applied because the prosecutor's decision to not take cases falls within the scope of his duties. *Id.*

Wheeler likens his actions to *Harrington* and *Roe* because all he might have done was threaten to not take cases from Quitman. Both cases, however, are distinguishable. Once more, Bevill is not suing Wheeler solely for his decision not to take cases from Quitman—which resulted in his termination—he is allegedly involved in a conspiracy with other officials to have him fired. In *Roe* and *Harrington*, there was no agreement between the prosecutors and anyone else that the plaintiffs should be demoted from their jobs, unlike the case at bar. Also, *Roe* and *Harrington* are factually distinguishable in the sense that they involved the prosecutor's decision not to take cases from a certain officer, not an entire city if Bevill were not fired. Lastly, *Harrington* explicitly declined to rule on the exact situation that confronts the Court here—a prosecutor's potential advice and/or agreement that the officer be terminated from his job. *See Harrington*, 977 F.2d at 40 n.2 ("Harrington's statement of issues on appeal as to the District Attorney defendant only addresses 'the refusal to prosecute cases brought by Officer Harrington.' Accordingly, we do not confront any other actions, including advice to City Manager Cole, undertaken by the District Attorney regarding Harrington.").

For these reasons, the Court concludes that Wheeler has not established he is entitled to absolute immunity. But, in addition, the Court notes that absolute immunity typically does not apply to employment decisions within an officer's own office. *See Forrester v. White*, 484 U.S. 219, 229, 108 S. Ct. 538, 545 (1988). "It would be passing strange to hold that while a prosecutor is not immune from liability for firing his own employees, he is immune for getting others to fire

their employees." *Mikko v. City of Atlanta, Ga.*, 857 F.3d 1136, 1143 (11th Cir. 2017).  Therefore, the Court finds that prosecutorial immunity does not apply to the conspiracy claim here.

### ii.     The Eleventh Amendment does not apply here.

Wheeler also argues that Bevill's conspiracy claim against him in his official capacity is barred by the Eleventh Amendment.  Though Bevill makes passing references to Wheeler acting in his official capacity in his complaint, it does not appear that Bevill is pursuing his claim against Wheeler in that sense.  For example, Bevill's prayer for relief does not mention any relief related to Wheeler's official capacity, and he only seeks monetary damages in his individual capacity (Dkt. #38 at pp. 25–26).  In his response, however, Bevill has not clarified whether he is exploring a claim against Wheeler in his official capacity.  So, the Court will analyze Wheeler's argument.

"To determine whether a defendant is being sued in his or her official or individual capacity, [the Court must] examine the allegations in the complaint, and the course of proceedings." *Robinson v. Hunt Cnty., Tex.*, 921 F.3d 440, 446 (5th Cir. 2019) (cleaned up) (citations omitted).  Considerations include "the substance of the complaint, the nature of relief sought, and statements in dispositive motions and responses." *Harmon v. Dallas Cnty., Tex.*, 294 F. Supp. 3d 548, 569–70 n.5 (N.D. Tex. 2018) (citation omitted), *aff'd*, 927 F.3d 884 (5th Cir. 2019). Here, Bevill has not sought any relief against Wheeler in his official capacity—monetarily or equitably.  He also has not spent any time in his briefing discussing any claims he wishes to pursue against Wheeler in his official capacity, or any other Defendant for that matter.  Bevill's prayer for relief only includes mention of the officials in their individual capacity, and Wheeler (as well as other Defendants) have dedicated most of their briefing to discussing qualified immunity, which does not apply to official-capacity suits.  *See Mangaroo v. Nelson*, 864 F.2d 1202, 1206 (5th Cir. 1989) (noting qualified immunity does not apply to official-capacity claims).

Given Bevill's complaint, as well as his focus on his claims against Defendants in their individual capacities for monetary relief, the Court interprets Bevill's complaint as only relating to claims against Defendants in their individual capacity (except for Wood County and the City of Quitman).  *See Senu-Oke v. Jackson State Univ.*, 521 F. Supp. 2d 551, 557 (S.D. Miss. 2007) (holding plaintiff only intended to pursue claims against defendants in their individual capacities because "plaintiff is suing under § 1983 only for monetary relief and under the law, or reasons given *supra,* he cannot recover such damages from JSU or the defendants in their official capacities. Rather, such relief is only available against the defendants individually"), *aff'd*, 283 F. App'x 236 (5th Cir. 2008).  Accordingly, the Court does not address Wheeler's contentions.

### III.    Retaliation for Exercising First Amendment Rights: Dobbs

Next, Bevill has also filed a claim against Dobbs directly for First Amendment retaliation. In his motion, Dobbs has also moved for summary judgment on the First Amendment retaliation claim against him on the basis of qualified immunity for the same reasons with respect to the conspiracy claim.  For the reasons discussed with respect to the conspiracy claim, Dobbs is not entitled to qualified immunity.  Specifically, Bevill has shown sufficient facts demonstrating (1) a violation of his constitutional rights and (2) that his rights were clearly established under the First Amendment.  Therefore, Dobbs's motion for summary judgment is denied.

### IV.    Policy, Custom that Allows for Harassment, Oppression, and Retaliation: Wood County

Finally, the Court considers Wood County's motion for summary judgment with respect to Bevill's claim that Wood County had a policy of harassment, oppression, and retaliation against its citizens.  When alleging a § 1983 claim, a plaintiff may not establish liability against a government entity through respondeat superior.  *Deville v. Marcantel*, 567 F.3d 156, 170 (5th Cir. 2009) (*citing Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)); *Molina v. Collin Cnty., Tex.*, No. 4:17-CV-00017, 2017 WL 5619847, at *3 (E.D. Tex. Nov. 21, 2017).  Thus, plaintiffs

must prove that the government entity "itself causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell*, 436 U.S. at 694–95). To establish that the government entity caused the constitutional violation, the Fifth Circuit requires a showing that an "official policy" caused the plaintiff's harm. *Deville*, 567 F.3d at 170. The Fifth Circuit has explained that an official policy is:

> 1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

> 2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.

*Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984).

Having considered the evidence presented, the Court finds there is a genuine dispute of material fact on Bevill's claim against Wood County and whether it had a policy allowing for unconstitutional retaliation. Thus, Wood County's motion is denied.

## CONCLUSION

It is therefore **ORDERED** that Defendant Wood County's Motion for Summary Judgment (Dkt. #148), Defendant Tom Castloo's Motion for Summary Judgment (Dkt. #149), Judge Jeffrey Fletcher's Motion for Summary Judgment (Dkt. #150), Defendant James Wheeler's Motion for Summary Judgment (Dkt. #152), Defendant's (David Dobbs) Motion for Summary Judgment (Dkt. #153), Defendant James Wheeler's Motion to Strike Summary Judgment Evidence (Dkt. #167), and Judge Fletcher's Unopposed Motion for Leave to File Sur Surreply (Dkt. #177) are hereby **DENIED.**

**IT IS SO ORDERED.**

**SIGNED this the 1st day of June 2023.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE