# United States Court of Appeals for the Fifth Circuit

———————————

No. 23-40321

———————————

United States Court of Appeals
Fifth Circuit

**FILED**

May 30, 2024

Lyle W. Cayce
Clerk

TERRY BEVILL,

*Plaintiff—Appellee,*

*versus*

JAMES WHEELER, *Former Wood County District Attorney*; JEFFREY FLETCHER; THOMAS CASTLOO, *Wood County Sheriff*; DAVID DOBBS, *City of Quitman Mayor*,

*Defendants—Appellants.*

———————————————————

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 4:19-CV-406

———————————————————

Before KING, HO, and ENGELHARDT, *Circuit Judges*.

KING, *Circuit Judge*:

In 2017, Plaintiff-Appellee Terry Bevill, then a Captain of the Quitman Police Department, signed an affidavit in support of a motion to transfer venue that was filed in a pending criminal proceeding against his friend and former colleague, David McGee. Following an investigation, Quitman Mayor David Dobbs, having concluded that Bevill's voluntary submission of his affidavit violated two Quitman Police Department policies, decided to terminate Bevill's employment. Bevill filed suit pursuant to 42

U.S.C. § 1983, asserting a First Amendment retaliation claim against Dobbs. Bevill further alleged that Dobbs, State District Judge Jeffrey Fletcher, Wood County District Attorney James Wheeler, and Wood County Sheriff Tom Castloo conspired to terminate his employment in retaliation for his speech.

This interlocutory appeal is the second one in this matter. In the first appeal, this court affirmed the district court's denial of the Rule 12(b)(6) motions to dismiss that Sheriff Castloo, DA Wheeler, and Judge Fletcher filed asserting qualified immunity. *See Bevill v. Fletcher*, 26 F.4th 270 (5th Cir. 2022) [hereinafter *Bevill I*]. Two years later, this court is now tasked with reviewing the district court's denial of Defendants-Appellants' motions for summary judgment. We AFFIRM.

## I.

### A.

In 2017, during Bevill's employment with the Quitman Police Department ("QPD"), David McGee was arrested and charged with facilitating and/or permitting the escape of an inmate and tampering with government records while he was employed as an administrator at Wood County Jail. Fearing that he could not receive a fair trial in Wood County, McGee asked Bevill, his friend, to sign an affidavit in support of a motion to transfer venue.

Bevill claims that he shared McGee's concerns about receiving a fair trial. According to Bevill's complaint, McGee's status as a jailer working for the Wood County Sheriff's Department generated pretrial publicity locally and drew the ire of newly elected Sheriff Castloo, who had told Bevill that he hoped McGee would be convicted and put "under the jail" for a long time. Furthermore, based on his personal knowledge and an article published by the *Kilgore News Herald* detailing Judge Fletcher's first 100 days in office, Bevill also believed that Sheriff Castloo had a close relationship with DA

Wheeler, who was prosecuting the case against McGee, and Fletcher, who was the presiding judge.

On June 2, 2017, Bevill signed an affidavit on McGee's behalf providing two reasons for why McGee's motion to transfer venue should be granted: (1) pretrial publicity; and (2) alleged personal relationships between Sheriff Castloo, DA Wheeler, and Judge Fletcher. In relevant part, Bevill attested:

> I believe it will not be possible for DAVID MCGEE to get a fair and impartial trial in Wood County, Texas due to the pre-trial publicity involved in this case and the personal relationship between the Sheriff, the District Attorney, and the Presiding Judge in this matter. I am very familiar with the close relationships between these influential persons, and DAVID MCGEE will be greatly prejudiced by having a trial in Wood County.

> It is not possible for DAVID MCGEE to obtain a fair and impartial trial in Wood County, Texas because there is a dangerous combination against Defendant instigated by influential persons that a fair and impartial trail [sic] cannot be obtained.

Bevill's affidavit sent a spark through the local community. A few hours after the affidavit was filed, DA Wheeler circulated the document to Sheriff Castloo via text message. Castloo testified that the affidavit angered him, as he viewed it as an attack on his integrity. He forwarded the affidavit to Quitman City Administrator/Secretary Greg Hollen with the message, "Here it is . . ." to which Hollen immediately replied, "Wow and our librarian even motorized [sic] it."

While McGee's motion to transfer venue was pending, Judge Fletcher and DA Wheeler purportedly met with Wood County DA Investigator Jerry Hirsch to discuss Bevill's affidavit. According to Hirsch, Fletcher stated that

he intended to charge Bevill with perjury, and that Bevill would not receive a "free pass" for writing it.

DA Wheeler also discussed Bevill's affidavit with Mayor Dobbs. During their meeting, Wheeler purportedly explained that the affidavit would hurt "[Wheeler's] future legal career" and "hurt him financially." Wheeler also showed Dobbs a video of Bevill from a drug bust that occurred decades ago, which Dobbs interpreted as Wheeler's effort to "tie that video evidence to the fact that Captain Bevill was a dirty cop." Judge Fletcher was not in attendance at this meeting. But, in a journal entry dated June 5, 2017, he wrote:

> Must be doing a good job in the 402nd. . . . In something I have never seen or heard of . . . a Quitman Police Captain named Terry Bevill signed an affidavit stating that me, the Sheriff (Tom Castloo), and the DA (Jim Wheeler) are in a "dangerous conspiracy" and our close personal relationship prevents a former jail captain (David McGee) from getting a fair trial. Completely baseless and a total pile of crap. *QPD is about to be terminated as a department due to the scurrilous insubordination by a police officer*.

(emphasis added).

On June 8, 2017, QPD Chief Kelly Cole was summoned to a meeting with Mayor Dobbs, Administrator/Secretary Greg Hollen, and Quitman City Attorney Jim McLeroy. Cole was presented with the affidavit, as well as paperwork to place Bevill on administrative leave. That same day, Bevill was placed on administrative leave pending an investigation into allegations of violations of QPD and City policies.

Following the City's investigation, Mayor Dobbs presented Chief Cole with termination forms for Bevill. Cole understood that "a decision had been made" regarding Bevill's termination, and that in this circumstance he

was stripped of his traditional decision-making authority over disciplinary decisions. Bevill was officially discharged on June 21, 2017. Mayor Dobbs confirmed that Bevill was terminated because of the substance of his affidavit, though he contends that the City's decision to terminate him was made "solely in reliance on advice of counsel." Namely, the City determined that Bevill had violated QPD policies which prohibit employees from "making or negotiating any compromise or arrangement for any criminal or person to escape the penalty of law," "seek[ing] to obtain any continuance of any trial in court out of friendship for the defendant, or otherwise interfer[ing] with the courts of justice," and "discredit[ing] the peace officer profession or their employing agency."

Furthermore, in brief written comments provided to the Texas Workforce Commission in July 2017 as part of Bevill's unemployment benefits proceeding, Administrator/Secretary Hollen indicated that Bevill was terminated for making allegations of illegal activity that were "not true," and that "even the district attorney said he would not take anymore cases from the City."

McGee was ultimately found guilty after trial. At the trial's conclusion, Judge Fletcher issued a warrant for Bevill's arrest on the ground that he had committed aggravated perjury. Bevill's case remained pending for sixteen months, and he eventually was no-billed on the charges.

**B.**

In June 2019, Bevill brought suit against the City of Quitman, Texas, Sheriff Castloo, Mayor Dobbs, DA Wheeler, Judge Fletcher, and Wood County, Texas under 42 U.S.C. §§ 1983 and 1985(2). Bevill alleged that Mayor Dobbs directly retaliated against him for exercising his First Amendment rights. He further alleged that Dobbs, Sheriff Castloo, DA

No. 23-40321

Wheeler, and Judge Fletcher conspired to commit First Amendment retaliation against him.

Castloo, Wheeler, and Fletcher filed motions to dismiss, raising the defense of qualified immunity and arguing that Bevill failed to allege sufficient facts supporting a conspiracy. The district court denied their motions in part. *See Bevill v. City of Quitman*, No. 4:19-CV-406, 2020 WL 1065430 (E.D. Tex. Mar. 5, 2020). These defendants appealed the district court's order denying their motions to dismiss on the basis of qualified immunity, and we affirmed. *See Bevill I*, 26 F.4th at 272–73.

Addressing the viability of Bevill's First Amendment claim, we held that Bevill spoke "as a private citizen, not a public employee" when he submitted his affidavit. *Id.* at 278. We further held that Bevill's interest in his speech outweighed the government's interest in the efficient provision of public services. *Id.* at 279 n.4. Accordingly, we concluded that Bevill "plausibly averred a deprivation of his First Amendment rights." *Id.* at 279. We further held that the defendants were not entitled to qualified immunity, reasoning that our *en banc* decision in *Kinney v. Weaver*, 367 F.3d 337 (5th Cir. 2004), "clearly establishe[d] the right of a plaintiff to be free from governmental officials' exerting their power or influence over a third-party employer to cause the plaintiff to be terminated for exercising his First Amendment rights." *Bevill I*, 26 F.4th at 282–83. Finally, we determined that Bevill had adequately averred a conspiracy claim, i.e., he pleaded sufficient facts to raise a reasonable expectation that discovery would reveal evidence of an illegal agreement. *Id.* at 284.

On December 20, 2022, Defendants Sheriff Castloo, Judge Fletcher, DA Wheeler, and Mayor Dobbs filed motions for summary judgment. Despite their previously unsuccessful efforts on appeal, the individual Defendants, referencing the parties' evidentiary submissions and the

No. 23-40321

undisputed facts of the case, asserted: (1) there is insufficient evidence of a conspiracy among them to terminate Bevill in retaliation for his affidavit; and (2) qualified immunity applies to Bevill's claims. In tandem with these efforts, Mayor Dobbs, for the first time in this case, claimed qualified immunity with respect to Bevill's claims against him for First Amendment retaliation and conspiracy to commit First Amendment retaliation. And DA Wheeler additionally argued that he, as a prosecutor, is entitled to pretrial dismissal on grounds of absolute immunity.

The district court disagreed with Defendants. The court first held that the record supports the conclusion that Bevill's First Amendment rights were violated. The district court went on to find that there is sufficient evidence for a jury to "infer that the individual Defendants reached an agreement, expressly or tacitly, that Bevill should be fired for filing his affidavit." Consistent with this court's prior holding in *Bevill I*, the district court further held that Bevill's constitutional rights were clearly established. Finally, the district court held that DA Wheeler is not entitled to prosecutorial immunity. This appeal followed.

## II.

We begin with jurisdiction and our standard of review. Each Defendant-Appellant asserted the affirmative defense of qualified immunity in his respective motion for summary judgment. The doctrine of qualified immunity "shields public officials sued in their individual capacities 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 328 (5th Cir. 2020) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To prevail against a good faith assertion of qualified immunity, a plaintiff must satisfy a two-pronged test. First, the plaintiff must show that "the official

violated a statutory or constitutional right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Second, the plaintiff must show that "the right was 'clearly established' at the time of the challenged conduct." *Id.* (quoting *Harlow*, 457 U.S. at 818).

The qualified immunity doctrine impacts the scope of this court's appellate jurisdiction in this case. Although "the denial of a motion for summary judgment based upon qualified immunity is a collateral order capable of immediate review, . . . [o]ur jurisdiction is significantly limited, . . . for it extends to such appeals only 'to the extent that [the denial of summary judgment] turns on an issue of law.'" *Kinney*, 367 F.3d at 346 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)).[1] At this interlocutory juncture, this court "cannot challenge the district court's assessments regarding the sufficiency of the evidence—that is, the question whether there is enough evidence in the record for a jury to conclude that certain facts are true." *Cole*

---

[1] As the Supreme Court in *Ashcroft v. Iqbal* explained:

> Though determining whether there is a genuine issue of material fact at summary judgment is a question of law, it is a legal question that sits near the law-fact divide. Or as we said in *Johnson*, it is a "fact-related" legal inquiry. To conduct it, a court of appeals may be required to consult a "vast pretrial record, with numerous conflicting affidavits, depositions, and other discovery materials." That process generally involves matters more within a district court's ken and may replicate inefficiently questions that will arise on appeal following final judgment. Finding those concerns predominant, *Johnson* held that the collateral orders that are "final" . . . turn on "abstract," rather than "fact-based," issues of law.

556 U.S. 662, 674 (2009) (citation sentences omitted) (quoting *Johnson v. Jones*, 515 U.S. 304, 314, 316–17 (1995)).

*v. Carson*, 935 F.3d 444, 452 (5th Cir. 2019) (en banc) (quoting *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015)).

On appeal, several Defendants-Appellants contend that Bevill has produced insufficient summary judgment evidence that a conspiracy to terminate him existed. Bevill claims that this is a sufficiency-of-the-evidence determination that we lack interlocutory appellate jurisdiction to review. Defendants-Appellants offer a different view. They note that while we lack jurisdiction at this juncture to review the *genuineness* of the factual disputes the district court identified, we have jurisdiction to review their *materiality*. *Cunningham v. Castloo*, 983 F.3d 185, 190 (5th Cir. 2020). Defendants-Appellants contend that they are challenging the *legal significance* of the facts disputed by the parties, and that even if we take as true Bevill's version of the facts, those facts are insufficient to support a conspiracy claim *as a matter of law*.

"The distinction between permissible 'materiality' review and impermissible 'genuineness' review can be hazy in practice." *Buehler v. Dear*, 27 F.4th 969, 979 (5th Cir. 2022). For instance, in *Rodriguez v. Neeley*, 169 F.3d 220, 222 (5th Cir. 1999), we held in an interlocutory appeal that, "[g]iving plaintiffs all inferences from the summary judgment record," a trier of fact could not reasonably conclude that there was a conspiracy to deprive the plaintiffs of their constitutional rights.[2] However, in *Kinney v.*

_____

[2] It is worth noting that in *Rodriguez*, we emphasized that there was evidence supporting the conclusion that the defendants engaged in a "coordinated plan" to engage in a sting operation targeting aliens on probation, but that there was insufficient evidence to reasonably conclude that this plan targeted the *plaintiffs*, who were bystanders that were detained as a result of the sting. 169 F.3d at 222. Thus, *Rodriguez* can be understood as focusing on the *materiality* of the disputed evidence rather than its *sufficiency*. In other words, the evidence sufficiently indicated that a coordinated plan among the defendants

*Weaver*, 367 F.3d at 346–49, we squarely addressed the jurisdictional issue disputed by the parties, and our decision there supports Bevill's contention that we lack jurisdiction to consider Defendants-Appellants' sufficiency-of-the-evidence arguments.

Because there is arguably some support for Defendants-Appellants' view of our interlocutory jurisdiction—e.g., *Rodriguez*—our decision in *Kinney* is worth reviewing in detail. *Kinney*, like the case at bar, was an interlocutory appeal of an order denying summary judgment that involved claims of First Amendment retaliation and conspiracy. 367 F.3d at 340. Addressing our jurisdiction on interlocutory appeal, we clarified:

> Whenever the district court denies an official's motion for summary judgment predicated upon qualified immunity, the district court can be thought of as making two distinct determinations, even if only implicitly. First, the district court decides that a certain course of conduct would, as a matter of law, be objectively unreasonable in light of clearly established law. Second, the court decides that a genuine issue of fact exists regarding whether the defendant(s) did, in fact, engage in such conduct. According to the Supreme Court, as well as our own precedents, we lack jurisdiction to review conclusions of the *second* type on interlocutory appeal. Stated differently, in an interlocutory appeal we cannot challenge the district court's assessments regarding the sufficiency of the evidence—that is, the question whether there is enough evidence in the record for a jury to conclude that certain facts are true.
>
> We do, however, have jurisdiction to . . . review the *first* type of determination, the purely legal question whether a given

---

existed, but the *objective* of that coordinated plan was not to deprive the plaintiffs of their constitutional rights.

course of conduct would be objectively unreasonable in light of clearly established law.

*Id.* at 346–47 (internal citations omitted).

Then, addressing the proper standard of review, we acknowledged that "[w]here factual disputes exist in an interlocutory appeal asserting qualified immunity, we accept the plaintiffs' version of the facts as true." *Id.* at 348. We then set forth at length the relevant factual disputes, "together with the district court's concomitant assessment of what facts [were] supported by the plaintiffs' summary judgment evidence." *Id.* For instance, we had to accept the following sufficiency-of-the-evidence conclusions from the district court:

> There is ample evidence in the record for a jury to conclude that the defendants conspired to deter the plaintiffs from testifying in court by boycotting their business. . . .
>
> Plaintiffs' evidence reflects a dogged determination by the defendants to rid Kilgore College of the plaintiffs as instructors in retaliation for speaking out about excessive force by police officers.

*Id.* at 349 (internal citations omitted).

Later in the opinion, we acknowledged that "[m]uch of the argument in the district court concerned the issue of whether the plaintiffs adduced sufficient evidence of a conspiracy." *Id.* at 351. However, "[t]he district court's determination that there was sufficient evidence of a conspiracy [was] not at issue in th[e] interlocutory appeal." *Id.*

Since *Kinney*, this court has repeatedly held that whether a certain defendant is implicated in a conspiracy is a fact issue that we cannot review on an interlocutory appeal reviewing the denial of qualified immunity. For instance, in *Hill v. Gressert*, 705 F. App'x 219, 221 (5th Cir. 2017), we

determined that we lacked interlocutory jurisdiction to address the district court's finding, as a matter of fact, that two defendants were implicated in a third defendant's misconduct that we had previously determined amounted to a violation of the plaintiff's clearly established constitutional rights. In *Morales v. Cardenas*, No. 22-50836, 2023 WL 6442593, at *3 (5th Cir. Oct. 3, 2023), we addressed a defendant's argument that "he [was] entitled to summary judgment because the evidence the district court cited d[id] not permit an inference that he entered into a conspiracy . . . to deprive [the plaintiff] of his civil rights." We determined that this defendant's "arguments only challenge[d] the genuineness of the factual dispute," and that we lacked interlocutory jurisdiction "to consider [his] arguments regarding the genuineness of the district court's factual determinations." *Id.*

Accordingly, Defendants-Appellants' jurisdictional arguments are foreclosed by *Kinney* and its progeny.[3] After reviewing the summary judgment evidence, the district court concluded that "the jury could infer that the individual Defendants reached an agreement, expressly or tacitly, that Bevill should be fired for filing his affidavit." Under *Kinney*, we lack

---

[3] *Cf. Pfannstiel v. City of Marion*, 918 F.2d 1178, 1188 (5th Cir. 1990) ("Our jurisdiction on this special interlocutory appeal is limited to the officers' entitlement to claim [qualified] immunity. Extending our examination past the actions which were alleged to have harmed the plaintiffs to inquire into motive, actual intent, *or agreement to harm* would be improper." (emphasis added)); *Vakilian v. Shaw*, 335 F.3d 509, 519 (6th Cir. 2003) ("On appeal, Shaw argues that Vakilian has failed to put forth sufficient evidence to support a factual finding that a conspiracy existed and that he was motivated by discriminatory animus. Because this is an interlocutory appeal based on qualified immunity, we cannot consider whether Vakilian's evidence is sufficient to present a genuine issue for trial as to the underlying factual elements of his claim."); *Heartland Acad. Cmty. Church v. Waddle*, 595 F.3d 798, 806–08 (8th Cir. 2010) ("We lack [interlocutory] jurisdiction over the Officials' arguments that Heartland adduced insufficient evidence to demonstrate various Officials participated in a conspiracy to harass and intimidate HCA. These fact-intensive arguments amount to nothing more than prohibited 'I didn't do it!' defenses.").

jurisdiction to consider Defendants-Appellants' arguments that there is insufficient evidence for a jury to conclude that they did, in fact, reach such an agreement. *Kinney*, 367 F.3d at 346–47. Thus, our task in this appeal is limited to determining whether such an agreement would be objectively unreasonable in light of clearly established law. *See id.* at 346. For this inquiry, our standard of review is *de novo. Id.* at 349. And, we must view the evidence in the light most favorable to Bevill and draw all reasonable inferences in his favor. *See Bluebonnet Hotel Ventures, L.L.C. v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 276 (5th Cir. 2014).

## III.

Conspiracy claims asserted under § 1983 require plaintiffs to prove "(1) the existence of a conspiracy involving state action and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." *Armstrong v. Ashley*, 60 F.4th 262, 280 (5th Cir. 2023) (quoting *Pfannstiel*, 918 F.2d at 1187). Because a conspiracy claim is not actionable if there is no deprivation of the asserted civil right, *Shaw v. Villanueva*, 918 F.3d 414, 419 (5th Cir. 2019), Defendants-Appellants' arguments regarding the viability of Bevill's First Amendment claim lie at the heart of this interlocutory appeal.

To establish his First Amendment retaliatory-discharge claim, Bevill must show that "(1) he suffered an adverse employment decision, (2) he spoke as a citizen on a matter of public concern, (3) his interest in the speech outweighs the government's interest in the efficient provision of public services, and (4) the protected speech motivated the adverse employment action." *Bevill I*, 26 F.4th at 276. The first and fourth elements of the claim are not at issue on appeal; it is undisputed that Bevill suffered an adverse employment action by being fired, and that he was fired because of his affidavit. However, notwithstanding this court's prior consideration of these issues, albeit on motions to dismiss, Defendants-Appellants maintain that

Bevill cannot satisfy the second and third elements of his claim.

## A.

We begin by addressing the second element—whether Bevill spoke as a citizen on a matter of public concern. As we explained in *Gibson v. Kilpatrick*, 838 F.3d 476, 481–82 (5th Cir. 2016), addressing this issue requires two separate inquiries. First, with respect to the speech at issue, Bevill must show that he spoke as a *citizen* and not as an *employee*. *See id.* at 481. If he spoke as a citizen, Bevill then must show that his speech "raised a matter of public concern." *See id.* at 482.

In this appeal, Defendants-Appellants in their opening briefs do not substantively dispute that Bevill spoke as a citizen when he filed his affidavit. We held that Bevill spoke as a citizen in *Bevill I*, and we agree with the district court that "[t]he facts that informed the [district court's] and [the previous panel's] analysis have not meaningfully changed after discovery."[4]

However, Mayor Dobbs and DA Wheeler contend that, with respect to the second element of a retaliatory-discharge claim, this court in *Bevill I* addressed only whether Bevill spoke as a citizen, rather than as an employee; we did not also decide whether his speech raised a matter of public concern. Relatedly, the district court's March 5, 2020, opinion, addressing the motions to dismiss, indicated that there "d[id] not appear to be any

---

[4] DA Wheeler attempts to relitigate the citizen-versus-employee issue in his reply brief, primarily by arguing that Bevill's affidavit had "significant implications" for QPD and the City of Quitman. In *Bevill I*, we explained that a person speaks as a public employee when he or she makes a statement "pursuant to [his or her] official duties." 26 F.4th at 276 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). Wheeler's arguments regarding the implications of Bevill's speech are better addressed by the *third* element of Bevill's First Amendment retaliatory-discharge claim, discussed below, which requires weighing Bevill's interest in his speech against the government's interest in the efficient provision of public services.

meaningful dispute between the parties as to whether [Bevill's] statements implicated a matter of public concern," so the court did not address that prong of the analysis. Accordingly, our focus in this appeal with respect to the second element of Bevill's retaliatory-discharge claim is addressing whether Bevill's affidavit raised a matter of public concern.

Speech raises a matter of public concern "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Lane v. Franks*, 573 U.S. 228, 241 (2014) (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). "The inquiry turns on the 'content, form, and context' of the speech." *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 147–48 (1983)).

Defendants-Appellants argue that summary judgment evidence has established that Bevill's speech was predominately motivated by his *personal* interests, that is, helping his friend, rather than matters generally considered important or interesting by the public, i.e., exposing bias or wrongdoing in Wood County criminal proceedings. In short, as the district court concluded, Defendants-Appellants' argument "boils down to a simple proposition: Bevill's speech cannot be constitutionally protected . . . because he was interested in his friend's criminal case."

The district court was not persuaded by Defendants-Appellants, reasoning that when "the speech in question merely touches on an element of personal concern in the broader context of a matter of public concern, . . . a court is not precluded from concluding that an employee's speech as a whole addresses a matter of public concern." *Salge v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 186 (5th Cir. 2005). Specifically, the district court emphasized that "while Bevill certainly spoke at his friend's invitation, he also spoke because he personally believed that Wheeler, Castloo, and Fletcher could not

discharge their public duties in a faithful way."

Our cases show that when an employee's speech is "mixed" such that it involves matters of both private and public concern, including mixed "motives," we still employ the "balancing test" approach that is used to evaluate the factors of content, context, and form. *See, e.g., Graziosi v. City of Greenville*, 775 F.3d 731, 737–41 (5th Cir. 2015); *Gibson*, 838 F.3d at 487; *Stotter v. Univ. of Tex. at San Antonio*, 508 F.3d 812, 825–26 (5th Cir. 2007); *Modica v. Taylor*, 465 F.3d 174, 180–81 (5th Cir. 2006); *Chavez v. Brownsville Indep. Sch. Dist.*, 135 F. App'x 664, 669–73 (5th Cir. 2005); *Salge*, 411 F.3d at 186; *Markos v. City of Atlanta*, 364 F.3d 567, 570–74 (5th Cir. 2004); *Teague v. City of Flower Mound*, 179 F.3d 377, 382–83 (5th Cir. 1999). In other words, the mixed nature of the speech is simply an aspect to weigh and consider in each case. *See Markos*, 364 F.3d at 572 (rejecting the proposition that "motivation is the new litmus test for the matter of public concern analysis, displacing the [content, context, and form] factors"). We address the factors of content, context, and form in turn.

Beginning with content, we note that "[i]t is well established that speech exposing or otherwise addressing malfeasance, corruption or breach of the public trust . . . touches upon matters of public concern." *Graziosi*, 775 F.3d at 738; *Lane*, 573 U.S. at 241 ("The content of Lane's testimony—corruption in a public program and misuse of state funds—obviously involves a matter of significant public concern."); *Garcetti*, 547 U.S. at 425 ("Exposing governmental inefficiency and misconduct is a matter of considerable significance."). Given the undeniable importance of a fair trial, as reflected in multiple provisions of the Constitution, in addition to the additional costs and inefficiencies suffered when convictions and sentences must be set aside or redone simply because of procedural deficiencies that could have been remedied at the outset, the public's interest in the content of Bevill's affidavit cannot reasonably be contested.

While we acknowledge Defendants-Appellants' point that Bevill's affidavit addresses only "the concern that McGee may not receive a fair trial," and not "public corruption on a widespread scale," we have held that a public employee's speech drawing attention to one instance of governmental misconduct can be protected by the First Amendment. *See, e.g.*, *Markos*, 364 F.3d at 569, 574 (holding that a police sergeant's speech about the cover-up of a potential excessive-force incident raised a matter of public concern). Furthermore, even if Bevill was motivated in part by a desire to help his friend, his speech nevertheless addressed a "subject undoubtedly of public concern." *See id.* Indeed, the fact that someone raising an issue of governmental misconduct also had a personal interest in redressing that misconduct hardly is surprising, nor is it disqualifying for the purpose of asserting First Amendment protections. *See id.* ("[T]he fact that . . . [the plaintiff's] motivations were partially private is not enough to remove this speech from the realm of public concern.").

Moving on to form and context, the fact that Bevill's speech was in the form of sworn testimony—an affidavit—weighs decisively in favor of his speech being protected. *See Lane*, 573 U.S. at 241 ("Unlike speech in other contexts, testimony under oath has the formality and gravity necessary to remind the witness that his or her statements will be the basis for official governmental action, action that often affects the rights and liberties of others." (quoting *United States v. Alvarez*, 567 U.S. 709, 721 (2012) (plurality opinion))); *Kinney*, 367 F.3d at 367 n.35 (5th Cir. 2004) (collecting cases) ("Testimony in judicial proceedings 'is inherently of public concern.'" (quoting *Johnston v. Harris Cnty. Flood Control Dist.*, 869 F.2d 1565, 1578 (5th Cir. 1989))). The context of Bevill's testimony also is significant, given that his affidavit was submitted in support of a motion filed into the public record of a well-publicized felony criminal proceeding, involving multiple counts of varying criminal acts by an officer entrusted with the custody of prisoners.

These facts fortify the district court's conclusion that Bevill spoke on a matter of public concern.

Accordingly, we agree with the district court that Bevill spoke as a citizen on a matter of public concern. Many of Defendants-Appellants' arguments on this issue ask this court to draw adverse inferences about Bevill's subjective motivations in filing his affidavit. For instance, Mayor Dobbs argues that because Bevill did not advise any City official in advance of his intent to sign an affidavit, or make any effort to convey his allegations of corruption to anyone other than McGee's attorney, Bevill intended to keep the matter private and was not concerned with exposing corruption. We cannot draw such inferences, and iterate that, at this stage, we must credit Bevill's testimony that he truly believed McGee would not receive a fair trial. Furthermore, Bevill's deposition testimony indicates that he knew his affidavit would be public information. Viewing the evidence in the light most favorable to him, Bevill's personal interest in helping his friend does not outweigh the factors that clearly weigh in favor of a determination that Bevill spoke on a matter of public concern—namely, that Bevill provided sworn testimony, in the context of a well-publicized judicial proceeding, that raised an issue of potential governmental misconduct affecting a criminal defendant's right to a fair trial. *See Lane*, 573 U.S. at 241.[5]

---

[5] We briefly note that we agree with the district court's disposition of two of Defendants-Appellants' additional arguments related to this element of Bevill's retaliatory-discharge claim. First, we agree with the district court that Bevill's speech being in the form of opinion testimony does not change the nature of his speech. *See Kinney*, 367 F.3d at 341–42 (holding that police instructors testified on a matter of public concern when they gave opinion testimony that Kerrville Police Department officers had used excessive force and that the Kerrville Police Department failed to implement proper policies). Second, the district court correctly rejected Defendants-Appellants' assertion that Bevill's speech did not address a matter of public concern simply because it violated QPD policies. *See Salge*,

## B.

We next turn to the third element of Bevill's First Amendment retaliatory-discharge claim, which requires us to determine whether Bevill's interest in his speech outweighed the government's interest in the efficient provision of public services. *Bevill I*, 26 F.4th at 276. The *Pickering* balancing test undertaken by courts to address this element of a First Amendment retaliatory-discharge claim seeks to "promote the individual and societal interests that are served when employees speak as citizens on matters of public concern *and* to respect the needs of government employers attempting to perform their important public functions." *Garcetti*, 547 U.S. at 420 (emphasis added) (discussing *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568–69 (1968)). "So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Id.* at 419. The Supreme Court has previously recognized as pertinent considerations "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987).

In considering Defendants-Appellants' motions for summary judgment, the district court, as it previously had, determined that Bevill's interest in his speech regarding potential malfeasance in Texas's criminal justice system outweighed the government's interest, particularly relative to

---

411 F.3d at 185 ("Whether the speech in question violates an employer's policy has no relevance to whether the subject matter of the speech is on a matter of public concern.").

only hypothetical, unrealized adverse consequences of Bevill's affidavit. In *Bevill I*, this court reached the same conclusion. Specifically, we noted:

> [O]ur conclusion that Bevill has shown that his interest in the affidavit outweighs the government's interest is further buttressed by the realization that Defendants raise hypothetical, not actual, effects of Bevill's speech on the ability of Quitman to provide public services. But "[r]eal, not imagined, disruption is required." *See Branton v. City of Dallas*, 272 F.3d 730, 741 (5th Cir. 2001) (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1115 (9th Cir. 1983)). Regardless, if Defendants had identified actual effects, Fifth Circuit precedent indicates that testimony about potential malfeasance in Texas's criminal justice system "outweigh[s] the government's interest in efficiency." *See Breaux v. City of Garland*, 205 F.3d 150, 157 n.10 (5th Cir. 2000).

*Bevill I*, 26 F.4th at 279 n.4.

In the present appeal, we see little reason to disturb this prior holding. DA Wheeler is the only Defendant-Appellant who attempts to substantively relitigate this issue, and he again raises only hypothetical harms, including "bring[ing] discredit upon the City and tarnish[ing] the image of the City and City Police Department by creating the appearance of ties to this type of unlawful behavior."[6] Wheeler further alleges that Bevill's affidavit could "jeopardize prosecutions of future criminal cases in Wood County" by requiring the prosecution to disclose, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), Bevill's affidavit "for any trial involving the prosecution of a criminal defendant where Bevill's testimony, or potentially any Quitman police officer, [would be] required in light of the fact that this testimony was

---

[6] Notably, Mayor Dobbs, despite having not been a party to the prior appeal, and despite being the person who decided to terminate Bevill's employment, does not address the third element of Bevill's First Amendment retaliatory-discharge claim.

made by the Captain of its Police Department."

DA Wheeler fails to provide evidence that would justify reaching a different outcome at summary judgment than at the motion to dismiss stage. As noted above, we concluded in *Bevill I* that, even "if Defendants had identified actual effects, Fifth Circuit precedent indicates that testimony about potential malfeasance in Texas's criminal justice system 'outweigh[s] the government's interest in efficiency.'" 26 F.4th at 279 n.4 (quoting *Breaux*, 205 F.3d at 157 n.10). In any event, however, Wheeler's arguments are too speculative to hold at summary judgment that the government's interests outweighed Bevill's interest in his speech. For instance, it is not evident that any uncertainty regarding the City's official position, or that of the police chief or the remainder of the police department, could not be clarified and addressed as warranted. As we noted in *Kinney*, "[d]isruption is always possible, but to give deference to unfounded predictions of harm would allow the government arbitrarily to punish speech under the guise of preempting disruption." 367 F.3d at 364. Thus, at summary judgment, these predictions of harm do not convince us that the *Pickering* calculus weighs in DA Wheeler's favor. *See id.* at 364–65 (holding that genuine disputes of material fact regarding the government's concerns with disruption caused by the plaintiffs' speech precluded summary judgment).

\*　　\*　　\*

On this instant record, Bevill has borne his summary judgment burden relative to establishing that he suffered a deprivation of his First Amendment rights. We next turn to the second step of our qualified immunity analysis, and ask whether it would have been apparent to reasonable officials holding Defendants-Appellants' positions at the time of the alleged violation that Defendants-Appellants' conduct violated the First Amendment.

## C.

As noted above, once an official asserts the defense of qualified immunity, the plaintiff must show that "(1) the official violated a statutory or constitutional right, and (2) the right was 'clearly established' at the time." *Bevill I*, 26 F.4th at 275 (citing *Benfield v. Magee*, 945 F.3d 333, 337 (5th Cir. 2019)). A defendant "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014). "It is not necessary, of course, that 'the very action in question has previously been held unlawful.'" *Ziglar v. Abbasi*, 582 U.S. 120, 151 (2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). But, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741.

In this appeal, Mayor Dobbs argues that the district court erred in determining that, at the time of Bevill's termination, there was clearly established law indicating that terminating the employment of a similarly situated individual acting under similar circumstances would violate that individual's First Amendment rights. According to Dobbs, the relevant circumstances involve a police captain knowingly violating a departmental procedure—by voluntarily signing an affidavit without regard for the truthfulness of the sworn statements contained therein—to assist a friend in obtaining a continuance of a criminal trial date. We agree with the district court that Bevill is not required to point to a case with such rigid factual analogies, and that existing precedent provided sufficient notice to Dobbs that a public employee's opinion testimony alleging governmental misconduct, made as a citizen in a judicial proceeding, is protected speech.

No. 23-40321

As the district court explained, this court held in *Kinney* that it was clearly established that "[t]estimony in judicial proceedings is inherently of public concern." 367 F.3d at 367 n.35 (internal quotation omitted) (collecting cases); *see also Miles v. Beckworth*, 455 F. App'x 500, 505 (5th Cir. 2011) ("Prior cases . . . have established that testimony in judicial proceedings are inherently of public concern for First Amendment purposes."). We further noted, in *Kinney*, that "it is well-established in the jurisprudence of both the Supreme Court and this court that official misconduct is of great First Amendment significance." 367 F.3d at 369. Considering these principles, plus our prior holding in *Bevill I* that *Kinney* is sufficiently factually similar to the case at bar to clearly establish Bevill's First Amendment rights, we find that Mayor Dobbs had "fair warning" that terminating Bevill for providing opinion testimony alleging official misconduct in a judicial proceeding would violate Bevill's First Amendment rights. *See Kinney*, 367 F.3d at 350 (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)).

Turning to Bevill's conspiracy claim, which applies to all Defendants-Appellants in this appeal, we note that in *Bevill I*, we addressed Bevill's conspiracy claim against Judge Fletcher, Sheriff Castloo, and DA Wheeler, and, in affirming the denial of their motions to dismiss, held that *Kinney* "clearly establishes the right of a plaintiff to be free from governmental officials' exerting their power or influence over a third-party employer to cause the plaintiff to be terminated for exercising his First Amendment rights." *Bevill I*, 26 F.4th at 282–83. In its subsequent order denying Defendants-Appellants' motions for summary judgment, the district court, considering the evidence in the light most favorable to Bevill, concluded that sufficient evidence exists for a jury to conclude that Defendants-Appellants did, in fact, influence Bevill's employer—QPD—to terminate him.

As discussed above, we lack jurisdiction on interlocutory appeal to review this sufficiency-of-the-evidence assessment. Considering that (1) this

court already substantively addressed whether an agreement to terminate Bevill would constitute a violation of his clearly established constitutional rights, and (2) the district court determined that there is a genuine dispute of material fact regarding whether such an agreement, in fact, existed, we reaffirm our holding in *Bevill I* that Defendants-Appellants are not entitled to qualified immunity on Bevill's conspiracy claim.

Two additional points regarding Bevill's First Amendment retaliatory-discharge claim, however, are worth addressing. First, several Defendants-Appellants point to the district court's conclusion, in its order denying summary judgment, that "[h]ow, and to what extent, an employee's personal interest plays a role in the [second element's] public-concern analysis is not quite clear under Fifth Circuit precedent." Drawing on this language, Defendants-Appellants claim that it was error for the district court to aver that there is no clear-cut, precise approach to determining whether any given speech raises a matter of public concern, but then conclude that the law on this issue was clearly established.

As discussed above, our public-concern analyses consistently employ a balancing test that evaluates the factors of content, context, and form. Our cases discussing "mixed motives" do the same, though how a speaker's personal motives affect the factors of content, context, and form may vary on a case-by-case basis. While it is true that there is a "lack of precision inherent in such a fact-intensive and holistic analysis," *Chavez*, 135 F. App'x at 673, it does not follow that a plaintiff's First Amendment right that implicates a public-concern analysis can never be clearly established. We agree with the district court that pre-June 2017 case law addressing the public concern inherent in allegations of official misconduct and testimony in judicial proceedings clearly established Bevill's First Amendment rights, notwithstanding the fact that our analytical process in reaching public-concern holdings is fact-intensive and holistic.

Second, and finally, we stress that we are holding that Defendants-Appellants are not entitled to qualified immunity at the summary judgment stage, where all evidence and disputed issues of material fact must be viewed in the light most favorable to Bevill. Importantly, we are not granting summary judgment for Bevill. Thus, for disputed issues remaining to be decided at trial, after the presentation of the evidence, the jury, or, where appropriate, the court, may find some or all of the evidence and/or arguments presented by one or more of the Defendants convincing. But at this stage, we hold that Bevill has satisfactorily supported his First Amendment retaliatory-discharge and conspiracy claims to overcome Defendants-Appellants' defenses of qualified immunity at summary judgment.

## D.

We finally address DA Wheeler's contention that the district court erred in concluding that Wheeler did not establish his entitlement to the absolute prosecutorial immunity recognized by the Supreme Court, in *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976), from civil suits seeking damages under § 1983. As an initial matter, prosecutors are not entitled to immunity simply based on their title; instead, courts look to the "'functional nature of the activities' of which the plaintiff complains." *McGruder v. Necaise*, 733 F.2d 1146, 1148 (5th Cir. 1984) (quoting *Imbler*, 424 U.S. at 430). It is the prosecutor's burden to establish that the at-issue activities are protected by prosecutorial immunity. *See Buckley v. Fitzsimmons*, 509 U.S. 259, 274 (1993). This functional approach "distinguishes between investigatory actions and advocatory ones, with only the latter due absolute immunity." *Wearry v. Foster*, 33 F.4th 260, 266 (5th Cir. 2022). "At its core, the advocacy function is one that is 'intimately associated with the judicial phase of the criminal process.'" *Id.* (quoting *Imbler*, 424 U.S. at 430). "This includes a prosecutor's decision on which witnesses to call and what other evidence to present, and an out-of-court effort to control the presentation of a witness's

testimony." *Mowbray v. Cameron County*, 274 F.3d 269, 276–77 (5th Cir. 2001) (cleaned up). And it also includes the decision to pursue—or not pursue—criminal charges. *Oliver v. Collins*, 904 F.2d 278, 281 (5th Cir. 1990).

On appeal, DA Wheeler argues that "the singular basis of Bevill's claim against Wheeler is that Wheeler had threatened to stop prosecuting cases involving the City of Quitman." And, regardless of whether the motivation behind that decision was retaliatory, Wheeler maintains that the conduct about which Bevill complains—deciding which cases he would or would not prosecute—falls squarely within the prosecutorial discretion protected by absolute immunity. Wheeler cites several cases from other circuits to support his claim that prosecutorial immunity applies to blanket decisions not to prosecute cases generally. *See, e.g.*, *Roe v. City & County of San Francisco*, 109 F.3d 578, 584 (9th Cir. 1997) (holding that prosecutors were entitled to absolute immunity for deciding not to prosecute an officer's cases); *Harrington v. Almy*, 977 F.2d 37, 40 (1st Cir. 1992) (holding that a prosecutor's refusal to prosecute cases brought by a particular officer fell within the scope of prosecutorial immunity); *San Agustin v. El Paso County*, No. 18-CV-02646-MEH, 2019 WL 4059167, at *16 (D. Colo. Aug. 28, 2019) (holding that a prosecutor's decision to "refus[e] to use Plaintiff as a trial witness" was entitled to prosecutorial immunity).

These cases, however, are distinguishable from the case at bar. Namely, the cases cited by DA Wheeler involve a prosecutor's *actual decision* to not prosecute cases brought by certain officers or call those officers as witnesses. Such decisions are based on "delicate issues of witness credibility," *Harrington*, 977 F.2d at 41, that "fall[] entirely within a prosecutor's judicial function regardless of whether one case or a line of cases is at issue," *Roe*, 109 F.3d at 584. Viewing the evidence in Bevill's favor, it is difficult to see how *threatening* to categorically not prosecute a particular

*city's* cases implicates the issues of witness credibility that were present in the cases DA Wheeler cites.

We find instructive the Second Circuit's discussion of prosecutorial immunity in *Doe v. Phillips*, 81 F.3d 1204 (2d Cir. 1996). In *Doe*, the court acknowledged the general principle that prosecutors have absolute immunity for decisions to prosecute or forgo prosecution. *Id.* at 1209–10. Still, the court noted that this principle has limitations: A prosecutor could not, for instance, couple a threat of prosecution with demands for bribes or sexual favors. *Id.* at 1210. Accordingly, the court established a principle that a prosecutor cannot couple the threat of a prosecutorial decision with a demand that a certain condition be met, if he "has acted without any colorable claim of authority to impose the condition in question." *Id.* (internal quotation omitted).

This principle applies here. While DA Wheeler may assert prosecutorial immunity in his decisions to prosecute or forgo prosecution generally, this immunity does not cover his alleged act of wielding his prosecutorial authority as a threat to influence a public employment decision over which he had no lawful authority. Such a threat cannot reasonably be considered "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430.[7] We agree with the district court that DA Wheeler is not shielded by absolute prosecutorial immunity.

---

[7] Wheeler also cites his purported concern with the impact of Bevill's affidavit on his disclosure obligations as evidence that he acted at all times pursuant to his duty as a prosecutor. We reiterate that the district court found that there is sufficient evidence for a jury to conclude that Defendants-Appellants reached an agreement to terminate Bevill, a finding that we are bound to abide by on interlocutory appeal. Plus, Wheeler's claim that he met with Mayor Dobbs out of concern for his prosecutorial duties is not clearly corroborated by Dobbs himself, who testified that Wheeler called the meeting to express his anger about the affidavit harming his career and financial future, and to make it known that Bevill had been hired over his objections. At bottom, the parties' dispute over

No. 23-40321

## IV.

In *Bevill I*, we held that (1) Bevill's complaint stated a colorable First Amendment claim, (2) Bevill's First Amendment rights were clearly established, and (3) Bevill adequately averred that Defendants-Appellants had an agreement to violate his constitutional rights. 26 F.4th at 279, 283–84. The summary judgment evidence, when viewed in a light most favorable to Bevill, continues to support the conclusion that Bevill suffered a violation of his clearly established constitutional rights. Furthermore, at this interlocutory juncture, we lack jurisdiction to address the district court's holding that there is a genuine dispute of material fact regarding whether Defendants-Appellants reached an agreement to terminate Bevill. For the foregoing reasons, the order of the district court denying Defendants-Appellants' motions for summary judgment is AFFIRMED.

---

Wheeler's subjective intentions—i.e., legitimate concern over prosecutorial duties versus retaliatory animus—is an issue for the jury to decide.