# United States District Court

## EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| TERRY BEVILL, | § | |
| | § | |
| *Plaintiff,* | § | |
| v. | § | Civil Action No. 4:19-cv-406 |
| | § | Judge Mazzant |
| CITY OF QUITMAN, TEXAS, *et al.* | § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are five post-trial motions: (1) Defendant James Wheeler's Renewed Motion for Judgment as a Matter of Law and Alternatively, Motion for New Trial, and Alternatively for Remittitur (Dkt. #342); (2) Defendant Tom Castloo's Renewed Motion for Judgment as a Matter of Law; or in the Alternative, Motion for New Trial Motion [sic]; or in the Alternative, Motion for Remittitur (Dkt. #345); (3) City of Quitman and David Dobbs' Renewed Motion for Judgment as a Matter of Law or, in the Alternative, New Trial (Dkt. #346); (4) Defendant Judge Jeffrey Fletcher's Renewed Motion for Judgement [sic] as a Matter of Law; or, in the Alternative, Motion for New Trial; or in the Alternative, Motion for Remittitur (Dkt. #348); and (5) Plaintiff's Motion to Modify Final Judgment and Enter Proposed Amended Final Judgment (Dkt. #341). Having considered the Motions, the relevant pleadings, and the applicable law, the Court finds as follows:

1. Defendant James Wheeler's Motion (Dkt. #342) should be **DENIED**;

2. Defendant Tom Castloo's Motion (Dkt. #345) should be **DENIED**;

3. City of Quitman and David Dobbs' Motion (Dkt. #346) should be **DENIED**;

4. Defendant Judge Jeffrey Fletcher's Motion (Dkt. #348) should be **DENIED**; and

5.      Plaintiff's Motion (Dkt. #341) should be **GRANTED in part** and **DENIED in part.**

## BACKGROUND

"When you tear out a man's tongue, you are not proving him a liar, you're only telling the world you fear what he might say."[1] In the words of our Chief Justice, "those words were not written about this case, but they could have been."[2] This case exists because three public officials weaponized the justice system to pursue their personal vendettas against an honest public servant. Plaintiff Terry Bevill ("Bevill"), the former Captain of the Quitman Police Department ("Quitman PD"), submitted an affidavit in support of a motion to transfer in a pending criminal trial. The affidavit alleged that the case should be transferred out of Wood County because three elected officials in that community—State District Judge Jeff Fletcher ("Judge Fletcher"), Wood County District Attorney Jim Wheeler ("DA Wheeler"), and Sheriff Tom Castloo ("Sheriff Castloo")— shared a close personal relationship that prevented the defendant from receiving a fair trial there. They had him fired and arrested in retaliation.

Bevill's career in law enforcement required him to take an oath to defend the United States Constitution. When he exercised his First Amendment rights under it—by calling out public corruption in his hometown—he lost his job and was thrown in jail. The cost of doing the right thing was losing his livelihood, his freedom, and his good name. Bevill's affidavit accused Judge Fletcher, DA Wheeler, and Sheriff Castloo of being a "dangerous combination." According to an eight-person jury of their peers, they were. Because the Court sees no evidence to the contrary

---

[1] GEORGE R.R. MARTIN, A CLASH OF KINGS 122 (1999).

[2] *See Stern v. Marshall*, 564 U.S. 462, 468 (2011) (cleaned up).

after a careful re-examination of the trial record, Defendants' Motions for Judgment as a Matter of Law and New Trial are **DENIED.**

## I.    Factual Background

Bevill is the former Captain of Quitman PD and instructor at the Kilgore Police Academy. In 2017, Bevill's friend and former Wood County Jail Administrator, David McGee ("McGee"), was arrested and charged with facilitating the escape of a Wood County jail inmate and tampering with government records. He was set to stand trial in Wood County, Texas. On June 2, 2017, McGee asked Bevill to sign an affidavit supporting McGee's motion to transfer venue. McGee sought a venue change due to the pretrial publicity of the circumstances surrounding his arrest and the personal relationship between Judge Fletcher, DA Wheeler, and Sheriff Castloo. Judge Fletcher would be presiding over McGee's trial. DA Wheeler would be prosecuting it. To McGee, that mix would deprive him of a fair trial. Bevill shared McGee's belief that the key players' friendships would ensure that McGee would not receive a fair trial in Wood County. Accordingly, on June 2, 2017, Bevill executed an affidavit that stated:

> My name is TERRY BEVILL.  I am currently the Quitman Police Department Captain and the former Jail Administrator for Hopkins County, and a formal investigator with Wood County Sheriff's office.  I am over the age of 18 and competent to make this oath.
>
> I believe it will not be possible for DAVID MCGEE to get a fair and impartial trial in Wood County, Texas due to the pre-trial publicity involved in this case and the personal relationship between the Sheriff, the District Attorney, and the Presiding Judge in this matter.  I am very familiar with the close relationships between these influential persons, and DAVID MCGEE will be greatly prejudiced by having a trial in Wood County.
>
> It is not possible for DAVID MCGEE to obtain a fair and impartial trial in Wood County, Texas because there is a dangerous combination against Defendant instigated by influential persons that a fair and impartial trial cannot be obtained.
>
> This suit should be heard in RAINS County, Texas, where it is possible to obtain a fair and impartial trial.

3

(Pl.'s Ex. 1 at p. 5 ("Bevill Affidavit")). Bevill did not sign the affidavit in his capacity as a Quitman PD officer, nor did he speak with anyone at Quitman PD about signing it (Pl.'s Ex. 6 at p. 2).

Word spread quickly after McGee's attorney filed the motion to transfer venue. The day it was filed, DA Wheeler texted Sheriff Castloo a photograph of the affidavit (Pl.'s Ex. 11). Sheriff Castloo then shared it with Quitman City Secretary, Greg Hollen ("Secretary Hollen"), with an accompanying message: "[h]ere it is" (Pl.'s Ex. 12). The next morning, Sheriff Castloo and Secretary Hollen attended a fishing tournament together, though Sheriff Castloo denies discussing the affidavit any further despite having the opportunity to do so (Dkt. #336 at pp. 145–48).

Meanwhile, at the DA's Office, Wood County DA Investigator Jerry Hirsch ("Investigator Hirsch") discussed the affidavit with DA Wheeler and Judge Fletcher (Dkt. #330 at pp. 165–68). According to Investigator Hirsch, DA Wheeler called him into his office, where Judge Fletcher was waiting (Dkt. #330 at pp. 165–66). There, DA Wheeler presented Investigator Hirsch with the affidavit (Dkt. #330 at pp. 165–67). Investigator Hirsch read it (Dkt. #330 at pp. 165–67). Then, Judge Fletcher told him that he intended to file perjury charges against Bevill (Dkt. #330 at pp. 165–67). As Investigator Hirsch recalls, Judge Fletcher did not believe that Bevill deserved a "free pass" for executing the affidavit (Dkt. #330 at pp. 167–68).

Some time later, Investigator Hirsch met with Mayor Dobbs and DA Wheeler, who requested that Investigator Hirsch be present at the meeting "as a witness" (Dkt. #330 at pp. 173–75). Investigator Hirsch stated that the three of them discussed Bevill's affidavit, though he thought it "unusual" that the sitting district attorney would meet with the sitting mayor to discuss a city employee's affidavit (Dkt. #330 at pp. 174–75). Though Judge Fletcher did not attend the meeting, he made his feelings known on the subject as reflected in the following entry in his personal journal:

> In something I have never seen or heard of . . . a Quitman Police Captain named Terry Bevill signed an affidavit stating that me, the Sheriff (Tom Castloo), and the DA (Jim Wheeler) are in a "dangerous conspiracy" and our close personal relationship prevents a former jail [c]aptain (David McGee) from getting a fair trial. Completely baseless and a total pile of crap. QPD is about to be terminated as a department due to the scurrilous insubordination by a police officer. . . .

(Pl.'s Ex. 28 at p. 1 ("Judge Fletcher's Journal")).

That same day—one business day after Bevill submitted his affidavit—Secretary Hollen began contacting attorneys to search through Quitman PD policies and procedures (Pl.'s Ex. 3 at pp. 5–6). According to Secretary Hollen, he did so based on a hunch that the City of Quitman had a policy preventing its employees from involving themselves or the City in legal proceedings without prior authorization.[3] As it turns out, Secretary Hollen's hunch was correct. The next day, June 6, 2017, Secretary Hollen sent an email to Quitman City Attorney, Jim McLeroy ("McLeroy"), and Quitman's outside counsel, Julia Gannaway ("Gannaway"), stating that after "digging thru [sic] [Quitman PD policies] with the Mayor," several sections were "pertinent" (Pl.'s Ex. 3 at p. 19). Gannaway responded that evening with a draft administrative leave notice to present to Bevill, a draft *Garrity* warning,[4] and a draft internal complaint form (Pl.'s Ex. 3 at p. 18). Thus, as of the evening of June 6, 2017, the decision to place Bevill on leave had already been made.

---

[3]  Mysteriously, Defendants requested a transcript from each day of trial from voir dire to verdict, except the trial proceedings that took place on September 13, 2024, and September 16, 2024 (Dkt. #322; Dkt. #331). During those two days, Angela Albers, Bryan Jeanes, Lance Wyatt, Secretary Hollen, and Judge Fletcher testified. With no transcript to cite, the Court must rely on its recollection of the testimony that took place during those two days.

[4]  A *Garrity* warning is a warning given to a law enforcement officer who is being questioned as part of an internal investigation into their conduct. *See Garrity v. New Jersey*, 385 U.S. 493 (1967). The warning stems from the Fourteenth Amendment protection from coerced statements, which extends to law enforcement officers and other "members of our body politic." *Id.* at 500. "Upon invoking the *Garrity* rule, an officer invokes his right against self-incrimination and any statement made by the officer may only be used for departmental investigation purposes and not for criminal prosecution purposes." *Troxell v. City of S. Houston*, No. Civ.A. H-12-01835, 2013 WL 3965302, at *2 n.14 (S.D. Tex. Aug. 1, 2013) (citing *id.*).

Until that night, Quitman Police Chief, Kelly Cole ("Chief Cole"), had not been involved in the investigation. In fact, according to Chief Cole, though personnel decisions related to hiring, firing, and internal discipline were his "exclusive responsibility," he did not even see Bevill's affidavit (Dkt. #329 at pp. 119–20, 134). That is, until June 8, 2017, when he was called into a meeting at City Hall with Mayor Dobbs, Secretary Hollen, and McLeroy (Dkt. #329 at pp. 119–20, 134). There, along with the affidavit, Mayor Dobbs, Secretary Hollen, and McLeroy presented Chief Cole with administrative leave documents to give to Bevill (Dkt. #329 at pp. 119–20; Pl.'s Ex. 7 at pp. 1–2). They recommended that Chief Cole be the one to place Bevill on leave pending an investigation (Dkt. #329 at p. 121). The documents were already prepared with Secretary Hollen's name on them (Dkt. #329 at pp. 121–22). Chief Cole agreed that leave would be appropriate while the investigation was pending but requested to substitute Secretary Hollen's name for his own, "if we're doing this properly" (Dkt. #329 at pp. 121–22). Everyone agreed (Dkt. #329 at p. 122).

After signing the documents, on June 8, 2017, Chief Cole presented them to Bevill, thereby placing him on administrative leave pending a full investigation into his conduct (Pl.'s Ex. 7 at pp. 3–4). The documents stated that Bevill's affidavit violated two Quitman PD policies (Pl.'s Ex. 7 at pp. 1–2). Also on June 8, Secretary Hollen and the City of Quitman reached out to a third-party city attorney, Blake Armstrong ("Armstrong"), to assist the investigation and interview Bevill and Chief Cole (Pl.'s Ex. 3 at p. 40). The City subsequently hired Armstrong to do just that (Dkt. #330 at pp. 20–22; Pl.'s Ex. 5A at pp. 16–22). On June 12, 2017, in accordance with the administrative leave documents, Bevill provided a written statement regarding his affidavit (Pl.'s Ex. 3; Pl.'s Ex. 7 at pp. 1–2). Chief Cole, in turn, shared that statement with Secretary Hollen so that he could consider it during the investigation (Dkt. #329 at pp. 141–42). However, Chief Cole—the person

"exclusive[ly] responsib[le]" for Quitman PD personnel decisions—was not asked to participate in the investigation (Dkt. #329 at pp. 119–20, 134, 142). That was odd, according to Chief Cole, "since [Quitman PD] had a well-established way [it] did that" (Dkt. #329 at p. 142).

On June 19, 2017, Armstrong interviewed Bevill and Chief Cole (Dkt. #330 at p. 32; Pl.'s Ex. 6). His interview with Bevill revealed why he filed his affidavit in the first place. Beginning with DA Wheeler, Armstrong learned that Bevill did not trust DA Wheeler because of the speed at which McGee's case was proceeding from indictment to trial (Pl.'s Ex. 6 at p. 2). Armstrong discovered that DA Wheeler had falsely accused Bevill of planting evidence on defendants and committing official oppression on multiple occasions (Pl.'s Ex. 6 at p. 2). As to Judge Fletcher, Bevill opined that Judge Fletcher carried a reputation for being tough on crime and imposing harsh sentences (Pl.'s Ex. 6 at p. 2). Regarding Sheriff Castloo, Bevill explained that he thought Sheriff Castloo took "the circumstances involving Mr. McGee personally" and, as a result, he was concerned that McGee may be treated differently than other defendants (Pl.'s Ex. 6 at p. 2). Thus, despite having "no personal knowledge of any sinister or unethical relationship" between Judge Fletcher, DA Wheeler, and Sheriff Castloo, Bevill believed that the circumstances above suggested that McGee would be treated unfairly relative to other, similarly situated defendants if tried in Wood County (Pl.'s Ex. 6 at p. 2). Finally, Bevill told Armstrong that he did not speak with any City of Quitman or Quitman PD representatives before signing the affidavit (Pl.'s Ex. 6 at p. 2).

After interviewing Bevill, Armstrong turned to Chief Cole. During that interview, Armstrong learned that Chief Cole knew nothing of Bevill's affidavit until McLeroy requested the Quitman PD policies and procedures from him (Pl.'s Ex. 6 at p. 3). Chief Cole also "express[ed] some concern that Captain Bevill may be treated unfairly by the District Attorney's office given his

testimony" (Pl.'s Ex. 6 at p. 3). However, Chief Cole "was of the opinion that additional disciplinary action may be warranted and referenced a possible suspension without pay" (Pl.'s Ex. 6 at p. 3). Armstrong's investigation culminated an "Interview Findings Memorandum," which did not even attempt to conclude whether Bevill actually violated any Quitman PD policies or whether he should be terminated (*See* Pl.'s Ex. 6; Dkt. #330 at pp. 48–49).

The investigation concluded on June 21, 2017 (Dkt. #329 at p. 261). That day, Mayor Dobbs, Secretary Hollen, McLeroy, and Gannaway reconvened to discuss the results of their collective investigatory efforts and Armstrong's interviews (Dkt. #329 at pp. 260–61). Ultimately, the four decided to terminate Bevill (Dkt. #329 at pp. 260–61; Dkt. #330 at pp. 36–37). That afternoon, June 21, 2017, at 4:00 p.m., with Mayor Dobbs present, Chief Cole presented Bevill with a Disciplinary Action Form and Findings of Investigation report (Dkt. #329 at pp. 148–49; Pl.'s Ex. 8 at pp. 1–3). As Chief Cole recalls, the goal was to convince Bevill to resign (Dkt. #329 at pp. 148–49; Dkt. #330 at pp. 47–48; *see also* Pl.'s Ex. 3 at p. 45). Bevill refused. Out of options, and despite expressing disagreement with the decision to terminate Bevill (Dkt. #329 at pp. 149–50), Chief Cole presented him with the termination paperwork (Dkt. #330 at p. 48; Pl.'s Ex. 8). Though he denies being "solely" responsible for the decision, Mayor Dobbs was the final decisionmaker behind Bevill's termination (*Compare* Dkt. #330 at pp. 23–24, *with* Dkt. #329 at p. 261). As the termination paperwork reflects, the City determined that Bevill violated two Quitman PD policies:

> Chapter 11, Section 11.20.2 – Members of the Department shall not take part or be concerned, either directly or indirectly, in making or negotiating any compromise or arrangement for any criminal or person to escape the penalty of law. Employees shall not seek to obtain any continuance of any trial in court out of friendship for the Defendant or otherwise interfere with the courts of justice. . . .

> Chapter 12 (code of conduct standard 4.9) – Peace Officers shall at all times conduct themselves in a manner which does not discredit the Peace Officer profession or their employing agency.

8

(Pl.'s Ex. 8 at pp. 2–5).

The day after Bevill's termination, on June 22, 2017, the Quitman City Council publicly convened (Pl.'s Ex. 13 ("Council Meeting Minutes")). As staff members of the Quitman City Council, Chief Cole and Secretary Hollen attended the meeting, with Mayor Dobbs presiding (Council Meeting Minutes at p. 1). DA Wheeler, Judge Fletcher, Sheriff Castloo, and Investigator Hirsch also attended (Council Meeting Minutes at p. 1). After Mayor Dobbs called the meeting to order, he opened the floor to citizen comments (Council Meeting Minutes at p. 1). Sheriff Castloo promptly spoke up to address Bevill's affidavit and shared the following:

> Tonight's comments that I have concern the headlines of the paper about the former jail administrator requesting a change of venue and my exasperation with the City of Quitman and the police department. I understand the second in command down there signed on an affidavit basically saying that [McGee] could not get a fair trial here in Wood County and it was based on the friendship between myself and the district attorney as well as the district judge.
>
> . . .
>
> I understand that there has been action taken but I understand that the City of Quitman has issued no formal response one way or the other as to, if they agree with this, if they do not agree with this, it just leaves it out in the open like they're ambivalent.[5]
>
> . . .
>
> I guess what I want to do here tonight is try to clear the air. I understand you've taken some steps. I understand that maybe more steps need to be taken.
>
> . . .
>
> Second in command that identifies himself as a captain of the police department and former investigator for the Wood County Sheriff's office, former captain of the jail in Hopkins County, to say that a person that is under indictment for four felonies can't get a fair trial in Wood County, makes one wonder. It has a definite effect on our relationship with the police department. It will have an effect on it for some time

---

[5] The transcript that was submitted at trial exclusively to aid the jury stated that this portion of the audio is "inaudible" (Dkt. #306 at pp. 5–6). The Court disagrees. Based upon the Court's review of the audio, the portion that the transcript states is inaudible are unmistakably the words "they're ambivalent" (Council Meeting Audio at 3:24). In any event, the post-trial briefing does not make any argument based upon the portion of the audio that the transcript treats as inaudible.

to come, I'm sure. We need to try to get past this, but I guess what I'm asking you guys to do tonight is to look within yourself and see, does the City of Quitman agree with this type of behavior? If you do, your silence will absolutely identify that. If you don't, I would ask that someone from this council or department head or somebody that represents the City of Quitman issues some type of statement clarifying your stance. Because at this point, there is no stance.

(Pl.'s Ex. 14 ("Council Meeting Audio" at 2:30–5:00) (cleaned up)).

Despite the public uproar, Bevill's affidavit did not help McGee. Judge Fletcher ultimately denied McGee's motion to transfer. As McGee's trial approached, Judge Fletcher continued to write in his journal. In an entry dated June 25, 2017, he called the allegations in Bevill's affidavit "baseless and scurrilous and . . . not true in any way" ( Judge Fletcher's Journal at p. 2). Ironically, he considered Bevill's affidavit to be "[j]ust an effort to thwart our efforts to clean up the county from the corruption that appears to have existed in the county for a very long time" ( Judge Fletcher's Journal at p. 2). He added that he was "shocked at the level of disregard for the rules and the law shown by people in former positions of authority" ( Judge Fletcher's Journal at p. 2).

Then came the McGee trial. On June 26, 2017, the first day of trial, Judge Fletcher wrote in his journal: "McGee trial begins in an hour . . . expect fireworks" ( Judge Fletcher's Journal at p. 3). After a two-day trial, the jury convicted McGee. But the fireworks display was only just beginning. At the conclusion of trial, on his own accord, from the bench, and in open court, Judge Fletcher issued a warrant for Bevill's arrest for aggravated perjury ( Judge Fletcher's Journal at p. 3; Pl.'s Ex. 29; Pl.'s Ex. 32). Judge Fletcher recounted the event in his journal:

> I issued a warrant for the arrest of the Quitman Police Captain (former) for Aggravated Perjury, a 3rd degree felony for the false affidavit he filed in support of the motion to transfer venue. Issued warrant and Bevill to be arrested tomorrow and agrees to turn himself in on a $10,000 bond.

( Judge Fletcher's Journal at p. 3). Bevill turned himself in to the Wood County Sheriff's Department the next day (Dkt. #335 at pp. 174–75). There, Bevill was booked, his possessions were

confiscated, and he was placed in a cell (Dkt. #335 at p. 185). A few hours later, Bevill was released on bond subject to the following conditions: (1) turn over all of his firearms; (2) submit to drug testing every two weeks at a cost of $20 per test; (3) obtain prior written permission from the Wood County Community Supervision Corrections Department or the court before leaving Wood County; (4) report to Wood County Community Supervision and Corrections Department every two weeks; and (5) abstain from the use of alcohol (Dkt. #335 at pp. 179–85; Pl.'s Ex. 32 at p. 3).

Bevill's felony charges sat stagnant in the DA's Office for sixteen months before his case was finally submitted to a grand jury (Pl.'s Ex. 33). While Bevill's case remained in legal limbo, in October of 2018, DA Wheeler submitted his letter of resignation, effective January 1, 2019 (Dkt. #330 at pp. 259–60; Pl.'s Ex. 34J). On October 12, 2018, DA Wheeler surrendered his supervisory control over the DA's Office (Dkt. #330 at p. 261). Days later, Bevill's case was submitted to a grand jury. On October 31, 2018, the grand jury no-billed Bevill on the aggravated perjury charge (Pl.'s Ex. 33). In sum, Bevill submitted an affidavit in hopes of securing a fair trial for his friend. For that, he lost his career and languished in jail, only to later be vindicated by the grand jury's no bill. As a result of his reputational and other injuries, he filed suit.

## II.    Procedural History

### A.    *Bevill I* and *Bevill II*

Seeking recourse from his termination from Quitman PD and his subsequent arrest, Bevill sued the City of Quitman, Mayor Dobbs, Judge Fletcher, DA Wheeler, Sheriff Castloo, and Wood County, Texas, under 42 U.S.C. § 1983 (Dkt. #38). Bevill's operative complaint alleged: (1) First Amendment retaliatory termination against Mayor Dobbs and the City of Quitman; (2) conspiracy to commit First Amendment retaliatory termination against Mayor Dobbs, Judge Fletcher, DA

11

Wheeler, Sheriff Castloo, and the City of Quitman; (3) unconstitutional oppression, intimidation, and retaliation in contravention of the First Amendment against Sheriff Castloo and Wood County; and (4) conspiracy to arrest and prosecute Bevill for his affidavit against Judge Fletcher, DA Wheeler, Sheriff Castloo, and Wood County (Dkt. #38).

Judge Fletcher, DA Wheeler, and Sheriff Castloo moved to dismiss Bevill's Complaint, asserting qualified immunity and arguing that Bevill failed to allege sufficient facts to support a conspiracy under Rule 12(b)(6) (Dkt. #48; Dkt. #49). The Court concluded that Judge Fletcher, DA Wheeler, and Sheriff Castloo were not entitled to qualified immunity on Bevill's § 1983 conspiracy claim (Dkt. #89). The Court also determined that Bevill plausibly stated a claim against Judge Fletcher, DA Wheeler, and Sheriff Castloo for conspiracy to violate his constitutional rights (Dkt. #89). The defendants appealed the Court's denial of qualified immunity. The Fifth Circuit affirmed. *Bevill v. Fletcher*, 26 F.4th 270, 284 (5th Cir. 2022) ("*Bevill I*"). Evaluating the plausibility of Bevill's First Amendment claim, the Fifth Circuit held that Bevill spoke "as a private citizen, not a public employee," when he submitted his affidavit. *Id.* at 278. The Fifth Circuit added that Bevill's interest in his speech outweighed the government's interest in the efficient provision of public services. *Id.* at 279 n.4. Thus, it concluded that Bevill "plausibly averred a deprivation of his First Amendment rights." *Id.* at 279. Next, relying on its prior opinion in *Kinney v. Weaver*, 367 F.3d 337 (5th Cir. 2004), the Fifth Circuit affirmed the Court's denial of qualified immunity, holding that *Kinney* "clearly establishe[d] the right of a plaintiff to be free from governmental officials exerting their power or influence over a third-party employer to cause the plaintiff to be terminated for exercising his First Amendment rights." *Bevill I*, 26 F.4th at 282–83 (cleaned up). Finally, the Fifth Circuit agreed that Bevill plausibly pleaded a conspiracy claim. *Id.* at 284.

After *Bevill I*, the case proceeded to the summary judgment stage. Undeterred by their prior unsuccessful arguments, Judge Fletcher, DA Wheeler, and Sheriff Castloo, and Mayor Dobbs[6] moved for summary judgment, arguing that: (1) there is no evidence of a conspiracy to commit retaliatory termination; and (2) qualified immunity shielded them from their actions (Dkt. #148; Dkt. #149; Dkt. #150; Dkt. #152; Dkt. #153). Additionally, DA Wheeler asserted absolute prosecutorial immunity as a basis for dismissal of Bevill's claims against him (Dkt. #152 at pp. 29–34). The Court denied the Motions (Dkt. #245). In doing so, the Court held once more that Bevill's speech was protected (Dkt. #245 at pp. 14–20). The Court also held that the summary judgment record before the Court supported a finding that his First Amendment rights were violated (Dkt. #245 at pp. 14–20). Evaluating the sufficiency of the evidence on Bevill's conspiracy claim, the Court concluded that a fact issue existed and allowed his conspiracy claim to proceed to a jury (Dkt. #245 at p. 24). And yet again, consistent with its prior analysis, the Court concluded that "Wheeler, Fletcher, and Castloo are not entitled to qualified immunity on the underlying First Amendment claim" (Dkt. #245 at p. 24). As to Mayor Dobbs's newly alleged qualified immunity defense, the Court held that Bevill "overc[a]me the defense at [that] juncture" (Dkt. #245 at p. 24). A second appeal followed. *Bevill v. Wheeler*, 103 F.4th 363 (5th Cir. 2024) ("*Bevill II*").

On appeal, the Fifth Circuit affirmed the Court's denial of summary judgment. *Id.* at 383. Revisiting Bevill's retaliatory-discharge claim, this time at the summary judgment stage, the Fifth Circuit concluded that Bevill had "borne his summary judgment burden relative to establishing that he suffered a deprivation of his First Amendment rights." *Id.* at 379. In the second iteration of

---

[6] Mayor Dobbs did not assert qualified immunity as a defense until the summary judgment stage, when he claimed qualified immunity on Bevill's claims against him for First Amendment retaliation and conspiracy to commit First Amendment retaliation. *Bevill II*, 103 F.4th at 371.

its qualified immunity analysis, the Fifth Circuit determined that "pre-June 2017 case law addressing the public concern inherent in allegations of official misconduct and testimony in judicial proceedings clearly established Bevill's First Amendment rights . . . ." *Id.* at 381. Thus, it determined that Judge Fletcher, DA Wheeler, Sheriff Castloo, and Mayor Dobbs were not entitled to qualified immunity. With the summary judgment chapter closed, trial was finally imminent.

### B.    Trial

On September 9, 2024—after five years of contentious litigation—this case was finally tried to a jury. After six-and-a-half days of trial and a day-and-a-half of deliberations, the jury returned a verdict (Dkt. #312). It found that: (1) Mayor Dobbs terminated Bevill in retaliation for executing his affidavit; (2) Judge Fletcher, DA Wheeler, Sheriff Castloo, Mayor Dobbs, and the City of Quitman conspired to terminate Bevill in retaliation for exercising his affidavit; (3) the City of Quitman maintained a policy, custom, or practice that motivated the decision to terminate Bevill in retaliation for exercising his First Amendment rights; and (4) Wood County did not maintain a policy, custom, or practice that motivated the decision to terminate Bevill in retaliation for exercising his First Amendment rights (Dkt. #312). The jury also found that Sheriff Castloo, DA Wheeler, Judge Fletcher, and Mayor Dobbs acted with malice or reckless indifference in conspiring to terminate Bevill (Dkt. #312 at p. 4). In total, the jury awarded Bevill $18,000,000 in actual damages and $3,350,000 in punitive damages, for a total award of $21,350,000 (Dkt. #312).

The Court entered Final Judgment on the jury's verdict on November 5, 2024 (Dkt. #326). On December 3, 2024, post-trial motions flooded the Court's docket. Bevill filed a Motion to Alter Judgment, requesting that the Court amend its Final Judgment to reference Defendants' joint and several liability and Wood County's responsibility as the entity responsible for Sheriff Castloo's

14

behavior (Dkt. #341). DA Wheeler, Sheriff Castloo, Mayor Dobbs and the City of Quitman, and Judge Fletcher filed separate motions seeking judgment as a matter of law or, in the alternative, a new trial or, in the alternative, remittitur (Dkt. #342; Dkt. #345; Dkt. #346; Dkt. #348). In the weeks that followed, the parties traded responsive briefing (Dkt. #351; Dkt. #352; Dkt. #355; Dkt. #356; Dkt. #357; Dkt. #360; Dkt. #361). Now begins the final, post-trial installment in the trilogy.

## LEGAL STANDARD

### I.    Renewed Motion for Judgment as a Matter of Law

Upon a party's renewed motion for judgment as a matter of law following a jury verdict, the Court should ask whether "the state of proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict." *Am. Home Assurance Co. v. United Space All.*, 378 F.3d 482, 487 (5th Cir. 2004); FED. R. CIV. P. 50(a). "A JMOL may only be granted when, 'viewing the evidence in the light most favorable to the verdict, the evidence points so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at any contrary conclusion.'" *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1261 (Fed. Cir. 2013) (quoting *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 838 (5th Cir. 2004)).

In the Fifth Circuit, a court should be "especially deferential" to a jury's verdict and must not reverse the jury's findings unless they are not supported by substantial evidence. *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012). "Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Threlkeld v. Total Petroleum, Inc.*, 211 F.3d 887, 891 (5th Cir. 2000). A court must not grant judgment as a matter of law "unless the facts and inferences point so strongly and overwhelming in the movant's favor that reasonable jurors could not reach a

contrary conclusion." *Baisden*, 693 F.3d at 498 (citation omitted). But "[t]here must be more than a mere scintilla of evidence in the record to prevent judgment as a matter of law in favor of the movant." *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 606 (5th Cir. 2007).

In evaluating a motion for judgment as a matter of law, a court must "draw all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that [the court] might regard as more reasonable." *E.E.O.C. v. Boh Bros. Constr. Co.*, 731 F.3d 444, 451 (5th Cir. 2013) (citation omitted). However, "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.'" *Id.* at 151 (citation omitted).

## II.    Motion for New Trial

Under Federal Rule of Civil Procedure 59(a), a new trial can be granted to any party to a jury trial on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985). However, "[u]nless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is grounds for granting a new trial . . . At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." FED. R. CIV. P. 61.

16

Defendants seeking a new trial must show that the verdict was against the great weight of the evidence, not merely against the preponderance of the evidence. *Dresser–Rand Co. v. Virtual Automation, Inc.,* 361 F.3d 831, 838–39 (5th Cir. 2004); *Shows v. Jamison Bedding, Inc.,* 671 F.2d 927, 930 (5th Cir. 1982)). A jury verdict is entitled to great deference. *Dresser–Rand Co.,* 671 F.2d at 839. "Weighing the conflicting evidence and the inferences to be drawn from that evidence, and determining the relative credibility of the witnesses, are the province of the jury, and its decision must be accepted if the record contains any competent and substantial evidence tending fairly to support the verdict." *Gibraltar Savings v. LDBrinkman Corp.,* 860 F.2d 1275, 1297 (5th Cir. 1988).

A motion for remittitur is one that seeks "[a]n order awarding a new trial, or a damages amount lower than that awarded by the jury." *Remittitur,* Black's Law Dictionary (11th ed. 2019). "Generally, remittitur is only ordered when the court is 'left with the perception that the verdict is clearly excessive.'" *DHI Grp., Inc. v. Kent*, No. 21-20274, 2022 WL 3755782, at *2 (5th Cir. Aug. 30, 2022) (quoting *Thomas v. Tex. Dep't of Crim. Just.*, 297 F.3d 361, 368 (5th Cir. 2002)).

## III.    Motion to Alter or Amend the Judgment

In the Fifth Circuit, "[a]ny motion that draws into question the correctness of a judgment is functionally a motion under Civil Rule 59(e), whatever its label." *Harcon Barge Co. v. D&G Boat Rentals, Inc.*, 784 F.2d 665, 669–70 (5th Cir. 1986) (en banc) (citing 9 Moore's Federal Practice ¶ 204.12[1] at 4–67 (1985)). "Rule 59(e) serves the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence. . . . Reconsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly." *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004) (internal citations and quotations omitted).

The Fifth Circuit recognizes that Rule 59(e) "favor[s] the denial of motions to alter or amend a judgment." *S. Constructors Grp., Inc. v. Dynalectric Co.*, 2 F.3d 606, 611 (5th Cir. 1993). The rule does not exist to be a vehicle for re-litigating old issues, presenting the case under new theories, obtaining a rehearing on the merits, or taking a "second bite at the apple." *Cabalcante v. United States*, No. 4:16-cv-964, 2021 WL 2894086, at *1 (E.D. Tex. July 9, 2021) (citing *Sequas Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998)). However, it allows a party to "question the correctness of a judgment." *Templet*, 367 F.3d at 478. The rule for reconsideration of a final judgment allows a court to alter or amend a judgment because of (1) an intervening change in controlling law, (2) the availability of new evidence not available previously, (3) the need to correct a clear error of law or fact, or (4) to prevent a manifest injustice. *Schiller v. Physicians Res. Grp., Inc.*, 342 F.3d 563, 567 (5th Cir. 2003).

## ANALYSIS

Unsurprisingly given the six years that this case has been pending and its journey through two appeals, Defendants are dissatisfied with the jury's verdict and attack the trial results on several grounds. The task before the Court is to analyze five post-trial motions—four of which were brought by Defendants,[7] all of whom urge the Court to grant them a new trial or erase the unfavorable verdict against them altogether by entering judgment as a matter of law (Dkt. #342; Dkt. #345; Dkt. #346; Dkt. #348). Alternatively, Defendants seek to remit the jury's damages award against them (Dkt. #342; Dkt. #345; Dkt. #346; Dkt. #348). Though each motion has its own intricacies, they are substantively intertwined. The fifth and final post-trial motion—

---

[7]  For convenience, "Defendants" hereinafter refers to DA Wheeler, Sheriff Castloo, Judge Fletcher, Mayor Dobbs, and the City of Quitman, collectively.

Plaintiff's Motion to Modify Final Judgment—urges the Court to amend its Final Judgment to indicate that Defendants are jointly and severally liable and add Wood County as the entity responsible for its official policymaker, Sheriff Castloo (Dkt. #341). The Court turns first to Defendants' motions, beginning with the Renewed Motions for Judgment as a Matter of Law. Then, the Court will address Defendants' Motions for New Trial and Remittitur, before finally addressing Bevill's Motion to Amend.

### Renewed Motions for Judgment as a Matter of Law

The Court's analysis will proceed in five parts. First, the Court wrestles with the threshold question of waiver. Then, the Court will turn to the merits of Defendants' renewed motions for judgment as a matter of law ("RJMOL Motions"). Defendants take issue with most of the legal and factual determinations that the Court and jury made before and during trial. Defendants' overlapping RJMOL arguments fall under three broad categories: (1) immunity defenses; (2) the extent to which the First Amendment protects Bevill's speech; and (3) the sufficiency of the evidence introduced at trial to support Bevill's conspiracy claim (*See* Dkt. #342; Dkt. #345; Dkt. #346; Dkt. #348). As to the City of Quitman and Mayor Dobbs[8] specifically, the Court must also consider whether Bevill carried his burden to establish that a policymaker for the City caused the alleged First Amendment violation (Dkt. #346 at pp. 4–7).

The Court begins with preservation. "'Any argument made in a renewed motion for judgment as a matter of law under Rule 50(b) must have been previously made in a motion for judgment as a matter of law under Rule 50(a).'" *Innovation Scis., LLC v. Amazon.com, Inc.*, No.

---

[8] For clarity, because the City of Quitman and Mayor Dobbs filed a joint RJMOL Motion (Dkt. #346), when discussing their arguments, the Court will refer to the City of Quitman and Mayor Dobbs collectively as "the Quitman Defendants."

4:18-CV-474, 2021 WL 2075677, at *5 n.4 (E.D. Tex. May 24, 2021), *aff'd*, No. 2021-2111, 2022 WL 2824675 (Fed. Cir. July 20, 2022) (quoting *OneBeacon Ins. Co. v. T. Wade Welch & Assocs.*, 841 F.3d 669, 767 (5th Cir. 2016)). Consequently, "[i]f a party fails to move for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) on an issue at the conclusion of all of the evidence, that party waived both its right to file a renewed post-verdict Rule 50(b) motion and also its right to challenge the sufficiency of the evidence on that issue on appeal." *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 238 (5th Cir. 2001) (internal citations omitted); *see also In re Isbell Records, Inc.*, 774 F.3d 859, 867 (5th Cir. 2014) ("Since a Rule 50(b) motion is technically only a renewal of the Rule 50(a) motion for judgment as a matter of law . . . it cannot assert a ground that was not included in the original motion.") (internal quotations omitted) (cleaned up).

Bevill's position is that certain arguments advanced in Defendants' separate RJMOL Motions (Dkt. #342; Dkt. #345; Dkt. #346; Dkt. #348) are waived because they were not first raised in their Joint Rule 50(a) Motion ("JMOL Motion") (Dkt. #298). Specifically, he argues that DA Wheeler, Sheriff Castloo, and the Quitman Defendants each waived their arguments that there was insufficient evidence to support a punitive damages submission (Dkt. #351 at pp. 8–9) (citing Dkt. #341 at pp. 12–13; Dkt. #345 at p. 17; Dkt. #346 at p. 24). Next, Bevill avers that Sheriff Castloo waived his argument that Bevill failed to prove that Sheriff Castloo, through retaliatory animus, wielded his power as sheriff to convince the City of Quitman to terminate Bevill (Dkt. #351 at p. 9) (citing Dkt. #345 at p. 5). Third, Bevill submits that the Quitman Defendants waived their argument that Bevill did not carry his burden of proving that a policymaker for the City caused the alleged First Amendment violation (Dkt. #351 at p. 9) (citing Dkt. #346 at pp. 4–5). Finally, he asserts that the Quitman Defendants waived their argument that the First Amendment does not

20

protect Bevill's speech because he acted in his official capacity in executing the affidavit (Dkt. #351 at p. 9) (citing Dkt. #346 at p. 8).

After reviewing Defendants' JMOL Motion and hearing transcript (Dkt. #298; Dkt. #324), the Court concludes that only Bevill's first argument—regarding waiver as to punitive damages—has merit.[9] In their oral and written Rule 50(a) Motions, Defendants made no reference to punitive damages as a basis for judgment as a matter of law (*See* Dkt. #298; Dkt. #324). The *only* mention of punitive damages came in the form of a trial brief submitted on September 17, 2024 (Dkt. #297)—the same day that Defendants moved for JMOL orally and in writing (Dkt. #324; Dkt. #298). And that mention is merely a passing one.

The trial brief—styled "James Wheeler's Brief Regarding Jury Charge Instructions and Questions on Punitive Damages"—primarily urges the Court to include a more detailed definition of "recklessness" in its punitive damages instruction and to include a list of factors for the jury to consider in evaluating whether a punitive damages award is appropriate (Dkt. #297). It includes only a single reference to the sufficiency of punitive damages evidence, which appears in the brief's introductory paragraph: "there has been no evidence offered at trial that would support the submission of an exemplary damages question" (Dkt. #297 at p. 1). That will not do. Certainly, if Defendants wanted to challenge the sufficiency of punitive damages evidence as a basis for judgment as a matter of law, they could have done so orally or in writing, instead of in a separate, contemporaneous filing. They did not. Even liberally construed, the Court does not read DA

---

[9] Notwithstanding the fact that Defendants waived their ability to move for RJMOL on the basis that Bevill did not present legally sufficient evidence to submit the punitive damages question to the jury, Defendants move for a new trial because the punitive damages award was against the great weight of the evidence (Dkt. #342 at pp. 27–28; Dkt. #345 at p. 30; Dkt. #346 at pp. 24–25; Dkt. #348 at pp. 26–27). Thus, the Court will address that argument in the Motion for New Trial section of the Opinion. *See infra* at 84–88.

Wheeler's trial brief as asserting a JMOL argument of any kind. Thus, the Court, in its discretion, determines that DA Wheeler, Sheriff Castloo, and the Quitman Defendants waived their challenges to the sufficiency of the evidence to support a punitive damages question by failing to raise it initially in their JMOL Motion. *See, e.g.*, *Davis v. Fort Bend Cnty.*, 765 F.3d 480, 487 n.1 (5th Cir. 2014) (citing *Levy Gardens Partners 2007, L.P. v. Commonwealth Land Title Ins. Co.*, 706 F.3d 622, 633 (5th Cir. 2013)); *In re Depuy Orthopaedics, Inc.*, 870 F.3d 345, 351 (5th Cir. 2017) ("Some courts have decided that waiver determinations are committed to a district court's discretion."); *Enron Corp. Sav. Plan v. Hewitt Assocs. L.L.C.*, 258 F.R.D. 149, 156 (S.D. Tex. 2008) ("Courts have substantial discretion in deciding when objections should be deemed waived.").

The Court disagrees with Bevill's remaining waiver arguments. First, by objecting to the Court's qualified immunity ruling in his JMOL Motion, Sheriff Castloo preserved his argument that the trial evidence was insufficient to prove that he acted with "retaliatory animus." Bevill's argument to the contrary—that Sheriff Castloo did not preserve the issue because his RJMOL Motion did not style the objection using the same "retaliatory animus" language as his JMOL Motion (Dkt. #351 at p. 9)—elevates form over substance. That is because the question of whether Sheriff Castloo acted with "retaliatory animus" is but one aspect of the larger question of his entitlement to qualified immunity. And in his JMOL Motion, Sheriff Castloo *did* object to the Court's prior determination that he was not so entitled by citing to the Fifth Circuit's *Bevill I* opinion, which affirmed that *Kinney* clearly established that a First Amendment violation occurs when a "government [official], *because of retaliatory animus*, uses his or her position to influence a *third-party* employer to terminate one of its employees for exercising his or her First Amendment rights" (Dkt. #345 at p. 5). *Bevill I*, 26 F.4th at 281 (emphasis added) (internal quotations omitted).

In other words, the "retaliatory animus" objection that Sheriff Castloo raises in his RJMOL Motion is really just one part of the very same qualified immunity objection he raised in his JMOL Motion (Dkt. #345 at pp. 4–6; Dkt. #324 at p. 7; Dkt. #298 at p. 7). Thus, by asserting an entitlement to qualified immunity in his oral and written JMOL motions, Sheriff Castloo preserved the argument despite omitting the magic words "retaliatory animus" in his RJMOL Motion (Dkt. #324 at p. 7; Dkt. #298 at p. 7).

Second, the Quitman Defendants did not waive their argument that Bevill did not establish that a City policymaker caused his First Amendment violation (Dkt. #351 at p. 9) (citing Dkt. #346 at pp. 4–5). At the close of evidence, in open court, the Quitman Defendants argued that "the record is insufficient to establish a finding of municipal liability against the City of Quitman" because Bevill did not show that his termination resulted from a policy accepted by a City policymaker; namely, the Quitman City Council (Dkt. #324 at pp. 19–20). That is enough to preserve the issue. *See, e.g.*, FED. R. CIV. P. 7(b) (requiring a motion to be in writing "unless made during a hearing or trial"); *Tharling v. City of Port Lavaca*, 329 F.3d 422, 426 & n.4 (5th Cir. 2003) (affirming a district court's grant of an oral motion for judgment as a matter of law); *Haralson v. State Farm Mut. Auto. Ins. Co.*, 564 F. Supp. 2d 616, 620 (N.D. Tex. 2008) ("[T]here is no requirement that a Rule 50(a) motion be reduced to writing.").

Third and finally, the Quitman Defendants did not waive their argument that the First Amendment does not protect Bevill's speech because he spoke in his official capacity (Dkt. #351 at p. 9) (citing Dkt. #346 at p. 8). Defendants' JMOL Motion plainly argues that, because Bevill "immediately called attention to his status as a police officer in his affidavit," his speech "was not that of a citizen" and therefore did not enjoy First Amendment protection (Dkt. #298 at pp. 9–11).

23

The transcript of the oral JMOL motions reflects the same (Dkt. #324 at p. 10) ("Bevill's speech was not that of a citizen, but he immediately called attention to his status as a police officer in his affidavit."). While Defendants' RJMOL Motions may present this argument more comprehensively than their JMOL Motion, it is certainly present in both. Accordingly, Defendants' First Amendment objection has also been preserved.

Below is a summary of Defendants' waiver arguments and the Court's rulings as to each:

| Defendants' RJMOL Arguments | | |
|---|---|---|
| DA Wheeler | Insufficient evidence to support punitive damages submission (Dkt. #342 at pp. 12–13). | WAIVED |
| Sheriff Castloo | Insufficient evidence to support punitive damages submission (Dkt. #345 at p. 17). | WAIVED |
| Sheriff Castloo | Insufficient evidence to establish retaliatory animus (Dkt. #345 at p. 5). | PRESERVED |
| City of Quitman & Mayor Dobbs | Insufficient evidence to support punitive damages submission (Dkt. #346 at p. 24). | WAIVED |
| City of Quitman & Mayor Dobbs | Plaintiff did not carry burden of proving policymaker for the City caused alleged violation (Dkt. #346 at pp. 4–5). | PRESERVED |
| City of Quitman & Mayor Dobbs | Bevill's speech was not protected by First Amendment because Bevill was acting in official capacity when he executed affidavit (Dkt. #346 at p. 8). | PRESERVED |

## I.    First Amendment Violation

Turning to the merits, the Court begins its RJMOL analysis by assessing two of Bevill's claims: Bevill's § 1983 conspiracy claim and his First Amendment retaliatory-discharge claim. "Because a conspiracy claim is not actionable if there is no deprivation of the asserted civil right," the Court handles Bevill's First Amendment retaliatory-discharge claim first. *Bevill II*, 103 F.4th at 374 (citing *Shaw v. Villanueva*, 918 F.3d 414, 419 (5th Cir. 2019)).

To prevail on his First Amendment retaliation claim, Bevill was required to establish that: "(1) he suffered an adverse employment decision, (2) he spoke as a citizen on a matter of public concern, (3) his interest in the speech outweighs the government's interest in the efficient provision of public services, and (4) the protected speech motivated the adverse employment action." *Bevill I*, 26 F.4th at 276. In *Bevill I* and *Bevill II*, the parties did not dispute elements one and four (Dkt. #89 at pp. 9–10; Dkt. #245 at p. 14). Now, however, Sheriff Castloo and DA Wheeler challenge the sufficiency of the evidence as to element four (Dkt. #342 at p. 12; Dkt. #345 at p. 14). Accordingly, the Court addresses elements two, three, and four, in turn.

### A.    Speech as a Citizen on a Matter of Public Concern

In executing the affidavit, Bevill spoke as a citizen on a matter of public concern and therefore enjoyed the safeguards provided by the First Amendment. Defendants' argument to the contrary is the very same one that has now been rejected four separate times—twice by this Court and twice by the Fifth Circuit (Dkt. #89 at pp. 10–12; Dkt. #245 at pp. 14–19). *Bevill I*, 26 F.4th at 276–79; *Bevill II*, 103 F.4th at 375–77. Because Defendants' position on this subject is no better today than it was on any of the four prior occasions it has been raised, the Court rejects it again for the very same reasons, which are restated below.

25

Whether Bevill spoke as a citizen on a matter of public concern turns first on the distinction between speech as a *citizen* and speech as an *employee*. *Bevill II*, 103 F.4th at 375. Unless an employee speaks as a citizen, then "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Though the First Amendment protects citizen speech, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Lane v. Franks*, 573 U.S. 228, 237 (2014) (quoting *Garcetti*, 547 U.S. at 421). It is here that Defendants raise their first objection—that by stating his occupation at the beginning of the affidavit, Bevill "attempted to leverage his status as a police officer to help a friend" (Dkt. #345 at p. 15) (Bevill Affidavit at p. 1). After all, Defendants argue, executing affidavits was a regular part of Bevill's job as Captain of Quitman PD, so his doing so here was *employee* speech (Dkt. #346 at p. 8). The Court disagrees.

On summary judgment, the Court noted that "[t]he facts that informed the Court and the Fifth Circuit's analysis have not meaningfully changed after discovery" (Dkt. #245 at p. 14) (citing *Bevill I*, 26 F.4th at 276–79). The same holds true now, as Bevill introduced evidence at trial that matched the evidence in the summary judgment record. But for clarity's sake, the Court will recount the evidence that supports the conclusion that Bevill's speech was protected.

Bevill testified at trial that he executed the affidavit to help McGee—a friend who, in Bevill's view, would not receive a fair trial in Wood County (Dkt. #335 at pp. 137–40). The affidavit referenced Bevill's position with Quitman PD not to "influence the outcome" of the trial, but to provide personal background for the judge, who would read the affidavit (Dkt. #335 at p. 140). Most importantly, Chief Cole testified that he did not learn about Bevill's affidavit until after it had been

filed (Dkt. #329 at p. 119). Bevill voluntarily filed the affidavit on his own accord, without informing anyone at Quitman PD. He spoke for his own benefit, and ultimately the benefit of the community writ large, not Quitman PD's. Consequently, consistent with *Garcetti*, *Lane*, and both this Court's and the Fifth Circuit's opinions in this case, the Court concludes for a final time that Bevill's affidavit "merely concern[ed]" his job duties but was not executed in the scope of those duties (Dkt. #89 at pp. 10–12; Dkt. #245 at pp. 14–15). *Bevill I*, 26 F.4th at 276–79; *Bevill II*, 103 F.4th at 375; *Garcetti*, 547 U.S. at 420–22; *Lane*, 573 U.S. at 240 ("The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties."). Bevill spoke as a citizen, not an employee.

The Court's public concern analysis also remains unchanged after trial. Speech implicates a matter of public concern "'when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Bevill II*, 103 F.4th at 375 (quoting *Lane*, 573 U.S. at 241). In making that determination, the Court focuses on the specific content, context, and form of Bevill's speech. *Id.* (quoting *Lane*, 573 U.S. at 241). Defendants dispute whether Bevill spoke on a matter of public concern, arguing that his "private concerns predominated" over any public ones because the intent of the affidavit was to help his friend rather than to "expos[e] public corruption" (Dkt. #346 at p. 9). The Court remains unpersuaded.

In *Bevill II*, the Fifth Circuit conducted a fulsome analysis on the content, context, and form of Bevill's affidavit, ultimately concluding that he spoke on a matter of public concern. *See Bevill II*, 103 F.4th at 375–77. But it did so while viewing the summary judgment evidence in the light most favorable to Bevill. *Id.* at 377. Therefore, the Court must perform a new analysis with respect to the

evidence introduced at trial, this time "'in the light most favorable to the verdict.'" *Versata Software, Inc.*, 717 F.3d at 1261 (quoting *Dresser-Rand Co.*, 361 F.3d at 838). Thus, though the Court takes a different route to arrive at its conclusion, all roads lead to Rome. Bevill was the victor at trial, so the Court reviews the evidence in the light most favorable to him.

To recap, Bevill executed his affidavit to help his friend, McGee, receive a fair trial, which Bevill believed would be impossible in Wood County due to the close relationship between Judge Fletcher, DA Wheeler, and Sheriff Castloo (*See* Bevill Affidavit). Therefore, his motivations in executing the affidavit were mixed. On one hand, he submitted the affidavit as a personal favor for a friend (Dkt. #335 at pp. 137–40). On the other, he spoke because he believed that Judge Fletcher, DA Wheeler, and Sheriff Castloo's friendship prevented them from serving Wood County faithfully (Dkt. #335 at pp. 138, 141–42). In mixed speech situations, the Fifth Circuit implements a balancing test so that "the mixed nature of the speech is simply an aspect to weigh and consider in each case." *Bevill II*, 103 F.4th at 376 (collecting cases). Against that backdrop, the Court briefly re-evaluates the content, context, and form of Bevill's speech.

Beginning with the content of Bevill's speech, the Court's view remains undisturbed. As the Court observed on summary judgment, Bevill blowing the whistle on corruption in Wood County undoubtedly raised an issue of public concern (*See* Dkt. #245 at p. 15). Indeed, "[i]t is well established" in this Circuit "that speech exposing or otherwise addressing malfeasance, corruption[,] or breach of the public trust . . . touches on matters of public concern." *Graziosi v. City of Greenville Miss.*, 775 F.3d 731, 738 (5th Cir. 2015). The Quitman Defendants counter that "Bevill's affidavit conveyed no information at all" (Dkt. #346 at p. 10). Of course it did. It conveyed Bevill's opinion, in a public filing, that "the pre-trial publicity involved in [the McGee trial] and the

personal relationships between the Sheriff, the District Attorney, and the Presiding Judge" would preclude a fair trial for McGee (Bevill Affidavit). Whether or not Bevill had mixed motivations in executing his affidavit does not change its effect—it alerted the public to corruption among the most powerful judicial and law enforcement actors in the county, an issue that necessarily concerns the public in Wood County. *See, e.g.*, *Lane*, 573 U.S. at 241 ("The content of Lane's testimony—corruption in a public program and misuse of state funds—obviously involves a matter of significant public concern."); *Garcetti*, 547 U.S. at 425 ("Exposing governmental inefficiency and misconduct is a matter of considerable significance."); *Markos v. City of Atlanta, Tex.*, 364 F.3d 567, 574 (5th Cir. 2004) ("[T]he fact that the content of the speech and [the plaintiff's] motivations were partially private is not enough to remove this speech from the realm of public concern.").

The context and form of Bevill's affidavit support the same conclusion. As to the context, Bevill submitted his affidavit in support of a motion to transfer a high-profile criminal case out of Wood County. In doing so, he spoke his opinions on Judge Fletcher, DA Wheeler, and Sheriff Castloo into the public record. Thus, contextually, his opinions touched on a matter of public concern, irrespective of their private benefits to Bevill and McGee. Finally, if any question remained about the public's interest in Bevill's affidavit, the form of his speech answers it "decisively." *See Bevill II*, 103 F.4th at 377 (citing *Lane*, 573 U.S. at 241). After all, "[u]nlike speech in other contexts, testimony under oath has the formality and gravity necessary to remind the witness that his or her statements will be the basis for official government action, action that often affects the rights and liberties of others." *Lane*, 573 U.S. at 241 (quoting *United States v. Alvarez*, 567 U.S. 709, 724 (2012)). Indeed, the Fifth Circuit has recognized that "[t]estimony in judicial proceedings 'is inherently of public concern.'" *Kinney*, 367 F.3d at 367 n.35 (quoting *Johnston v.*

*Harris Cnty. Flood Control Dist.*, 869 F.2d 1565, 1578 (5th Cir. 1989)). The Court agrees. Consequently, Bevill spoke as a citizen on a matter of public concern.

### B.     The *Pickering* Balancing Test

Turning to the third element of Bevill's retaliatory-discharge claim, the Court recounts why Quitman PD lacked "an adequate justification for treating [Bevill] differently from any other member of the general public." *Garcetti*, 547 U.S. at 418. To reach that conclusion, the Court performs the *Pickering* balancing test. *Id.* at 420 (discussing *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563 (1968)). On one end of the *Pickering* scale are "the interests of [Bevill], as a citizen, in commenting upon matters of public concern . . . ." *Pickering*, 391 U.S. at 568. On the other is "the interest of [Quitman PD], as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*

Defendants raise a handful of arguments in their quest to diminish Bevill's interest in executing his affidavit and emphasize Quitman PD's interest in the efficient provision of public services. First, Defendants contend that Bevill signed his affidavit in his capacity as Captain of the Quitman PD and, therefore, his conduct would bear on Quitman PD and the City as a whole (Dkt. #342 at pp. 11–12; Dkt. #345 at p. 16; Dkt. #346 at pp. 11–12). The Court has already addressed this argument *ad nauseam*. *See supra* at 25–27. Bevill's passing reference to his position with Quitman PD at the beginning of his affidavit did not transform his speech from that as a citizen to that as a public employee. Whether Bevill's affidavit violated Quitman PD policies changes nothing. Quitman PD's interest in preventing its employees from "obtain[ing] any continuance of any trial in court of friendship for the defendant," is but a feather on the scale compared to Bevill's interest in alerting the public to potential corruption in Wood County. That argument fails.

The Quitman Defendants' next argument—that Bevill's affidavit "might be read as a representation of the City's position, which could be a big deal"—also fails (Dkt. #346 at p. 12) (cleaned up). While it is true that courts give "substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern," *see Nixon v. City of Houston*, 511 F. 3d 494, 499 n.8 (5th Cir. 2007) (quoting *Waters v. Churchill*, 511 U.S. 661, 673 (1994)), "hypothetical harms" will not tip the *Pickering* scale. *Bevill I*, 26 F.4th at 279 n.4 (rejecting Defendants' *Pickering* arguments based on "the realization that Defendants raise hypothetical, not actual, effects of Bevill's speech on the ability of Quitman to provide public services"); *Bevill II*, 103 F.4th at 378–79 (same). Once more, "'[r]eal, not imagined, disruption is required.'" *Bevill I*, 26 F.4th at 279 n.4 (quoting *Branton v. City of Dallas*, 272 F.3d 730, 741 (5th Cir. 2001)). The fear that Bevill's affidavit "might be read" as the City's official position is nothing more than an imagined disruption. As such, it does not outweigh Bevill's interest in exposing public corruption and ensuring a fair trial for McGee.

Finally, the Quitman Defendants (but not their co-defendants) appeal to *Nixon v. City of Houston* as "illustrat[ive of] the balance the Court should strike in this case" (Dkt. #346 at p. 13) (citing 511 F.3d at 494). At issue there were certain statements made by a police officer with the Houston Police Department ("HPD"). *Id.* at 498–501. The Fifth Circuit's *Pickering* analysis focused on two forms of speech: a monthly news article that Nixon published in a local periodical and media statements that Nixon made in response to a highly publicized police pursuit. *Id.* In the newsletter, Nixon made derogatory statements related to certain groups of individuals, including "minorities, women, and the homeless." *Id.* at 496. Nixon focused his media statements on publicly criticizing HPD's handling of the police pursuit. *Id.* at 496–97. In both statements, Nixon identified

himself as an officer with HPD. *Id.* at 498–501. After an investigation, HPD terminated Nixon on the ground that both statements violated HPD policies and "undermined the efficiency of the services provided by HPD." *Id.* at 496–97. On appeal, the Fifth Circuit held that "Nixon's magazine articles [were] not protected under the First Amendment," reasoning as follows:

> Given that Nixon identified himself as an HPD police officer and wrote from the perspective of an HPD police officer, and the articles made patently offensive and insensitive comments regarding certain segments of the population, it was reasonable for HPD to believe that such comments and the continuation of the publication of similar articles would hinder the important relationship between HPD and the citizens of Houston.

*Id.* at 500–01.

The Quitman Defendants' reliance on *Nixon* is misplaced. Unlike *Nixon*, where the court concluded that the value of his articles was "diminished by" their illegitimate and insulting rhetoric toward HPD and denigrating impact on the community, *see Nixon*, 511 F.3d at 500, Bevill's affidavit expressed legitimate concerns about potential wrongdoing by public officials in Wood County. Bevill's intent was to *protect* the public (and McGee) from corruption, not *disparage* it. He sought to promote fairness, not sow division between the City and its citizens. *Nixon* is distinguishable where it counts and does not control here. Bevill's speech was protected.

## C.    Speech Motivated Termination

Finally, though it did not reach the fourth element in its earlier decisions,[10] the Court turns briefly to the final element of Bevill's § 1983 claim: whether Bevill's speech motivated his termination. *Bevill I*, 26 F.4th at 276. Though not raised in Defendants' Joint JMOL Motion, Sheriff Castloo claims (for the first time in his RJMOL Motion) that "the speech relating to the

---

[10]  Neither the Court nor the Fifth Circuit reached the fourth element. Until trial, it was undisputed that Bevill suffered an adverse employment action by being fired and that he was fired because of his affidavit (Dkt. #89 at pp. 9–10; Dkt. #245 at p. 14). *Bevill I*, 26 F.4th at 276; *Bevill II*, 103 F.4th at 374–75.

government officials did not cause the termination under the fourth element" (Dkt. #345 at p. 14). The Court could treat this issue as waived, given its absence from Defendants' JMOL Motion (*See* Dkt. #298). Yet because DA Wheeler also makes a passing reference to the motivation behind Bevill's termination in his RJMOL Motion (Dkt. #342 at p. 12), the Court will dispose of Sheriff Castloo and DA Wheeler's arguments here. In short, they are unpersuasive.

Once more, to establish a § 1983 retaliatory discharge claim, Bevill had to show that his protected speech "precipitated the adverse employment action." *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004) (citing *Kinney*, 367 F.3d at 356). To prove the requisite link between his affidavit and his termination, Bevill was required to "show the speech was a substantial factor in bringing about his termination" (Dkt. #306 at p. 9). *See Coughlin v. Lee*, 946 F.2d 1152, 1157 (5th Cir. 1991) (explaining that, to establish a § 1983 retaliatory termination claim, "the employee must demonstrate that his protected conduct was a substantial motivating factor in his discharge") (internal citations omitted). Whether Bevill's affidavit was a substantial or motivating factor in his termination is a question of fact for the jury to resolve. *Branton*, 272 F.3d at 739 ("It is for a jury to resolve any remaining factual disputes as to whether plaintiff's protected speech was a substantial or motivating factor in the adverse employment decision, or whether the employer would have made the same employment decision in the absence of the protected speech.").

Bevill undoubtedly carried his burden to present legally sufficient evidence that his affidavit motivated Mayor Dobbs's decision to terminate him. And Defendants have not directed the Court to any "substantial evidence" to justify upsetting that termination. *See Baisden*, 693 F.3d at 499. Nor is there any. In fact, the trial record confirms the opposite—Bevill was fired for the substance of his affidavit (*See, e.g.*, Dkt. #329 at pp. 261–62 (Mayor Dobbs testimony that it was the

"substance of the affidavit" and the "words on the page" that created a policy violation and, hence, Bevill's termination); Pl.'s Ex. 3 at p. 37 (Draft Internal Complaint Form stating that the "Nature of Complaint" against Bevill was the affidavit that he "voluntarily provided . . . expressing a personal opinion regarding a pending criminal matter")).

Defendants' argument that Bevill was fired for violating City policy is revisionist history. By Monday, June 5, 2017—three days after Bevill signed the affidavit and Mayor Dobbs learned about the same—DA Wheeler was already in Mayor Dobbs's office calling for Bevill's termination even though neither had identified a single policy violation at that time (Pl.'s Ex. 12; Dkt. #329 at pp. 264–67). It was not until four City officials—including Mayor Dobbs—had spent that day and the three days that followed scouring Quitman policies and procedures for a potential violation that any such policy was identified (Pl.'s Ex. 3 at pp. 5–32). So, while Defendants say that Bevill was not fired for the substance of his affidavit, the trial record confirms that the motivation to fire Bevill arose well before the City even identified a possible policy violation.

In any event, no policy violation occurred in the first place. After a long search through the Quitman PD policies, city officials finally stumbled upon two possible violations to pin on Bevill: one prohibiting Quitman PD officers from seeking a continuance of trial or otherwise interfering with court proceedings out of friendship for the defendant (Chapter 11, Section 11.20.2); and the other requiring Quitman PD officers to "conduct themselves in a manner which does not discredit the Peace Officer profession or their employing agency" (Chapter 12) (Pl.'s Ex. 7 at pp. 1–2). But Bevill violated neither policy, as DA Wheeler's and Mayor Dobbs's trial testimony illustrates.

As to Chapter 11, DA Wheeler explained that a motion to transfer venue is not a motion for continuance (Dkt. #330 at p. 214). It does not permit a defendant to "escape the penalty of law"

(Dkt. #330 at p. 215). Rather, a motion to transfer is "just another pretrial motion" available to a defendant who believes that his case should be tried in a different venue (Dkt. #330 at p. 214). Thus, Bevill's affidavit did not "interfere" with court proceedings within the meaning of Chapter 11 (*See* Dkt. #330 at pp. 69, 214–15). Nor did Bevill violate Chapter 12. Calling out a potential injustice that could result from public corruption in Wood County does not "discredit the Peace Officer profession" (Dkt. #330 at pp. 51–52, 78–79). In fact, by Mayor Dobbs's own admission, bringing discredit to Quitman PD was not even a reason for Bevill's termination, despite what the termination documents indicated (*Compare* Dkt. #330 at pp. 78–79, *with* Pl.'s Ex. 8).

Defendants' stated purpose for firing Bevill was merely pretextual and does not invalidate the jury's finding. Indeed, the Fifth Circuit has made clear that "First Amendment retaliation claims are governed by the *Mt. Healthy* 'mixed-motives' framework, not by the *McDonnel Douglas* pretext analysis." *Gonzales v. Dallas Cnty., Tex.*, 249 F.3d 406, 412 n.6 (5th Cir. 2001). In *Mt. Healthy*, the Supreme Court held that once an employee has met his burden of showing that his protected conduct was a "substantial factor" or "motivating factor" in the employer's adverse employment action, the district court should determine whether the employer has shown by a preponderance of the evidence that it would have taken the same adverse employment action in the absence of the protected conduct. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). "If the employer is able to make such a showing, then the protected conduct in question does not amount to a constitutional violation justifying remedial action." *Charles v. Grief*, 522 F.3d 508, 516 n.28 (5th Cir. 2008). "An employee can, however, refute that showing by presenting evidence that 'his employer's ostensible explanation for the discharge is merely pretextual.'" *Haverda v. Hays Cnty.*, 723 F.3d 586, 592 (5th Cir. 2013) (quoting *Coughlin v. Lee*, 946 F.2d 1152,

1157 (5th Cir. 1991)). "[I]f a plaintiff brings forth evidence of pretext, the determination whether the employer's stated reasons are pretextual is a fact issue reserved for the jury." *Id.* at 595–96.

Put simply, Bevill was not required to prove at trial that the substance of his affidavit was the *only* factor that motivated his termination, just that it was a substantial factor (Dkt. #306 at pp. 9–10). *See Mt. Healthy*, 429 U.S. at 287. Bevill did so here. In turn, Defendants presented evidence that the true reason for his termination was that he violated City policy. Bevill then rebutted that evidence by showing that the City's independent investigation and purpose for terminating him was merely pretextual (Dkt. #342 at p. 12; Dkt. #345 at p. 14; Dkt. #330 at pp. 69, 214–15). Mayor Dobbs even admitted that, despite how inflammatory the substance of Bevill's affidavit was, the independent investigators did nothing to test the veracity of Bevill's statements in his affidavit (Dkt. #330 at p. 94). And according to Mayor Dobbs, even if an investigation revealed a problematic relationship between Judge Fletcher and Sheriff Castloo, that revelation would have "no bearing on the policy" that supported Bevill's termination (Dkt. #330 at p. 94). Thus, in the Court's view, the state of proof at the close of evidence was such that a fact issue existed about whether the substance of Bevill's affidavit precipitated his termination from Quitman PD. Accordingly, the Court submitted the question to the jury with the following instruction:

> [T]o prove Plaintiff Bevill's protected speech motivated Defendant Dobbs to cause Plaintiff Bevill to be terminated from the Quitman Police Department, Plaintiff Bevill must show the speech was a substantial factor in bringing about his termination. In other words, Plaintiff Bevill must show that his protected speech was a motivating factor in Defendant Dobbs's decision to terminate Plaintiff Bevill from the Quitman Police Department. Plaintiff Bevill need not prove his speech was the only reason Defendant Dobbs made the decision.
>
> If you find that Plaintiff Bevill has proven each element of his claim by a preponderance of the evidence, then you must consider whether Defendant Dobbs would have reached the same decision in the absence of the protected speech. If you find that Defendant Dobbs has proven by a preponderance of the evidence that he would have terminated Bevill whether or not Plaintiff Bevill engaged in the

protected speech, then you must return a verdict for Defendant Dobbs and against Plaintiff Bevill.

(Dkt. #306 at pp. 9–10; Dkt. #312 at p. 1). The jury found for Bevill on that question (Dkt. #312 at p. 1). The Court will leave that finding undisturbed.

## II.    Conspiracy to Violate § 1983

Having determined that Bevill's speech was protected, the Court turns to Bevill's § 1983 conspiracy claim. To prevail on his conspiracy claim, Bevill must prove "(1) the existence of a conspiracy involving state action and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." *Bevill II*, 103 F.4th at 374 (quoting *Armstrong v. Ashley*, 60 F.4th 262, 280 (5th Cir. 2023)). Because Bevill proved a violation of his First Amendment rights, *see supra* at 25–37, the only remaining question is whether Bevill proved the existence of a conspiracy involving state action—that is, whether Bevill "br[ought] forward 'facts tending to show that the defendants entered into an agreement to deprive him of his rights.'" *Imani v. City of Baton Rouge*, 614 F. Supp. 3d 306, 373–74 (M.D. La. 2022) (quoting *Leggett v. Williams*, 277 F. App'x 498, 501 (5th Cir. 2008) (internal brackets omitted)); *see Bevill II*, 103 F.4th at 374 (quoting *Armstrong*, 60 F.4th at 280). After careful consideration of the trial evidence, the Court concludes that he did.

For starters, the evidence at trial established that DA Wheeler was anything but fond of Bevill even prior to his execution of the affidavit. Bevill testified at trial that DA Wheeler personally disliked him and, more generally, "dislike[d] what would seem to be . . . all law enforcement" (Dkt. #335 at p. 125). Bevill expressed those feelings during his interview with Armstrong, where he highlighted DA Wheeler's previous unsuccessful attempts to charge him with planting evidence and committing "official oppression"—charges that were later dropped after investigation by the Texas Rangers (Pl.'s Ex. 6 at p. 2).

The evidence at trial also established an unusual and highly suspect relationship between Judge Fletcher, DA Wheeler, and Sheriff Castloo. According to Sheriff Castloo, though he would not categorize his relationship with Judge Fletcher and DA Wheeler as a "personal" one, the three shared a close working relationship (Dkt. #336 at pp. 135–37). Sheriff Castloo and Judge Fletcher would even have lunch together on occasion (Dkt. #336 at p. 136). Given that relationship, Sheriff Castloo and Judge Fletcher consented to joint interviews in the local paper, one of which was accompanied by a photo of Sheriff Castloo and Judge Fletcher reviewing documents together (Dkt. #336 at pp. 136–41; Pl.'s Ex. 10). In those interviews, Sheriff Castloo and Judge Fletcher stressed the importance of the Wood County Sheriff's Office, DA's Office, and District Judge "working in unison" (Dkt. #336 at p. 142). Bevill viewed that as an unusual relationship between those three branches, noting that it "contradicts the lanes they should be in" (Dkt. #335 at pp. 126–27).

This evidence does not stand alone in painting a suspect picture of the group. Indeed, Angela Albers—who succeeded DA Wheeler as Wood County DA in February of 2019 after working there since 2007—corroborated Bevill's perception of the relationship from the inside. At trial, she testified that, on multiple occasions, she witnessed Judge Fletcher and DA Wheeler discussing open cases with each other, without defense counsel present.[11] She added that they would even go so far as to discuss what Judge Fletcher was going to do on certain cases. All in all, Albers found it bizarre how much time Judge Fletcher spent in the DA's Office. According to Albers, those *ex parte* discussions between Judge Fletcher and DA Wheeler extended into 2017 around the time of the McGee trial and the Bevill affidavit. Albers felt that DA Wheeler and Judge

---

[11] It became clear to the Court during trial that whatever close relationship Judge Fletcher and DA Wheeler shared as colleagues and personal friends has since soured. DA Wheeler's seat at counsel table was situated such that he faced the witness stand. But During Judge Fletcher's testimony, DA Wheeler swiveled his chair 180 degrees around and turned his back to both Judge Fletcher and the jury.

Fletcher had a habit of making decisions about a case that should have been decided by a jury. Finally, Albers recalls DA Wheeler referring to Sheriff Castloo as Judge Fletcher's "enforcer."

Though the evidence of the close relationship between Judge Fletcher, DA Wheeler, and Sheriff Castloo is not alone determinative on the conspiracy question, it is probative. *Compare Lumpkins v. Off. of Cmty. Dev.*, 621 F. App'x 264, 269 (5th Cir. 2015) (per curiam) (internal quotations omitted) (concluding that threadbare allegations of personal friendship are "insufficient to provide plausible grounds to infer an agreement" necessary for a successful conspiracy claim), *with United States v. Harris*, 932 F.2d 1529, 1523 (5th Cir. 1991) ("[E]vidence of a pre-existing relationship between parties is relevant in determining whether they were engaged in a conspiracy.") (citations omitted). It is also far from the only evidence of a conspiracy in this record.

In fact, not only did Judge Fletcher, DA Wheeler, and Sheriff Castloo share a relationship and power dynamic conducive to a conspiracy, they also had a strong motive to orchestrate Bevill's termination. Bevill's affidavit directly accused them of being incapable of fairly and faithfully discharging their duties—an allegation that each viewed as an attack on their credibility (Dkt. #329 at pp. 266–68; Dkt. #330 at pp. 220–21; Judge Fletcher's Journal; Dkt. #336 at pp. 148–49). According to Mayor Dobbs, DA Wheeler "made it known" to him that he was angry about the affidavit (Dkt. #329 at pp. 266–68). DA Wheeler viewed it as a potential career-ruining allegation that "compromises [him], compromises [his] office, compromises [his] job and [his] family" (Dkt. #329 at pp. 266–68; Dkt. #330 at pp. 220–21). Judge Fletcher penned his feelings about the affidavit in his journal. He repeatedly called Bevill's affidavit "scurrilous" and suggested that Quitman PD would be terminated as a department because of it (Judge Fletcher's Journal at pp. 1–2). Finally, Sheriff Castloo testified that he was "ticked" about the affidavit and viewed it as an attack on his

39

integrity (Dkt. #336 at pp. 148–49). In sum, Judge Fletcher, DA Wheeler, and Sheriff Castloo reacted to the affidavit in a way that would suggest a "common motive" to retaliate against Bevill: retribution for the affidavit's damage to their reputation. *Cf. Montgomery v. Walton*, 759 F. App'x 312, 315 (5th Cir. 2019) (dismissing conspiracy claim in part because plaintiff failed to adequately allege a "common motive" for why the alleged co-conspirators would retaliate against him).

But Judge Fletcher, DA Wheeler, and Sheriff Castloo did more than just share a close working relationship and motive to retaliate against Bevill. They also interacted closely with one another immediately upon learning about Bevill's affidavit. On June 2, 2017, the date that Bevill executed the affidavit, DA Wheeler texted a photo of the affidavit to Sheriff Castloo (Pl.'s Ex. 11). Eight minutes later, Sheriff Castloo forwarded the affidavit to Secretary Hollen with the message "[h]ere it is," suggesting that the two had already spoken about the affidavit (Pl.'s Ex. 12). Sheriff Castloo and Secretary Hollen continued to exchange text messages the following morning, then the two attended a local fishing tournament together, where they would have had ample opportunity to discuss the impact of the affidavit (Pl.'s Ex. 12 at p. 2; Dkt. #336 at pp. 145–48). Meanwhile, DA Wheeler, Judge Fletcher, and Investigator Hirsch met to discuss the affidavit back at the DA's Office (Dkt. #330 at pp. 165–68). Judge Fletcher wanted to ensure that Bevill did not receive a "free pass" for executing the affidavit and even threatened to file perjury charges against Bevill (Dkt. #330 at pp. 165–68). DA Wheeler was similarly unhappy. In his meeting with Mayor Dobbs, DA Wheeler expressed his frustration with the affidavit and wondered if it was the City's official position (Dkt. #329 at pp. 267–68; Dkt. #330 at pp. 53–54, 219). There is even testimony suggesting that during that meeting, DA Wheeler may have threatened to withhold resources and stop taking cases from Quitman PD unless Bevill was terminated (*See, e.g.*, Dkt. #329 at p. 271). Mayor Dobbs

considered his meeting with DA Wheeler "unusual" because it was not typical for him to meet with the sitting DA (Dkt. #330 at p. 55). In fact, Mayor Dobbs testified that this was "the one time" he met with DA Wheeler (Dkt. #330 at p. 55). Despite the unusual nature of the rare meeting with a freshly inflamed DA Wheeler, however, Mayor Dobbs maintains that the meeting "had no bearing" on Bevill's termination (Dkt. #330 at p. 55).

Ultimately, the investigation into Bevill's conduct ensued, and the City found two policies to charge Bevill with violating so that it could terminate him (Pl.'s Ex. 8 at pp. 2–5). The next day, Judge Fletcher, DA Wheeler, and Sheriff Castloo attended a Quitman City Council Meeting as a united front (Council Meeting Minutes at p. 1). According to DA Wheeler, though he had a policy of not publicly commenting on pending cases, "it never even entered [his] mind that going to a city council meeting" to discuss an affidavit submitted in one of his cases alongside the presiding judge "had anything to do" with the McGee case (Dkt. #330 at pp. 228–29). Sheriff Castloo spoke for the group during the meeting and wasted no time before mentioning Bevill's affidavit. He explained to the City Council that "I understand you've taken some steps"—ostensibly, firing Bevill[12]—but called upon the City that "maybe more steps need to be taken" (Council Meeting Audio at 2:30–5:00). Sheriff Castloo concluded by stating that Bevill's affidavit "has a definite effect on our

---

[12] Here, the trial testimony diverges. Defendants conflict on when they learned about Bevill's termination. Chief Cole interpreted Sheriff Castloo's call for "more steps . . . to be taken" to mean that Defendants "were seeking something else, more than just the termination of Mr. Bevill" (Dkt. #329 at p. 155). But Sheriff Castloo claims that he "found out when [he] was walking through the door that night at the city council, when [he] was entering the building," *before* the City Council Meeting (Dkt. #336 at p. 151). Judge Fletcher, however, claims that he did not learn Bevill had been fired until *after* the City Council Meeting (Dkt. #336 at pp. 78, 80). Defendants' conflicting testimony opens the door to two competing inferences. First, that Defendants knew about Bevill's termination *before* the City Council Meeting and, therefore, Sheriff Castloo's request for additional action to be taken referred to some punishment above and beyond his termination—such as Bevill's arrest. Second and alternatively, that Defendants did not know about Bevill's termination until *after* the City Council Meeting and, therefore, Sheriff Castloo's call to action was a public request—on behalf of himself, Judge Fletcher, and DA Wheeler—for Bevill's termination. Whichever inference the jury chose to make remains unknown. This much is certain: either circumstance bears heavily on Defendants' conspiracy to have Bevill terminated in retaliation for his execution of the affidavit.

relationship with the police department" (Council Meeting Audio at 2:30–5:00). Thus, despite Bevill's firing, Sheriff Castloo expected even more retaliation. He got it. Judge Fletcher issued the bench warrant for Bevill's arrest less than a week later (Pl.'s Ex. 29; Pl.'s Ex. 32).

Turning to Judge Fletcher, specifically, his immediate reaction to the Bevill affidavit was that "QPD [should] be terminated as a department due to the scurrilous insubordination by a police officer" (Judge Fletcher's Journal at p. 1). Judge Fletcher's attitude toward Bevill's affidavit comports with his vindictive behavior in other cases. Some time in late 2017, while Bevill's aggravated perjury case was pending, DA Wheeler had a report prepared to submit to the Texas State Commission on Judicial Conduct ("Judicial Conduct Commission") (Dkt. #330 at pp. 227–38; Pl.'s Ex. 36). The report stated the following:

> In October of 2017, Judge Fletcher approached ADA Angela Albers to request information on Stacy Walton, a criminal defendant who had been charged with Driving While Intoxicated 2nd offense. . . . Ms. Albers advised him that she was not sure what would happen with the case at that point, but advised what she normally offers on that type of case. The case is a misdemeanor and was filed in County Court. Judge Fletcher stated that she had gotten away with a lot of things in the past and wanted to make sure that she would be held accountable.

(Pl.'s Ex. 36 at p. 1). The report went on to state that Judge Fletcher repeatedly pressured Albers into transferring the case to his court (Pl.'s Ex. 36 at p. 1). According to the report, Albers "did not feel that she had any choice in the matter because of the Judge's demands" and "feared that [Judge Fletcher] would retaliate against her" (Pl.'s Ex. 36; Dkt. #330 at p. 247). DA Wheeler's understanding was that Albers was "terrified of Judge Fletcher" (Dkt. #330 at p. 247).

DA Wheeler later called the Judicial Conduct Commission to discuss the report in more detail (Dkt. #330 at pp. 227, 238). Coincidentally, shortly before that phone call, Judge Fletcher approached DA Wheeler to discuss the pending Bevill aggravated perjury case (Dkt. #330 at pp. 227, 238). DA Wheeler recalled Judge Fletcher asking him "what [he] was going to do" with the

Bevill case and explaining to DA Wheeler that he wanted the case in front of him (Dkt. #330 at p. 227). Accordingly, DA Wheeler also referenced that exchange during his phone call with the Judicial Conduct Commission (Dkt. #330 at p. 227). The Judicial Conduct Commission instructed DA Wheeler to add it to the end of his report (Dkt. #330 at p. 227). He added the following:

> I have shown this note to Judge Fletcher to dissuade any further problematic situations. Further, he has inquired about one other matter. The matter has been assigned to Special Prosecutor Tom Burton, who has yet to file a case and concerns the allegation of Aggravated Perjury against Terry Bevill.

(Dkt. #330 at p. 227; Pl.'s Ex. 36). Despite Judge Fletcher's *ex parte* attempts to get Bevill's aggravated perjury case in front of him, the DA's Office neglected to prosecute Bevill's case for sixteen months (Dkt. #330 at pp. 250–55). It did not present the case to a grand jury until October of 2018, after DA Wheeler lost supervisory control over the DA's Office (Dkt. #330 at p. 261; Pl.'s Ex. 34J; Pl.'s Ex. 33). The grand jury no-billed Bevill on October 31, 2018 (Pl.'s Ex. 33).

With this background in mind, the Court recalls another fundamental tenet of conspiracy law. A plaintiff may establish a conspiracy by showing "that the alleged conspirators did or said something to create an understanding, the approximate time when the agreement was made, the specific parties to the agreement, the period of the conspiracy, or the object of the conspiracy." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 295 (3d Cir. 2018) (citations omitted) (cleaned up). In some form or another, evidence of each of those factors was presented at trial and considered by the jury during their deliberations. And from that evidence, a very clear picture emerges.

In particular, Judge Fletcher, DA Wheeler, and Sheriff Castloo shared a close working and personal relationship. They held positions of judicial, prosecutorial, and law enforcement authority in their community. When Bevill's affidavit undermined that authority, they sought revenge. They expressed their anger about the affidavit to Mayor Dobbs and the City, in a personal journal, and to

each other. Then, they wielded their positions of power to persuade the City to fire Bevill. But that was not enough. They wanted "more steps . . . to be taken" (Council Meeting Audio at 2:30–5:00). So, taking matters into his own hands, Judge Fletcher, *sua sponte*, issued a bench warrant for Bevill's arrest (Pl.'s Ex. 29; Pl.'s Ex. 32). Then, to cap it all off, DA Wheeler—the man initially responsible for pursuing charges against Bevill—ensured that his file collected dust in the DA's Office for sixteen months before his successor finally presented the case to a grand jury, which returned a no bill. Practically speaking, Judge Fletcher, DA Wheeler, and Sheriff Castloo possessed the means, motive, and opportunity to orchestrate Bevill's termination. They exercised their leverage over Bevill, Mayor Dobbs, and the City to ensure that Bevill paid the price for his affidavit. He did.

In view of the collective weight of this evidence, the Court is not persuaded by Defendants' argument that the conspiracy the jury found to exist—which Sheriff Castloo classifies as "guilt by association"—was a mere product of "speculation," "pure inferences," and "parallel conduct that could just as well be independent action" (Dkt. #342 at pp. 7–8; Dkt. #345 at pp. 12–13) (internal quotations omitted). To be sure, "a jury may not rest its verdict on speculation and conjecture" or "draw . . . a wholly unreasonable inference or one which amounts to mere speculation and conjecture." *Mack v. Newton*, 737 F.2d 1343, 1351 (5th Cir. 1984). And it is the Court's responsibility to "withdraw the case from the jury" when "'a conflict in substantial evidence to create a jury question'" is lacking. *Love v. King*, 784 F.2d 708, 711 (5th Cir. 1986); *Mack*, 737 F.2d at 1351 (quoting *Boeing Co. v. Shipman*, 411 F.2d 365, 375 (5th Cir. 1969)). But the Court's twin responsibility is to be "especially deferential" to the jury's verdict, *Baisden*, 693 F.3d at 499, and to grant it the flexibility to draw inferences and rely on circumstantial evidence in pursuit of its verdict when the evidence permits. *Mack*, 737 F.2d at 1351.

44

Here, the evidence of a conspiracy was legally sufficient to submit to the jury. Because Bevill met his burden of production, the jury's verdict is entitled to deference. That is particularly so in view of the nature of this case. The term "conspiracy" conjures images of under-the-table handshakes and back-alley meetings under the cover of night. In reality, that is not how parties conspire. *See Mack*, 737 F.2d at 1350 ("Since conspiracies . . . are rarely evidenced by explicit agreements, the determination of whether a conspiracy existed almost inevitably rests on the inferences that may fairly be drawn from the behavior of the alleged conspirators.") (internal citations omitted). They do so over time, in text messages, over lunch meetings, and during phone calls. That is why the law allows for a jury to base its conspiracy finding on circumstantial evidence, *see id.*, so long as that evidence is "specific" and shows a "shared . . . conspiratorial objective." *Hinkle v. City of Clarksburg, W. Va.*, 81 F.3d 416, 421 (4th Cir. 1996) (citations omitted). If it were otherwise, then conspiracies would be virtually impossible to prove absent some formal contract to conspire—a document that not even the most diabolical co-conspirator would execute. Consequently, there is rarely a single smoking gun available to prove a conspiracy. And there is none here. Indeed, there is no "room where it happened."[13] There is, however, an abundance of circumstantial evidence upon which the jury properly based its verdict.

In sum, "[t]he behavior of the alleged conspirators"—Judge Fletcher, DA Wheeler, and Sheriff Castloo—"suggest a commitment to a common end." *Mack*, 737 F.2d at 1350 (quoting *Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1043 (2d Cir. 1976)). That is, Bevill's retaliatory termination. The three acted "in unison" in their response to the affidavit, just as they

---

[13] LESLIE ODOM JR. & LIN-MANUEL MIRANDA, *The Room Where It Happens*, *on* HAMILTON (ORIGINAL BROADWAY CAST RECORDING) (Atlantic Records 2015).

intended when they took office (Dkt. #336 at p. 142). The jury agreed in arriving at its verdict (Dkt. #312 at pp. 1–2). The jury was permitted to rest its verdict on the substantial circumstantial evidence that Bevill presented at trial. *See Mack*, 737 F.2d at 1350. Whatever inferences the jury made in arriving at its verdict on the conspiracy question were well within the realm of acceptability. At the very least, they were inferences that "reasonable and fair-minded men in the exercise of impartial judgment" might reach, even if other inferences were possible from the evidence. *Boh Bros.*, 731 F.3d at 451; *Threlkeld*, 211 F.3d at 891. The verdict stands.

### III.    Municipal Liability

Next, the Court reviews the sufficiency of the evidence as to municipal liability. The Quitman Defendants challenge the jury's finding that the City of Quitman maintained a policy, custom, or practice that was the moving force behind Bevill's termination (Dkt. #342 at pp. 4–7; Dkt. #312 at p. 2). In their view, policymaking authority at a municipality is a creature of state law and, under the Texas Local Government Code, the City of Quitman vests its policymaking authority in the Quitman City Council—not Mayor Dobbs (Dkt. #346 at p. 5) (citing TEX. LOC. GOV'T CODE § 21.001).[14] Consequently, the Quitman Defendants contend that Bevill's stipulation that "Quitman City Council did not participate in the Bevill investigation and was not involved in any decisions made related to Bevill's employment" forecloses a municipal liability finding against the City (Dkt. #346 at p. 6; Dkt. #306 at p. 7). The Court is unpersuaded.

A plaintiff may not establish § 1983 liability against a government entity through *respondeat superior*. *Deville v. Marcantel*, 567 F.3d 156, 170 (5th Cir. 2009) (citing *Monell v. Dep't of Soc. Servs.*,

---

[14] The Quitman Defendants cite TEX. LOC. GOV'T CODE § 21.001 for this proposition (Dkt. #346 at pp. 5–6). That is the wrong provision, as it covers "Election of Alderman by Place System in General-Law Municipality," a topic wholly irrelevant to Mayor Dobbs's policymaking authority. Seemingly, the Quitman Defendants intend to cite TEX. LOC. GOV'T CODE § 22.031, which directly defines the governing structure of a Type A general law municipality.

436 U.S. 658, 691 (1978)); *Molina v. Collin Cnty., Tex.*, No. 4:17-CV-00017, 2017 WL 5619847, at *3 (E.D. Tex. Nov. 21, 2017). Instead, a plaintiff must pursue a direct claim against the government entity by demonstrating that the government entity "itself causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell*, 436 U.S. at 694–95). To do so, Bevill had to prove at trial that an "official policy" of the City of Quitman caused his termination. *See Deville*, 567 F.3d at 170. In the Fifth Circuit, an "official policy" is either:

1.  A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

2.  A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.

*Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984). Thus, "under *Monell*, a single decision may create municipal liability if that decision were made by a final policymaker responsible for that activity." *Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir. 1996). "When a final policy maker makes the relevant decision, and when that decision is within the sphere of the policy maker's final authority, 'the existence of a well-established, officially-adopted policy will not insulate the municipality from liability.'" *Id.* (quoting *Gonzalez v. Ysleta Indep. Sch. Dist.*, 996 F.2d 745, 754 (5th Cir. 1993)).

Courts in the Fifth Circuit also distinguish "decisionmakers" from "policymakers" for purposes of municipal liability. *See Bolton v. City of Dallas, Tex.*, 541 F.3d 545, 548–49 (5th Cir. 2008). Generally, only decisions made by the latter give rise to liability. In drawing out that distinction, and in describing policymakers, the Fifth Circuit has stated that "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with

respect to the action ordered." *Brady v. Fort Bend Cnty.*, 145 F.3d 691, 698 (5th Cir. 1998). In other words, a decisionmaker can become a policymaker only if that official possesses the formal authority to make policy. *See id.* Thus, an isolated discretionary action taken by a policymaking official does not establish an official policy imputed upon the municipality unless that official is "responsible for establishing final government policy" with respect to that discretionary activity. *Id.* at 699 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)). To qualify as a policymaker, an official must "decide the goals for a particular city function and devise the means of achieving those goals." *Webb v. Town of St. Joseph*, 925 F.3d 209, 217 (5th Cir. 2019). On the other hand, "[w]hen an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departure from them, is the act of the municipality." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

With that legal background in mind, the Court turns to its sufficiency review. After the close of the evidence, the Court submitted the following municipal liability elements to the jury:

1.  an official policy or custom existed;
2.  a policymaker for the city knew or should have known about the policy or custom;
3.  the policymaker was deliberately indifferent; and
4.  the policy or custom was the moving force leading to the constitutional violation.

(Dkt. #306 at p. 10). The Quitman Defendants do not challenge elements one, three, or four in their RJMOL Motion (*See* Dkt. #346 at pp. 4–7). They do, however, challenge the sufficiency of Bevill's proof that Mayor Dobbs was the official policymaker for the City of Quitman (Dkt. #346 at p. 6). Accordingly, they insist that municipal liability cannot attach because the decision to terminate Bevill was not made by the City's policymaker (Dkt. #346 at pp. 4–7).

After a thorough review of the trial record, the Court concludes that Mayor Dobbs was the policymaker for the City. State law governs whether an individual is the final policymaker for a municipality with respect to a certain "sphere of activity." *Pippin*, 74 F.3d at 586 (citing *Praprotnik*, 485 U.S. at 124; *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989); *Doe v. Rains Cnty. Indep. Sch. Dist.*, 66 F.3d 1402, 1407 (5th Cir. 1995)). According to the Quitman Defendants, the City of Quitman is a Type A general law municipality (Dkt. #346 at pp. 5–6). As such, its governing body consists of the Mayor and the City Council, per Texas statute. *See* TEX. LOC. GOV'T CODE § 22.031(b); *Jimenez v. Teague*, No. 5:13-CV-876-DAE, 2015 WL 128153, at *4 (W.D. Tex. Jan. 8, 2015) ("The City of Castroville is a Type A general-law municipality, whose governing body is the Mayor and the City Council. . . . Accordingly, the Mayor and City Council are the final policymakers for the City of Castroville."). In Texas, the general rule is that the city council is the final policymaker for the city. *See, e.g.*, *Groden v. City of Dallas, Tex.*, 826 F.3d 280, 286 (5th Cir. 2016); *Bolton*, 541 F.3d at 550. But that is not always the case. And it is not here.

First and foremost, Mayor Dobbs admitted as much during trial:

Q:     So no question in your mind you're the final decision maker, final policy maker for the city?

A:     That is correct, sir.

(Dkt. #330 at p. 75). Second, Mayor Dobbs's answer reveals a possible alternative governance structure, different from the Type A general law municipality default on which the Quitman Defendants focus. The Fifth Circuit has recognized that "[a] city's governing body may delegate policymaking authority expressly or implicitly." *Slidell*, 728 F.2d at 769. The City of Quitman did so expressly in 2011. In a 2011 City of Quitman Ordinance, the Quitman City Council reassigned supervisory authority over City department heads to the Mayor (Pl.'s Ex. 17). The City Ordinance

provided that, to the extent it did not conflict with duties specifically reserved for the City Council under the Texas Local Government Code, "the Mayor shall have the responsibility and authority incident thereto for the day-to-day supervision and management of the city's department heads" (Pl.'s Ex. 17 at p. 1). The City Ordinance was in effect during Mayor Dobbs's tenure. Thus, Mayor Dobbs did not have to act with the City Council's knowledge or approval in order to make hiring and firing personnel decisions. He could do so as the lone policymaker.

The City of Quitman Personnel Policies and Procedures Manual supports the same conclusion (Quitman Def.'s Ex. 2 at p. 6). Under the Section titled "Administration," the Mayor is described as the City's Chief Executive Officer (Quitman Def.'s Ex. 2 at p. 6). Pursuant to that role, "[f]inal authority, in the form of approval and review, is reserved by the Mayor and the City Council with regard to all personnel matters and other subjects covered by these regulations" (Quitman Def.'s Ex. 2 at p. 6). Therefore, Mayor Dobbs's hand in personnel matters was far more active than a simple thumbs up or down on hiring and firing decisions.

As the final arbiter on personnel matters related to City employees, Mayor Dobbs directly oversaw the Bevill investigation. After an initial discussion with DA Wheeler and Secretary Hollen, Mayor Dobbs—in his own words—"let Blake Armstrong lead" the independent investigation into Bevill's affidavit (Dkt. #329 at pp. 264–66). Mayor Dobbs's statement suggests that he possessed complete and total control over how the investigation would be conducted and who would conduct it (Dkt. #329 at pp. 264–66). Notably, Chief Cole was excluded from the Bevill investigation, despite being Bevill's direct supervisor (Dkt. #329 at pp. 119–20, 134, 276, 280; Dkt. #330 at p. 19). Throughout the investigation, Mayor Dobbs was included on email chains with Gannaway, Armstrong, and Secretary Hollen in a scavenger hunt for some Quitman policy that Bevill may have

50

violated (Pl.'s Ex. 3). Alongside Secretary Hollen, Mayor Dobbs arranged for Gannaway to prepare administrative leave documents to provide for Bevill (Pl.'s Ex. 3 at p. 10; Dkt. #329 at pp. 271–72). The documents identified two policies that Bevill supposedly violated (Pl.'s Ex. 7). Mayor Dobbs never asked Chief Cole to confirm whether Bevill violated those policies before placing him on leave (Dkt. #329 at pp. 276–77). Had he asked, he would have learned that Chief Cole did not consider Bevill's affidavit to be a terminable offense (Pl.'s Ex. 6 at p. 3; Dkt. #330 at pp. 56–57). Mayor Dobbs's refusal to consult with Chief Cole prompted the following colloquy at trial:

> Q:    Well, despite the fact that you had no experience as the mayor in dealing with the police department as the mayor and the head – ultimate supervisory head of that, you forewent talking to the chief of police about whether his disciplinary recommendation was correct or not?
>
> A:    That is correct, sir.

(Dkt. #330 at p. 57). Ultimately, Mayor Dobbs decided to terminate Bevill—a decision that he alone possessed the authority to make (Dkt. #329 at pp. 260–61; Dkt. #330 at pp. 24, 49). In fact, according to Mayor Dobbs, he did not even need approval from Quitman City Council to terminate Bevill (Dkt. #330 at pp. 23–24). Despite Chief Cole's exclusion from most of the City's investigation, Mayor Dobbs tasked Chief Cole with terminating Bevill, though it was Mayor Dobbs's ultimate decision (Dkt. #330 at pp. 46–48, 56).

The evidence shows that, from the moment that Mayor Dobbs learned about Bevill's affidavit, he steered the ship on how it would be investigated, who would be involved, and what the consequences would be. He was copied on emails with Gannaway, McLeroy, and Secretary Hollen as part of the initial investigation and drafting of administrative leave documents (Pl.'s Ex. 3). His name was referenced as a viable option to list as the "complainant" on the internal complaint form (Pl.'s Ex. 3 at p. 20). He helped navigate the relevant Quitman policies and procedures in search of

51

a policy to charge Bevill with violating (Pl.'s Ex. 3 at p. 21). He and Secretary Hollen engaged Armstrong to prepare a memorandum demonstrating the policies that Bevill allegedly violated (Pl.'s Ex. 4; Pl.'s Ex. 5). Then, only after Armstrong identified those policy violations, Mayor Dobbs participated in discussions to retain Armstrong to conduct an internal investigation and ultimately decided to "let Blake Armstrong lead" the investigation (Pl.'s Ex. 3 at p. 40; Dkt. #329 at pp. 264–66; Dkt. #330 at p. 27). Thus, with Mayor Dobbs's approval, Armstrong—an attorney on the City's dime who had already authored a memorandum stating that he made up his mind as to Bevill's violations—was tapped to conduct this so-called "independent investigation" (Pl.'s Ex. 3 at pp. 40–44; Pl.'s Ex. 4; Pl.'s Ex. 5). The entire point of the investigation was to decide whether Bevill, in fact, violated City policy such that he should be terminated—something that the lead investigator had already concluded. Finally, Mayor Dobbs ensured that Chief Cole—who, as Bevill's direct supervisor, would have been in the best position to advise Mayor Dobbs on how to reprimand Bevill—was removed from the equation (Dkt. #329 at 276, 280; Dkt. #330 at p. 19).

As if his own admission is not enough, all the evidence points to one conclusion: Mayor Dobbs was the final policymaker for this "sphere of activity." *See Pippin*, 74 F.3d at 586. That is, personnel decisions. Indeed, Mayor Dobbs's fingerprints on the pretextual Bevill investigation and termination were far more visible than the Quitman Defendants contend. They are undeniable and impossible to mistake. His decision-making authority was not limited to Bevill's termination. It permeated throughout the entire investigation, from the initial policy review on June 5 until Bevill's termination on June 21. He called the investigatory shots—when it would begin, who would conduct it, and who would be excluded from it. He held the pen on the final decision to fire Bevill. At bottom, Mayor Dobbs "decide[d] the goals" of the Bevill investigation and "devise[d] the means

of achieving those goals." *See Webb*, 925 F.3d at 217. Mayor Dobbs's latitude over the investigation

was that of a policymaker, not a decisionmaker. And as the City's personnel policymaker, Mayor

Dobbs's decision to terminate Bevill was "within the sphere of [his] final authority." *See Pippin*, 74

F.3d at 586. Hence, the City of Quitman is not insulated from liability. *Id.* (quoting *Gonzalez*, 996

F.2d at 754). The Court upholds the jury's verdict as to Question No. 3 (Dkt. #312 at p. 2).[15]

## IV.    Immunities

Shifting gears, the Court now looks to the immunities. Three are at issue: judicial immunity

for Judge Fletcher, prosecutorial immunity for DA Wheeler, and qualified immunity for Judge

Fletcher, DA Wheeler, Sheriff Castloo, and Mayor Dobbs. The Court takes each in turn.

### A.    Judicial Immunity

First up is Judge Fletcher, who reasserts an entitlement to judicial immunity for his

participation in the conspiracy to deprive Bevill of his First Amendment rights (Dkt. #348 at pp.

11–13). Judge Fletcher claims that he is immune from the consequences of his actions because

---

[15] The Quitman Defendants alternatively move for a new trial because "Bevill failed to secure a jury instruction
identifying the City's policymaker" (Dkt. #346 at pp. 6–7). But the Quitman Defendants did not object to the
Court's municipal liability instruction at the charge conference or otherwise propose an alternative instruction
identifying the City's policymaker (*See* Dkt. #325; Dkt. #200). In fact, the Quitman Defendants' proposed
instructions on the municipal liability question are identical to those that the Court included in its Final Instructions
to the Jury (*Compare* Dkt. #200 at pp. 9–10, *with* Dkt. #306 at pp. 10–11). That makes sense, because the Court's
instructions track the Fifth Circuit's Pattern Jury Instruction on municipal liability. 5th Cir. PJI 10.5.

Under Federal Rule of Civil Procedure 51, a party may not later assert that there is an error in a given jury instruction
if that party failed to properly object to it during trial. *See* Fed. R. Civ. P. 51(d)(1); *see also Turner v. Baylor Richardson
Med. Ctr.*, 476 F.3d 337, 347 (5th Cir. 2007) (affirming the district court's denial of a motion for new trial on an issue
that was not raised until the motion for new trial). "Where the party challenging the district court's instructions has
failed to raise the objection before the district court," the objection is considered waived absent a showing of plain
error. *Russell v. Plano Bank & Tr.*, 130 F.3d 715, 721 (5th Cir. 1997). To demonstrate plain error, the movant has the
burden of showing: "(1) that an error occurred; (2) that the error was plain, which means clear or obvious; (3) the
plain error must affect substantial rights; [and] (4) not correcting the error would 'seriously affect the fairness,
integrity, or public reputation of the judicial proceedings.'" *Highlands Ins. Co. v. Nat'l Union Fire Ins. Co.*, 27 F.3d
1027, 1032 (5th Cir. 1994) (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)). Defendants have not carried
their burden to show plain error. And because their briefing omits any discussion of these elements, it appears that
they do not even try to do so (*See generally* Dkt. #346 at pp. 6–7). Accordingly, the argument is waived.

Bevill's evidence against him at trial "consists of official judicial acts taken in the course and scope of his role as a jurist—including his official actions taken during the David McGee trial, the issuance of the warrant for [Bevill's] arrest, and acts in unrelated cases pending before his court" (Dkt. #348 at pp. 12–13). Thus, in Judge Fletcher's view, because Bevill's claim against Judge Fletcher hinges on perfectly lawful acts carried out in his judicial capacity, he is entitled to absolute judicial immunity for those acts (Dkt. #348 at p. 13). He accordingly urges the Court to discard the jury's verdict on Bevill's conspiracy claim against him. Judge Fletcher's arguments are unavailing.

In its previous Order, the Court found that Judge Fletcher's issuance of the bench warrant and attachment of certain bond conditions were judicial in nature and were not "'taken in the complete absence of all jurisdiction'" (Dkt. #89 at p. 22) (quoting *Mireles v. Waco*, 502 U.S. 9, 11 (1991)).[16] The Court's decision to grant Judge Fletcher judicial immunity in defense of Bevill's (since dismissed) claim of conspiracy to commit retaliatory arrest and criminal prosecution protected Judge Fletcher from liability as to that claim (Dkt. #89 at pp. 22–23). It is that decision upon which his new argument now rests. In his view, the judicial immunity the Court granted him for issuing the bench warrant precludes any adverse finding based upon that act (Dkt. #348 at pp. 11–13). So, the argument goes, because Bevill's § 1983 conspiracy claim "hinges on" the bench warrant, the jury could not consider his judicial acts in arriving at its verdict (Dkt. #348 at pp. 12–13). Consequently, he argues that the jury, unable to consider the bench warrant in its conspiracy determination, had legally insufficient evidence to find against Judge Fletcher (Dkt. #348 at p. 13).

---

[16] The Court previously granted Judge Fletcher judicial immunity under the law that the Court had to apply at the 12(b)(6) stage (Dkt. #89 at pp. 22–23). But at the 12(b)(6) stage, the facts were not nearly as crystalized as they were at trial. After having sat through presentation of all the evidence at trial, the Court questions whether it was correct in granting Judge Fletcher judicial immunity for his issuance of the bench warrant.

Judge Fletcher's arguments at the RJMOL stage necessitate a tri-pronged analysis. First, the Court grapples with Judge Fletcher's argument that he is entitled to judicial immunity such that he is not a proper defendant in this action at all. Second, the Court considers Judge Fletcher's argument that the Court, in ruling on his RJMOL Motion, must treat as nonexistent all the evidence adduced at trial related to his conduct, the consequences of which he claims immunity. Third and finally, with those questions answered, the Court must turn to the heart of its post-trial task: whether legally sufficient evidence supports the jury's verdict of liability against Judge Fletcher.

1.      *Judicial immunity does not categorically bar Bevill's § 1983 conspiracy claim.*

The Court begins with judicial immunity. The question is whether it bars Bevill's conspiracy claim against Judge Fletcher. The answer is no. For the first time in this case, Judge Fletcher seems to argue that, because he is immune from § 1983 suits predicated upon his judicial conduct, and because, according to him, the only evidence that inculpates him in this conspiracy are "judicial act[s] carried out in the course of an official judicial proceeding," he is entitled to judgment as a matter of law (Dkt. #348 at p. 13). But Judge Fletcher paints with too broad a brush. This much the Court agrees with Judge Fletcher on: he, as a former judge, is entitled to judicial immunity from suits predicated on his performance of his judicial functions. *See, e.g.*, *Nixon v. Fitzgerald*, 457 U.S. 731, 745–46 (1982) (recognizing absolute immunity for judges acting in the performance of their judicial duties). That is why the Court dismissed Bevill's claims predicated upon Judge Fletcher's issuance of a bench warrant—an exclusively judicial function (Dkt. #89 at p. 23). But that judicial immunity is vast, and that Judge Fletcher is entitled to judicial immunity on *some* claims does not absolve him from his patently non-judicial role in *this* conspiracy claim.

55

In wading through the murky waters on this issue, the Court begins with an obvious, though overlooked point. That is, Judge Fletcher never raised such a broad argument before. He had ample opportunity to assert the immunity he now seeks in the five years leading up to trial. He did not. Instead, he only moved to dismiss one claim on the basis of judicial immunity—a request that the Court granted (*See* Dkt. #48 (moving to dismiss, on the basis of judicial immunity, only Bevill's claim that Judge Fletcher conspired to violate Bevill's constitutional rights by having him criminally prosecuted); Dkt. #89 at p. 23). But his argument now appears infinitely broader and entirely novel.

No less, the Court will assume without deciding that Judge Fletcher properly preserved the issue. Accordingly, the Court proceeds to ask whether Judge Fletcher is entitled to any new immunity here. That is, does the Court's prior grant of judicial immunity on Judge Fletcher's acts taken during the McGee trial extend so far as to bar Bevill's § 1983 claim for conspiracy to commit First Amendment retaliatory termination? No. The Court demonstrates below.

"Like other forms of official immunity, judicial immunity is an immunity from suit, not just from ultimate assessment of damages." *Mireles*, 502 U.S. at 11. An assertion of judicial immunity is overcome in only two circumstances. *Id.* First, a judge does not enjoy judicial immunity for non-judicial actions—actions taken outside of the judge's judicial capacity. *Id.* Second, a judge does not enjoy judicial immunity for "actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Id.* at 12. "Judicial immunity is not overcome by allegations of bad faith or malice." *Id.* at 11; *Pierson v. Ray*, 386 U.S. 547, 554 (1967) ("[I]mmunity applies even when the judge is accused of acting maliciously and corruptly.").

"Absolute judicial immunity is broad but not unlimited." *Laird v. Spencer*, No. 20-30237, 2025 WL 79826, at *3 (5th Cir. Jan. 13, 2025) (citing *Mireles*, 502 U.S. at 11). For purposes of

judicial immunity, there is "an intelligible distinction between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform." *Forrester v. White*, 484 U.S. 219, 227 (1988). Whether a judge was acting in his or her judicial capacity—that is, whether the function performed was judicial in nature—depends on four factors: (1) whether the precise act complained of is a normal judicial function; (2) whether the acts occurred in the courtroom or appropriate adjunct spaces such as the judge's chambers; (3) whether the controversy centered around a case pending before the court; and (4) whether the acts arose directly out of a visit to the judge in his official capacity. *Ballard v. Wall*, 413 F.3d 510, 515 (5th Cir. 2005). The factors are construed broadly in favor of immunity. *Id.*

The thrust of Judge Fletcher's argument is that Bevill's § 1983 conspiracy claim is predicated on acts for which Judge Fletcher is judicially immune and, therefore, the evidence that Bevill submitted to prove a conspiracy cannot support the jury's verdict (Dkt. #348 at pp. 11–13). Judge Fletcher is wrong. Bevill's claim for conspiracy to commit retaliatory arrest and criminal prosecution sought to hold Judge Fletcher directly accountable for his issuance of the bench warrant, but Bevill's claim for conspiracy to commit First Amendment retaliation is quite different. Bevill's conspiracy claim seeks to hold Judge Fletcher, along with his co-conspirators, liable not for Bevill's arrest, but for his wrongful termination and the damages that flowed therefrom—a matter wholly separate from the bench warrant. Indeed, the acts for which Judge Fletcher enjoys judicial immunity represent only a small fraction of a larger quantum of evidence of his participation in the conspiracy to terminate Bevill. Thus, Bevill's conspiracy claim does not seek to impose liability against Judge Fletcher for his judicial acts. He is not entitled to judicial immunity on Bevill's claim for conspiracy to commit First Amendment retaliatory termination.

2.     *Sufficiency review does not permit post-hoc evidentiary rulings.*

Having determined that Judge Fletcher is not entitled to judicial immunity for the conspiracy claim at hand, the Court turns to the argument Judge Fletcher makes more overtly in his Motion: that no *admissible* evidence supports the verdict against him. In support of this argument, Judge Fletcher seems to argue that only one real piece of evidence exists which ties him to the conspiracy: his issuance of the bench warrant for Bevill's arrest. Because that is a fundamentally judicial act, and because the Court already granted him immunity on the claims predicated upon that act, Judge Fletcher contends that it was error to allow the jury to hear any evidence related to the warrant. And now, Judge Fletcher argues that the Court, in performing its sufficiency review, must disregard that evidence entirely.

Judge Fletcher's argument is incorrect. In considering an RJMOL motion (as opposed to a motion for new trial), "a district court may not exclude or disregard evidence admitted at trial on the basis that the admission was error." *Dixon v. Int'l Harvester Co.*, 754 F.2d 573, 580 (5th Cir. 1985) (citing *Sumitomo Bank of California v. Prod. Promotions, Inc.*, 717 F.2d 215, 218 (5th Cir. 1983)). "The trial court must take the record as presented to the jury and cannot enter judgment on a record altered by the elimination of incompetent evidence." *Id.* (citing *Sumitomo,* 717 F.2d at 218; *Midcontinent Broad. Co. v. N. Central Airlines, Inc.,* 471 F.2d 357, 358 (8th Cir. 1973)). The Court will consider Judge Fletcher's judicial acts in examining the sufficiency of the evidence.

3.     *The Court already concluded that the evidence is sufficient to support a conspiracy.*

Having determined that Judge Fletcher may be held liable for conspiracy to commit First Amendment retaliation and that the Court's sufficiency review cannot categorically disregard any evidence adduced at trial, the Court returns to a familiar analysis: whether sufficient evidence exists for a reasonable juror to conclude that Judge Fletcher was a member of the conspiracy. It does.

58

The Court has already explained much of the salient evidence which grounds its approval of the jury's verdict here. *See supra* at 37–46. Worthy of special attention, however, is just how myopic Judge Fletcher's argument actually is. As noted above, Judge Fletcher submits that Bevill's claim against him "hinges on" his judicial acts. In reality, Bevill's conspiracy claim is grounded in Judge Fletcher's extra-judicial acts, not the least of which include:

1. Judge Fletcher's close working and personal relationships with DA Wheeler and Sheriff Castloo;

2. Judge Fletcher's journal entries berating Bevill for his actions and stating his desire to have Quitman PD terminated as a department due to his "scurrilous insubordination" (*See* Judge Fletcher's Journal);

3. Judge Fletcher's meeting with DA Wheeler and Investigator Hirsch discussing the affidavit and ensuring that Bevill did not receive a "free pass" for executing it (Dkt. #330 at pp. 165–68); and

4. Judge Fletcher's attendance alongside Sheriff Castloo and DA Wheeler at the Quitman City Council meeting the day after Bevill's termination in which Sheriff Castloo demanded for more action to be taken in response to the Bevill affidavit (Council Meeting Minutes).

Consequently, even if it was permissible for the Court to disregard Judge Fletcher's judicial acts in conducting its sufficiency review, the remaining evidence was still sufficient for a reasonable jury to conclude that Judge Fletcher conspired to terminate Bevill. The Court rejects Judge Fletcher's judicial immunity argument.

### B.    Prosecutorial Immunity

Now, DA Wheeler's turn. In another familiar argument, DA Wheeler attempts to immunize himself from liability for a third time. His shield of choice is prosecutorial immunity. Like Judge Fletcher's judicial immunity claim, the Court previously granted DA Wheeler prosecutorial immunity on Bevill's (now dismissed) claim for conspiracy to commit retaliatory arrest and criminal prosecution (Dkt. #89 at pp. 24–25). At summary judgment, DA Wheeler sought

prosecutorial immunity on Bevill's claim for conspiracy to commit First Amendment retaliatory termination, which the Court denied (Dkt. #245 at pp. 28–32). On appeal, the Fifth Circuit agreed:

> While DA Wheeler may assert prosecutorial immunity in his decisions to prosecute or forgo prosecution generally, this immunity does not cover his alleged act of wielding his prosecutorial authority as a threat to influence a public employment decision over which he had no lawful authority. Such a threat cannot reasonably be considered intimately associated with the judicial phase of the criminal process. . . . We agree with the district court that DA Wheeler is not shielded by absolute prosecutorial immunity.

*Bevill II*, 103 F.4th at 382 (internal citations omitted).

DA Wheeler's principal prosecutorial immunity argument is that "[t]here was no evidence at trial that Wheeler exercised prosecutorial authority over David Dobbs as a means to influence Dobbs' decision to terminate Terry Bevill" (Dkt. #342 at p. 2). In support, he argues that the trial record established that his decisions fell squarely within the sphere of discretionary conduct protected by absolute prosecutorial immunity (Dkt. #342 at p. 3). DA Wheeler's argument fails.

Unlike the Court's judicial immunity analysis, *see supra* at 53–59, DA Wheeler's prosecutorial immunity argument has been sufficiently put to bed by the Fifth Circuit. *Bevill II*, 103 F.4th at 382. Accordingly, an extensive analysis is unnecessary. The Court need only review the trial record to determine if Bevill presented sufficient evidence of DA Wheeler's improper influence over Mayor Dobbs. He did. The trial testimony made clear that "the one time" that DA Wheeler met with Mayor Dobbs during his tenure was to discuss the fallout of the Bevill affidavit (Dkt. #330 at p. 55). At that meeting, DA Wheeler was undeniably angry about the affidavit (Dkt. #329 at pp. 266–68). So angry, in fact, that Mayor Dobbs felt that his "presence was the only thing [Mayor Dobbs] was hoping would calm him, but [Mayor Dobbs] couldn't assume that would work" (Dkt. #330 at p. 53). DA Wheeler demanded to know whether the opinions that Bevill shared in the affidavit represented the City's official position (Dkt. #330 at pp. 53–55). He viewed the

affidavit as career-altering and compromising to him, his office, his job, and his family (Dkt. #329 at pp. 266–68; Dkt. #330 at pp. 220–21). Then, there is conflicting testimony about whether DA Wheeler threatened to stop taking cases from Quitman PD unless Bevill was terminated (*See, e.g.*, Dkt. #329 at p. 271). At a minimum, the evidence introduced at trial was sufficient for a jury to conclude that DA Wheeler wielded his prosecutorial power to convince Mayor Dobbs to terminate Bevill. Thus, the Court's position remains unchanged: DA Wheeler's exercise of influence over Mayor Dobbs does not fall under prosecutorial immunity's protective umbrella (Dkt. #245 at pp. 3–5). *Bevill II*, 103 F.4th at 382. He is not immune. *Id.*

## C.    Qualified Immunity

In one final effort to escape liability for their actions, Defendants, for a third time, claim entitlement to qualified immunity. Lucky for the Court, this dead horse has already been sufficiently beaten. So, the Court will pull its punches today. Accordingly, the Court's analysis should be brief. But first, a summary of the Court's prior decisions on the issue.

The Court's first venture into qualified immunity came at the motion to dismiss stage (Dkt. #89). Having already determined that Bevill plausibly alleged a First Amendment violation, the bulk of the Court's analysis was dedicated to determining whether the constitutional right was clearly established at the time of the violation (Dkt. #89 at pp. 12–19). To answer that question, the Court examined Fifth Circuit decisions issued before June 21, 2017, the date of Bevill's termination (Dkt. #89 at p. 13). The Court homed in on two competing Fifth Circuit cases that the Court found worthy of lengthier discussion: *Kinney v. Weaver*, 367 F.3d 337 (5th Cir. 2004) and *Sims v. City of Madisonville*, 894 F.3d 632 (5th Cir. 2018) (Dkt. #89 at pp. 13–18). Defendants relied on the latter, arguing that the law had not been clearly established that someone other than the ultimate decision-

maker could be liable for First Amendment retaliatory termination until 2018, when the Fifth Circuit issued its opinion in *Sims*. Ultimately, however, *Kinney* won the day. The Court focused on the relationship between the terminating employer and the conspiring government officials (Dkt. #89 at p. 18). Because *Kinney*—unlike *Sims* and its predecessors—"contemplated the situation in which a government employee, because of retaliatory animus, uses his or her position to influence a *third-party* employer to terminate one of its employees for exercising his or her First Amendment rights," it proved to be a better analog than *Sims* (Dkt. #89 at pp. 18–19). On appeal, the Fifth Circuit agreed. *Bevill I*, 26 F.4th at 281–82. Showing its work with a convenient diagram, the Fifth Circuit determined that "*Sims* clearly established a different right than the one litigated here." *Id.* at 282. Specifically, *Kinney* established "the right of a plaintiff to be free from government officials exerting their power or influence over a third-party employer to cause the plaintiff to be terminated for exercising his First Amendment rights." *Id.* at 282–83 (cleaned up). Accordingly, the Fifth Circuit affirmed the Court's denial of qualified immunity at the motion to dismiss stage. *Id.* at 283.

Round two of the qualified immunity saga came at summary judgment. There, Defendants reasserted their qualified immunity defenses after discovery and urged the Court to proceed under a different analytical approach (Dkt. #245 at p. 26). Unpersuaded, the Court held firm that "Wheeler, Fletcher, Castloo, and Dobbs should have known their behavior was in violation of clearly established law under the facts that Bevill has put forward evidence for" (Dkt. #245 at p. 27). Once more, the Fifth Circuit agreed. Noting its lack of jurisdiction to evaluate the sufficiency of the summary judgment record on appeal, the court of appeals held that "Defendants-Appellants are not entitled to qualified immunity on Bevill's conspiracy claim." *Bevill II*, 103 F.4th at 380. However, the Fifth Circuit's affirmance came with a caveat:

> [W]e stress that we are holding that Defendants-Appellants are not entitled to qualified immunity at the summary judgment stage, where all evidence and disputed issues of material fact must be viewed in the light most favorable to Bevill. Importantly, we are not granting summary judgment for Bevill. Thus, for disputed issues remaining to be decided at trial, after the presentation of the evidence, the jury, or, where appropriate, the court, may find some or all of the evidence and/or arguments presented by one or more of the Defendants convincing. But at this stage, we hold that Bevill has satisfactorily supported his First Amendment retaliatory-discharge and conspiracy claims to overcome Defendants-Appellants' defenses of qualified immunity at summary judgment.

*Id.* at 381. Defendants hang their collective hats on the Fifth Circuit's dicta above to argue that the evidence introduced at trial should somehow convince the Court to reverse course on its prior decisions (Dkt. #342 at p. 5; Dkt. #346 at pp. 14–15). Rest assured, the Court holds a steady course.

Put simply, the pre-June 2017 caselaw is the same today as it was five years ago. It necessarily cannot evolve. The right that was clearly established then—that is, the right of a plaintiff to be free from government officials' exercise of power to cause the plaintiff to be terminated—is just as clearly established today. *Bevill I*, 26 F.4th at 282–83. And the evidence adduced at trial is not meaningfully different from the facts that informed the Court's and the Fifth Circuit's analysis at the motion to dismiss and summary judgment stages (Dkt. #89; Dkt. #245). *Bevill I*, 26 F.4th at 279–83; *Bevill II*, 103 F.4th at 379–81. Thus, the fact issue that existed then—whether Defendants conspired to terminate Bevill—also existed after the close of the evidence. Accordingly, the Court submitted that question to the jury, which found that Defendants agreed to violate Bevill's constitutional rights. Defendants urge the Court to upend six years of litigation and, for the first time, grant them qualified immunity, thereby turning the jury's verdict on its head. The Court declines that invitation. Qualified immunity does not bar Bevill's conspiracy claim.

*Motion for New Trial*

Having rejected Defendants' renewed requests for judgment as a matter of law, the Court next turns to their Motions for New Trial. Though each Defendant brings his own Motion for New Trial, the arguments common to each motion can be categorized into four broad topics: (1) evidentiary rulings; (2) the Court's instructions to the jury; (3) the jury's verdict on the conspiracy question; and (4) the jury's damages award (*See* Dkt. #342; Dkt. #345; Dkt. #346; Dkt. #348). The Court's analysis will proceed in that order.

## I.    Evidentiary Rulings

Defendants first move for a new trial based on several evidentiary decisions that the Court made during trial. Specifically, they challenge the Court's admission of evidence of Bevill's arrest on the ground that, because it happened after his termination, it is "irrelevant and unrelated to any issue in the case" (Dkt. #342 at p. 15; Dkt. #345 at p. 19). Alternatively, they object to its admission under Federal Rules of Evidence 403, 404(b), and 405. Finally, Judge Fletcher argues that the Court erred in permitting the jury to hear evidence of Bevill's arrest because he is protected by judicial immunity (Dkt. #348 at pp. 17–19).

All three evidentiary arguments are meritless because the Court did not err by admitting evidence of Bevill's arrest. But if there was error, it was harmless. *See E.E.O.C. v. Manville Sales Corp.*, 27 F.3d 1089, 1093 (5th Cir. 1994) (quoting *Carter v. Massey-Ferguson, Inc.*, 716 F.2d 344, 349 (5th Cir. 1983) (holding that erroneous evidentiary rulings are harmless and do not justify vacatur of a judgment when they do not affect "the substantial rights of the parties")).

64

## A.    Admission of Evidence of Post-Termination Events

Defendants first claim that the Court's admission of evidence surrounding Bevill's arrest entitles them to a new trial because such evidence was irrelevant, lacked probative value and was inflammatory, and introduced improper character evidence to establish prior bad acts or motives (Dkt. #342 at pp. 14–17; Dkt. #345 at pp. 18–20; Dkt. #348 at pp. 22–25). None of Defendants' arguments hold water.

### 1.    Federal Rules of Evidence 401 and 402

The Court begins with relevance. Federal Rules of Evidence 401 and 402 permit the admission of "all relevant evidence," which is defined as "evidence having *any tendency* to make the existence of" any material fact "more probable or less probable than it would be without the evidence." FED. R. EVID. 401, 402 (emphasis added). Against this low bar, *see Hicks-Fields v. Harris Cnty.*, 860 F.3d 803, 809 (5th Cir. 2017), evidence of Judge Fletcher's bench warrant and DA Wheeler's delay in prosecuting Bevill easily pass muster.

Indeed, "subsequent acts may tend to prove the nature of a prior conspiracy." *Grandstaff v. City of Borger, Tex.*, 767 F.2d 161, 171 (5th Cir. 1985) (citing *Anderson v. United States*, 417 U.S. 211, 219 (1974)); *see also Lutwak v. United States*, 344 U.S. 604 (1953) (determining that, in the context of a criminal conspiracy, "[t]he acts, being relevant to prove the conspiracy, were admissible, even though they might have occurred after the conspiracy ended"). And the circumstances surrounding Bevill's arrest and prosecution, while occurring after his termination, go to the heart of this case's central issue—the existence of a conspiracy to violate Bevill's First Amendment rights and the damages flowing therefrom. Defendants' Rule 401 and 402 arguments fail.

DA Wheeler and Sheriff Castloo cite to an Eighth Circuit case for the proposition that "[e]vidence of post-termination events, rather than the employment decision subject of the lawsuit, are not relevant, particularly when that evidence is only probative of a claim that has been dismissed" (Dkt. #342 at p. 16; Dkt. #345 at pp. 19–21) (citing *Green v. City of St. Louis*, 507 F.3d 662, 669 (8th Cir. 2007)). Their reading of *Green* is wrong for two reasons. First, that is not what the case says. In *Green*, the Eighth Circuit reviewed the district court's exclusion of post-termination evidence for abuse of discretion. *Green*, 507 F.3d at 669. The evidence at issue was a conversation that occurred after the plaintiff's termination in which the plaintiff was described as "radioactive" or "too hot to handle." *Id*. at 668. The district court excluded the evidence, holding that it was only relevant to a previously dismissed claim and would not be relevant to the plaintiff's termination. *Id*. at 669. Finding no abuse of discretion, the Eighth Circuit affirmed. *Id*. Critically, however, it added that "[t]he district court did not purport to state a rule that post-termination statements are never relevant to state of mind at the time of termination." *Id*. Thus, *Green* does not stand for such a brightline rule. Second, *Green* did not involve a conspiracy. As explained above, evidence of post-termination events are relevant to prove a conspiracy to terminate. *Green* does not change that fact. It is, therefore, inapposite. Bevill's arrest was relevant to his conspiracy claim and the Court stands by its admission at trial.

### 2.    *Federal Rule of Evidence 403*

Up next is Federal Rule of Evidence 403. It states, in full:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

FED. R. EVID. 403. Defendants raise two challenges to the admission of Bevill's arrest and his subsequent criminal prosecution under Rule 403. First, Defendants contend that Bevill's arrest has no probative value, and it "served only to inflame the jury and to improperly suggest that the jury should consider Bevill's employment termination and his post-termination criminal proceedings as a singular chain of events" (Dkt. #342 at pp. 15–16). Second, they argue that, though the jury was asked to determine the damages resulting from Bevill's *termination*, the evidence introduced at trial permitted the jury to focus on Bevill's distress and reputational damages resulting from his *arrest* (Dkt. #345 at p. 20). The Court addresses each in turn.

First, the Court performs the traditional 403 balancing test. On one side of the scale is the probative value of Bevill's evidence. On the other, in this case, is the danger of unfair prejudice. If the latter does not *substantially outweigh* the former, the Court properly admitted the evidence. And here it does not. A recap of the timeline illustrates this point. Days after learning about the Bevill affidavit, Judge Fletcher and DA Wheeler made their feelings known to each other, Mayor Dobbs, and Investigator Hirsch, going so far as to demand action and question whether it was the City's official position (Dkt. #329 at pp. 267–68; Dkt. #330 at pp. 53–54, 167–68, 219). Bevill was terminated on June 21, 2017. The next day, June 22, 2017, Sheriff Castloo demanded for more action to be taken in response to Bevill's affidavit at the Quitman City Council Meeting, alongside Judge Fletcher and DA Wheeler (Council Meeting Audio at 2:30–5:00). Less than a week later, Judge Fletcher acted on Sheriff Castloo's demand by issuing the warrant for Bevill's arrest (Pl.'s Ex. 29; Pl.'s Ex. 32). Then, DA Wheeler sat on the charges for well over a year. As demonstrated above, Bevill's treatment as a criminal after his termination from Quitman PD and Defendants' fulfillment of Judge Fletcher's pre-termination vow that Bevill would not receive a "free pass" for

executing the affidavit are highly probative on the conspiracy question. Defendants urge the Court to treat the causal link between Bevill's speech and termination as separate and distinct from his subsequent arrest and prosecution (Dkt. #342 at p. 17; Dkt. #345 at p. 20). The Court cannot. As the jury decided, Bevill's speech precipitated his termination. Defendants' vindictive behavior in response to it—before, during, and after his termination—bear heavily on the question of whether they played a part in his firing. They did. That causal chain cannot be broken.

That the evidence introduced at trial may have upset the jury does not warrant a wholesale exclusion under Rule 403. Yes, the evidence at trial was inflammatory. That is because the facts of this case are inflammatory. The evidence that Defendants seek to exclude concerns the manner in which elected officials violated their constitutional oaths and the laws of the United States to retaliate against Bevill for upholding his own. Defendants cannot blatantly disregard the Constitution in a patently offensive manner, then complain that the evidence establishing the same was too prejudicial for the jury to hear. The question, then, is whether the danger of unfair prejudice substantially outweighed the evidence's probative value. It did not.

Second, the Court analyzes the potential confusion of the issues. Defendants demand a new trial because Bevill's presentation of evidence of his arrest commingled the damages flowing from his arrest and those flowing from his termination. In other words, Defendants' concern is whether the jury improperly awarded Bevill damages for his arrest, instead of his termination alone (Dkt. #345 at p. 20). Defendants' concern is misplaced. The Court need look no further than the damages question on the Verdict Form. Question No. 5 asked the following:

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Plaintiff Terry Bevill for the damages, if any, *that resulted from Plaintiff Terry Bevill's termination from the City of Quitman Police Department?*

(Dkt. #312 at p. 3) (emphasis added). Thus, Defendants' requested severance of damages flowing from Bevill's termination and those flowing from his arrest is already baked into the damages question itself. The Court trusts that the jury read that question properly. Indeed:

> [T]he "crucial assumption" underlying our system of trial by jury "is that juries will follow the instructions given them by the trial judge. Were this not so, it would be pointless for a trial court to instruct a jury, and even more pointless for an appellate court to reverse . . . because the jury was improperly instructed."

*Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983) (quoting *Parker v. Randolph*, 442 U.S. 62, 73 (1979)). The Court stands by its evidentiary ruling under Rule 403.

### 3.    *Federal Rules of Evidence 404(b) and 405*

With the final evidentiary arrow in their quiver, Defendants take aim at Federal Rules of Evidence 404(b) and 405. Federal Rule of Evidence 404(b) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Rule 405 lays out the proper ways to prove one's character when such evidence is permitted. FED. R. EVID. 405. How exactly Defendants think admission of evidence regarding Bevill's arrest violated these rules is unclear; they advance nothing more than a citation to the Federal Rules of Evidence in support of their arguments (Dkt. #342 at p. 16; Dkt. #345 at p. 19). That is, except for Judge Fletcher, who argues that the Court "abused its discretion when it permitted testimony regarding [his] propensities as a judge to be admitted into evidence" (Dkt. #348 at p. 22). He adds that the Court violated Rule 404(b)'s prohibition of "evidence of subsequent extrinsic acts to show a witnesses' [sic] character" (Dkt. #348 at p. 22) (citing FED. R. EVID. 404(b); *Dial v. Travelers Indem. Co.*, 780 F.2d 520, 523 (5th Cir. 1986)). Judge Fletcher's arguments, like his co-defendants', miss the mark.

Judge Fletcher caps off his Rule 404 argument by declaring that "[t]he only purpose for allowing evidence of the arrest warrant, the subsequent criminal proceedings, and the circumstances surrounding both incidents was to prove Judge Fletcher was a bad man" (Dkt. #348 at p. 23). The Court sees several non-propensity purposes for this evidence. For one, the arrest warrant and corresponding criminal proceedings were admitted not to show that Judge Fletcher was a "bad man," but to show that he participated in a conspiracy with DA Wheeler. Their treatment of Bevill post-termination is highly probative of the retaliatory motive they possessed and their ability to exercise their positions of authority to punish Bevill for his affidavit—evidence suggestive of participation in a conspiracy to have him terminated. *Grandstaff*, 767 F.2d at 171 (citing *Anderson*, 417 U.S. at 219) ("[S]ubsequent acts may tend to prove the nature of a prior conspiracy . . . ."). Under Rule 404(b), the evidence of Bevill's arrest and criminal treatment after his firing was intrinsic, not extrinsic. *See United States v. Ramirez*, 106 F.3d 397, at *9 (5th Cir. 1997) (citing *United States v. Royal*, 972 F.2d 643, 647 (5th Cir. 1992) ("[E]vidence of acts committed pursuant to a conspiracy offered to prove a defendant's participation in a conspiracy is not extrinsic evidence and is therefore admissible.")). The evidence was properly admitted.

Finally, to the extent that Judge Fletcher challenges the admissibility of Albers's trial testimony regarding his involvement in the Stacy Walton case, that argument fares no better. Rule 404(b)(2) permits the use of other crimes, wrongs, or acts "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Like the evidence of the arrest and prosecution, Albers's testimony regarding the Stacy Walton case was not offered to prove Judge Fletcher's character. It was offered to show the opportunity to conspire. There is no conspiracy without opportunity. That opportunity can take

the form of a close relationship, an open line of communication, or even physical proximity. In this case, it took the form of access. Judge Fletcher had access to the DA's Office, and vice versa. And he used it to work closely with the DA's Office *ex parte*, as shown by the Stacy Wilson case. It also tends to show his influence over the DA's Office, including Albers, who testified that she feared that Judge Fletcher would retaliate against her unless she handled the case on his terms. Though the evidence may paint Judge Fletcher in a bad light, it is not inadmissible under Rule 404. The evidence was not used to show that Judge Fletcher "acted in accordance with [his] character" but that he possessed the opportunity and relationship to conspire with the DA's Office to have Bevill terminated. FED. R. EVID. 404(b)(2). Hence, it was properly admitted at trial.

### B.    Judicial Immunity

Once more, Judge Fletcher seeks to use judicial immunity as a shield, this time in hopes of obtaining a new trial. He argues that the Court erred in admitting evidence of Bevill's arrest in light of its prior decision to immunize him from Bevill's conspiracy to commit retaliatory arrest and criminal prosecution claim (Dkt. #348 at pp. 17–19; Dkt. #89 at pp. 22–23). Because the Court held that Judge Fletcher was judicially immune from his involvement in Bevill's arrest, any reference to his arrest during trial is inadmissible, so the argument goes. Thus, though he raises a familiar argument, Judge Fletcher's Motion for New Trial raises a novel issue for the Court to wrestle with. The question is this: whether the doctrine of judicial immunity renders inadmissible *per se* all evidence of Bevill's arrest which tends to show that Judge Fletcher participated in a conspiracy to terminate Bevill. The answer is no.

According to Judge Fletcher, "[j]udicial immunity bars the use of judicial acts as evidence to establish a judge's involvement in a conspiracy, particularly when those acts are performed

within the scope of the judge's official duties" (Dkt. #348 at p. 18) (citing *Stump v. Sparkman*, 435

U.S. 349, 356–57 (1978)). That argument mischaracterizes the holding in *Stump* because it conflates

cognizability with admissibility. True enough, *Stump* stands for the proposition that "[a] judge will

not be deprived of immunity because the action he took was in error, was done maliciously, or was

in excess of his authority . . . ." *Stump*, 435 U.S. at 356. Yet it makes no mention of the evidentiary

*admissibility* of judicial acts when used for another purpose; it only contemplates the immunity that

judges enjoy from claims predicated directly upon those acts. *See id.* at 355–64. And here, the

judicial immunity that the Court previously extended to Judge Fletcher immunizes him only from

claims *based upon* his issuance of the bench warrant and the bond conditions attached to it. That is,

his immunity only shielded him from Bevill's claim for conspiracy to commit retaliatory arrest and

criminal prosecution—a claim for which the bench warrant, arrest, and bond conditions were

necessary components (*See* Dkt. #89 at pp. 22–23). The Court's prior decision, however, does not

compel the total exclusion of evidence related to Judge Fletcher's issuance of the bench warrant.

That makes sense, as that evidence is probative of Bevill's conspiracy claim.

Though not explicitly, Judge Fletcher appears to invoke the "law of the case" doctrine to

argue otherwise. But in this context, the "law of the case" doctrine would only prevent Bevill from

presenting evidence that would attempt to prove that Judge Fletcher was not immune for the

issuance of the bench warrant and the corresponding bond conditions. *See Malina v. Gonzales*, No.

CIV. A. 90-4959, 1994 WL 148778, at *2 (E.D. La. Apr. 19, 1994). The doctrine does not render

evidence of the warrant, arrest, and bond conditions irrelevant to Bevill's conspiracy claim. Indeed,

"[e]vidence of immune acts is generally admissible for purposes other than the issue of immunity."

*Id.* (citing *Harris v. Harvey*, 605 F.2d 330, 337 (7th Cir. 1979)). Here, that other purpose is to prove

Judge Fletcher's (extra-judicial) participation in a conspiracy to retaliate Bevill in violation of the First Amendment. The Court agrees with the Seventh Circuit that the "doctrine of judicial immunity does not require the exclusion of judicial acts from evidence but merely protects a judge from liability for those acts." *Harris*, 605 F.2d at 337. As applied here, Bevill's claim for conspiracy to commit First Amendment retaliatory termination does not seek to hold Judge Fletcher liable for issuing the bench warrant. Instead, that evidence is just one piece of a larger puzzle that Bevill assembled to prove that Judge Fletcher, DA Wheeler, Sheriff Castloo, and Mayor Dobbs conspired against him. It was admissible for that purpose. There was no error.

Still, Judge Fletcher disagrees. He relies on *Dennis v. Sparks* to argue that "even where an action could have been alleged to [have] been performed in the furtherance of a conspiracy, if it was judicial in nature, the officer is insulated from liability damages for such actions" (Dkt. #348 at p. 18) (citing 449 U.S. 24, 31 (1980)). Again, Judge Fletcher's argument ignores the full picture. In *Sparks*, the United States Supreme Court considered whether a judge's judicial immunity extends to private parties with whom he conspired. *Sparks*, 449 U.S. at 26. The Supreme Court held in the negative. *Id.* at 27. The challenged conduct at issue in *Sparks* was the judge's alleged corrupt issuance of an injunction as the result of a conspiracy between the judge and other, private defendants. *Id.* Thus, the plaintiff's suit sought to recover damages that flowed directly from the judicial act: the issuance of the injunction. *Id.* That claim is akin to Bevill's claim for conspiracy to commit retaliatory arrest and criminal prosecution, which the Court already dismissed on judicial immunity grounds (*Compare id.*, *with* Dkt. #89 at pp. 22–23). Judge Fletcher relies on *Sparks*'s dicta to argue that any reference to his conduct was inadmissible simply because he was a judge. Specifically, he quotes *Sparks* for the proposition that a judge "'need not defend' and 'cannot be

held liable for damages' for his conduct in a collateral proceeding in which he allegedly conspired"

(Dkt. #348 at pp. 18–19) (quoting *Sparks*, 449 U.S. at 31). But that is not what *Sparks* says. This is:

> In terms of undermining a judge's independence and his judicial performance, the concern that his conduct will be examined in a collateral proceeding against those with whom he allegedly conspired, a proceeding in which he cannot be held liable for damages and which he need not defend, is not of the same order of magnitude as the prospects of being a defendant in a damages action from complaint to verdict with the attendant possibility of being held liable for damages if the factfinder mistakenly upholds the charge of malice or of a corrupt conspiracy with others.

*Sparks*, 449 U.S. at 31. *Sparks* does not stand for as broad a proposition as Judge Fletcher's argument appears to contemplate. All it says is that under *those facts*, where the judge was immune from a plaintiff's claim that was directly premised on the judge's participation in a conspiracy, the judge's testimony in a collateral proceeding was less intrusive on his independence and judicial performance than it would be if he was a party to the action exposed to liability. *See id.*

   *Sparks* is unpersuasive because it did not squarely address the issue before the Court today. Namely, it made no mention of the admissibility of evidence of judicially immune acts to prove a judge's participation in a conspiracy when that evidence is commingled with other evidence of non-judicial acts for which that judge is not immune. Thus, the Court cannot rely on *Sparks*. And unlike the judicial act at issue in *Sparks*, here, the evidence of Judge Fletcher's issuance of the bench warrant was neither necessary nor sufficient for Bevill's claim for conspiracy to terminate him; neither did it form the basis of his claim. Indeed, Bevill's live conspiracy claim seeks to recover for his *termination*, not for his *arrest*. Thus, Judge Fletcher's judicial acts do not form the basis for Bevill's claim for conspiracy to commit First Amendment retaliatory termination. His termination does. The evidence of the bench warrant is simply probative to the broader retaliatory conspiracy between Judge Fletcher, DA Wheeler, Sheriff Castloo, and Mayor Dobbs.

In sum, there is a distinction between acts taken by a judge for which a plaintiff sues under § 1983 and acts that a judge takes that contribute to a larger body of evidence suggesting that the judge, in cahoots with other state actors, conspired to retaliate against that plaintiff. The bounds of judicial immunity are wide, but not infinite. *Laird*, 2025 WL 79826, at *3. The black robe is not an invisibility cloak. It immunizes judges from being haled into court for decisions that they make from the bench but does not erase those actions from all memory. Particularly when those judicial acts combine with non-judicial acts to form a vivid picture of a conspiracy. Accordingly, this ground for a new trial is meritless.

## II.    Erroneous Instructions

Next, Defendants take issue with the Court's instructions to the jury. "A new trial is the appropriate remedy for prejudicial errors in jury instructions." *Aero Intern., Inc. v. U.S. Fire Ins. Co.*, 713 F.2d 1106, 1113 (5th Cir. 1983) (citing *NMS Indus., Inc. v. Premium Corp. of Am.*, 451 F.2d 542, 545 (5th Cir. 1971)). In the Fifth Circuit, two requirements must be met before a new trial will be granted based on an erroneous jury instruction. First, the movant must demonstrate that "the charge as a whole creates substantial and ineradicable doubt whether the jury has been properly guided in its deliberations." *Hartsell v. Doctor Pepper Bottling Co.*, 207 F.3d 269, 272 (5th Cir. 2000). Second, "even if the instruction was erroneous, the instruction must have affected the outcome of the case." *Id.* But generally, "instructions need not be perfect in every respect provided that the change in general correctly instructs the jury, and any injury resulting from the erroneous instruction in harmless." *Rogers v. Eagle Offshore Drilling Servs., Inc.*, 764 F.2d 300, 303 (5th Cir. 1985) (citing *Kyzar v. Vale Do Ri Doce Navegacai, S.A.*, 464 F.2d 285, 289 (5th Cir. 1972)).

Defendants attack the Court's Final Instructions to the Jury from five angles. First, they insist that the Court erred in omitting a qualified immunity instruction from the Court's instructions (Dkt. #342 at pp. 17–18; Dkt. #345 at p. 21; Dkt. #346 at pp. 14–18; Dkt. #348 at pp. 21–22). Second, Judge Fletcher asserts that he was entitled to a jury instruction on judicial immunity and the Court's failure to instruct the jury accordingly constituted prejudicial error (Dkt. #348 at p. 19). Third, Defendants contend that the Court's instruction on protected speech improperly suggested a verdict to the jury (Dkt. #342 at pp. 18–19; Dkt. #345 at pp. 21–22). Fourth, Defendants argue that the Court's conspiracy instruction misstated the law on § 1983 conspiracy claims (Dkt. #342 at pp. 19–20; Dkt. #345 at pp. 22–23). Fifth and finally, Defendants aver that the Court's punitive damages instructions were inaccurate and, therefore, prejudicial (Dkt. #342 at pp. 20–21; Dkt. #345 at pp. 23–24). The Court's analysis proceeds in the same order.

## A.    Omission of Qualified Immunity Instruction

For one final time in this case, qualified immunity rears its ugly head. Defendants maintain that the Court erred by not allowing the jury to determine whether Defendants were entitled to qualified immunity (Dkt. #342 at pp. 17–18; Dkt. #345 at p. 21; Dkt. #346 at pp. 14–18; Dkt. #348 at pp. 21–22). To Defendants, the evidence at trial presented a fact question on qualified immunity which necessitated a corresponding jury instruction. Defendants' arguments are misguided.

Qualified immunity "ordinarily should be decided by the court long before trial . . . ." *McCoy v. Hernandez*, 203 F.3d 371, 376 (5th Cir. 2000). But "if the issue is not decided until trial the defense goes to the jury which must then determine the objective legal reasonableness of the [officials'] conduct." *Id.* (citing *Snyder v. Trepagnier*, 142 F.3d 791, 799 (5th Cir. 1998)). Thus, "'when qualified immunity depends on disputed issues of fact, those issues must be determined

by the jury.'" *Heaney v. Roberts*, 846 F.3d 795, 802 n.3 (5th Cir. 2017) (citing *Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir. 2006)).

Here, the issue of qualified immunity depended upon the answer to a single question: whether Defendants conspired to violate Bevill's First Amendment rights. At the motion to dismiss stage, the Court concluded that Defendants "had 'fair warning' that allegedly using their respective government positions to violate Plaintiff's First Amendment rights would be objectively unreasonable in light of clearly established law at the time" (Dkt. #89 at p. 19). The Fifth Circuit agreed on appeal. *Bevill I*, 26 F.4th at 281–83. Then, at the summary judgment stage, the Court found that Defendants "should have known their behavior was in violation of clearly established law under the facts that Bevill has put forward evidence for. . . . [A]ssuming that Bevill is correct that a conspiracy existed—which the Court finds there is a genuine dispute of material fact about— the behavior would be a violation of Bevill's clearly established First Amendment rights" (Dkt. #245 at p. 25). Finally, in *Bevill II*, the Fifth Circuit had to determine whether Defendants' agreement to terminate Bevill, if such an agreement existed, would be objectively unreasonable in light of clearly established law. *Bevill II*, 103 F.4th at 374. Affirming its holding in *Bevill I*, the court of appeals concluded that Defendants were not entitled to qualified immunity. *Id.* at 380. In sum, the four previous iterations of qualified immunity analysis in this case established that if Defendants conspired to terminate Bevill for executing his affidavit, it would be objectively unreasonable in light of *Kinney*. Thus, the only remaining question for the jury to answer was whether such an agreement existed. The jury answered yes to that question (Dkt. #312 at pp. 1–2).

Defendants present no cogent basis for submission of a qualified immunity instruction to the jury. Nor could they, as the Court and the Fifth Circuit already determined twice over that

Defendants were not entitled to qualified immunity, provided that the jury determined that Defendants conspired to violate his constitutional rights. In light of those four opinions, an affirmative answer to the question of whether Defendants conspired against Bevill was both necessary and sufficient to defeat qualified immunity. The Court submitted the conspiracy question to the jury. It found against Defendants. The Court, in turn, applied the jury's answer to the applicable law, thereby determining, for a final time and on a complete factual record, that Defendants were not entitled to qualified immunity. Any other conclusion would not only fundamentally conflict with the jury's verdict, but it would upend the Fifth Circuit's repeated decisions holding that *Kinney* would categorically render objectively unreasonable Defendants' conspiracy to terminate Bevill, so long as a jury determined they came to such an agreement. It did. Thus, the notion that any open question regarding qualified immunity remains is simply incorrect. Consequently, Defendants have not persuaded the Court that "the charge as a whole creates substantial and ineradicable doubt whether the jury has been properly guided in its deliberations." *Hartsell*, 207 F.3d at 272. Defendants are not entitled to a new trial on qualified immunity grounds.

### B.    Omission of Judicial Immunity Instruction

Judge Fletcher's request for a new trial based on the Court's alleged erroneous omission of a judicial immunity instruction faces the same fate. Judge Fletcher puts forth little argument in support of his conclusory assertion that he was entitled to a jury instruction on judicial immunity (Dkt. #348 at pp. 19–20). His requested instruction would have instructed the jury that it "may not consider Defendant Fletcher's issuance of the arrest warrant or the attachment of bond conditions for the purposes of determining liability or damages against Defendant Fletcher" (Dkt. #348 at pp. 19–20; Dkt. #302). But as the Court already concluded, Judge Fletcher's immunity from suit based

78

upon his judicial acts only immunized him from Bevill's claim for conspiracy to commit retaliatory arrest and criminal prosecution. *See supra* at 53–59. It did not, as Judge Fletcher suggests, prevent the jury from considering the bench warrant and bond conditions as evidence of his participation in the conspiracy to terminate Bevill. And Judge Fletcher cites to no authority that would suggest that the Court's omission of such an instruction constituted error worthy of a new trial. Accordingly, he is not entitled to one on these grounds.

### C.    Protected Speech Instruction

Changing tack, Defendants next argue that the Court's instruction to the jury that Bevill's speech was protected improperly suggested a verdict to the jury (Dkt. #342 at pp. 18–19; Dkt. #345 at pp. 21–22). Defendants challenge the following instruction that the Court gave to the jury:

> The Court has already determined that Plaintiff Bevill submitted his affidavit in his individual capacity as a citizen, the affidavit addressed a matter of public concern, and his interest in submitting the affidavit outweighed the government's interest in the effective provision of public services. In other words, the Court has determined that Plaintiff Bevill's speech was protected, so you must accept that fact as proved.

(Dkt. #342 at pp. 18–19; Dkt. #345 at pp. 21–22) (citing Dkt. #306 at p. 9). Defendants offer two challenges to the Court's instruction. First, they submit that the Court's instruction "implicitly suggests that the jury had no alternative but to find for the Plaintiff in Question 1"—whether Bevill's speech motivated Mayor Dobbs's decision to terminate him (Dkt. #342 at pp. 18–19; Dkt. #345 at pp. 21–22). Second, Defendants insist that the Court's instruction prevented the jury from distinguishing Bevill's conduct from his speech in determining the motivation for his firing (Dkt. #342 at pp. 18–19; Dkt. #345 at pp. 21–22). Given the clear overlap in Defendants' arguments, the Court will handle them together. Neither argument succeeds.

The Court's instruction did not suggest a verdict to the jury because it did not deprive the jury of an alternative answer to the first question. Question No. 1 on the Verdict Form asked

whether Bevill's "speech, which the Court has already determined is protected under the First Amendment, motivated Defendant David Dobbs's decision to terminate him from the Quitman Police Department" (Dkt. #312 at p. 1). Defendants' principal rebuttal at trial was that it was Bevill's *conduct* (i.e. his submission of the affidavit in violation of Quitman PD policy) rather than his *speech* (i.e. his opinion that Judge Fletcher, DA Wheeler, and Sheriff Castloo made up a "dangerous combination" that would prevent McGee from receiving a fair trial) that precipitated his termination. The Court's instruction left open that possibility. That the Court informed the jury that Bevill's speech was protected did not preclude a finding that it was some other factor— such as a policy violation—that caused his firing. The Court instructed the jury that Bevill's speech was protected because it had already found that as a matter of law. It was not a question for the jury. The Court properly instructed the jury accordingly and a new trial on this basis is unwarranted.

### D.    § 1983 Conspiracy Instruction

Next, Defendants criticize the Court's conspiracy instruction on two bases: (1) they challenge the Court's use of the word "agreement" instead of the word "conspiracy" in laying out the elements of a § 1983 conspiracy claim; and (2) they argue that the Court's explanation of conspirator liability was erroneous and prejudicial (Dkt. #342 at pp. 19–20; Dkt. #345 at pp. 22–23; Dkt. #306 at p. 11). The Court engages each in turn.

First, the Court reviews its submission of the § 1983 conspiracy elements to the jury. The Court instructed the jury as follows:

> To prevail on a claim for conspiracy to commit First Amendment retaliatory discharge, Plaintiff Bevill must prove by a preponderance of the evidence that:
>
> 1.    any combination of the City of Quitman, Defendant Castloo, Defendant Dobbs, Defendant Fletcher, and Defendant Wheeler engaged in an agreement to deprive Plaintiff Bevill of his constitutional rights; and

> 2.   Plaintiff Bevill suffered an actual deprivation of his constitutional rights in furtherance of the agreement by any party or parties to the agreement.

(Dkt. #306 at p. 11). According to Defendants, element two should have read: "Plaintiff Bevill suffered an actual deprivation of his constitutional right in furtherance of the conspiracy by a party to the conspiracy" (Dkt. #342 at pp. 19–20; Dkt. #345 at pp. 22–23; Dkt. #306 at p. 11). Without explaining how, Defendants contend that the Court's substitution of the word "agreement" in place of the word "conspiracy" somehow entitles Defendants to a new trial. Not so. Sure, Defendants correctly observe that the Fifth Circuit used the word "conspiracy" when reciting the elements in *Bevill II*. 103 F.4th at 374. Yet that does not render the Court's recital of the elements legally improper. Indeed, there is ample Fifth Circuit § 1983 conspiracy caselaw utilizing the word "agreement" in place of the word "conspiracy." *See, e.g.*, *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994) (explaining that a conspiracy under 42 U.S.C. § 1983, requires a plaintiff to show "an agreement between private and public defendants to commit an illegal act . . . ."); *Latiolais v. Cravins*, 484 F. App'x 983, 991 (5th Cir. 2012) (same); *Montgomery v. Walton*, 759 F. App'x 312, 314 (5th Cir. 2019) ("To establish a conspiracy claim under § 1983, the plaintiff must show that there was an agreement among the alleged co-conspirators to deprive him of his constitutional rights and that such an alleged deprivation actually occurred."); *Jabary v. City of Allen*,[17] 547 F. App'x 600, 610 (5th Cir. 2013) ("To prove a conspiracy under § 1983, a plaintiff must allege facts that indicate (1) there was an agreement among individuals to commit a deprivation . . . ."). Thus, the Court "correctly instruct[ed] the jury" on Bevill's conspiracy claim. *Rogers*, 764 F.2d at 303.

---

[17]   In *Bevill I*, the Fifth Circuit noted Judge Fletcher's reliance on *Jabary* and *Montgomery* in support of his motion to dismiss. *Bevill I*, 26 F.4th at 284. The Fifth Circuit observed that *Jabary* and *Montgomery* were distinguishable, not because of their use of the term "agreement" in defining the elements of a § 1983 conspiracy, but because those cases involved much more cursory allegations of a conspiracy than Bevill alleged in his Complaint. *Id.* Thus, *Jabary* and *Montgomery* properly lay out the elements for a § 1983 conspiracy.

Defendants' second objection to the Court's instructions is much more puzzling. Defendants insist that the Court erred in including the following instruction to the jury:

> To be liable as a conspirator, a defendant must be a voluntary participant in the common venture, although he need not have agreed on the details of the plan or even know who the other conspirators are. It is enough if the person understands the general objectives of the plan, accepts them, and agrees, either explicitly or implicitly, to do his or her part to further them.

(Dkt. #342 at pp. 19–20; Dkt. #345 at pp. 22–23). It is unclear which preliminary, unpublished draft or proposed instruction Defendants found that language in. One thing is for certain: the published version did not include that instruction (Dkt. #306 at p. 12). Without a proper argument to evaluate, the Court denies Defendants' request for a new trial on this basis.

### E.    Punitive Damages Instruction

In their final objection to the Court's instructions, Defendants point to the Court's punitive damages instruction. Defendants scrutinize the Court's decision to include a basic definition of recklessness instead of the more detailed definition that the Fifth Circuit Pattern Jury Instructions permit (Dkt. #342 at pp. 20–21; Dkt. #345 at pp. 23–24). Accordingly, they submit that the Court's instructions on punitive damages were not accurate and, therefore, prejudicial (Dkt. #342 at pp. 20–21; Dkt. #345 at pp. 23–24). Defendants' argument fails for two reasons.

First, the Court's instructions to the jury on punitive damages came directly from the Fifth Circuit Pattern Jury Instructions ("PJIs") (*Compare* Dkt. #306 at pp. 16–18, *with* 5th Cir. PJI 15.7). That is enough to avoid a new trial. "It is well-settled that a district court does not err by giving a charge that tracks this Circuit's pattern jury instructions and that is a correct statement of the law." *United States v. Whitfield*, 590 F.3d 325, 354 (5th Cir. 2009) (citing *United States v. Turner*, 960 F.2d 461, 464 (5th Cir. 1992)). The Court did so here. A new trial is not warranted on these grounds. Defendants' second argument is equally unavailing. They assert that a footnote to the Fifth Circuit

PJI on punitive damages provides them with the adequate ammunition to convince the Court to grant them a new trial. Specifically, they claim that the Fifth Circuit's guidance that "it may be advisable to give a more detailed definition of recklessness" compels the Court to upend the jury's verdict because the Court did not instruct the jury on those terms (Dkt. #342 pp. 20–21; Dkt. #345 at pp. 23–24) (citing 5th Cir. PJI 15.7 n.2). Clearly, however, the Fifth Circuit's suggestion that it "may be advisable" to define recklessness in more detail was simply permissive. The Court was not under any obligation to deviate from the default PJIs. The Court's adherence to the punitive damages language in the Fifth Circuit PJIs does not entitle Defendants to a new trial.

## III.    The Jury's Verdict on Bevill's § 1983 Conspiracy Claim

Next, the Court evaluates Defendants' argument that the jury could not possibly find a conspiracy to deprive Bevill of his First Amendment rights. Once more, Defendants criticize the sufficiency of the evidence of an agreement necessary to support a conspiracy (Dkt. #342 at pp. 21–22; Dkt. #345 at p. 24; Dkt. #348 at pp. 20–21). Once more, Defendants' argument falls flat.

For the same reasons that the Court concluded above that the evidence is legally sufficient to submit the conspiracy question to the jury, the evidence is also factually sufficient to support the jury's verdict. A new trial is warranted only when the jury verdict is "against the great weight of the evidence." *Winter v. Brenner Tank, Inc.*, 926 F.2d 468, 470 (5th Cir. 1991). Here, the great weight of the evidence suggests that an agreement existed to terminate Bevill in retaliation for executing his affidavit in the McGee trial. *See supra* at 37–46. The Court will not re-examine the evidence that Bevill submitted at trial after doing so at length with regard to this specific issue over nine pages in its RJMOL analysis. The bottom line, though Defendants seem to disagree, is that a conspiracy may be—and often is—proven by circumstantial evidence. *Mack*, 373 F.2d at 1350.

Bevill presented ample circumstantial evidence from which a jury could infer that Defendants arrived at an agreement to terminate him. Defendants' dissatisfaction with the jury's verdict does not entitle them to a new trial. The jury's verdict was supported by a myriad of evidence. It stands.

## IV.    The Jury's Damages Award

Finally, the question of damages. In addition to their disagreement with the jury's liability findings, Defendants also dispute the jury's damages award. They attack the jury's award on both categories of damages: compensatory and punitive (Dkt. #342 at pp. 22–28; Dkt. #345 at pp. 25–30; Dkt. #346 at pp. 18–24; Dkt. #348 at pp. 25–27). In their view, the jury's award on both categories is excessive. They accordingly move for a new trial or, in the alternative, remittitur.

In this Circuit, "when a jury verdict results from passion or prejudice, a new trial is the proper remedy." *Laxton v. Gap Inc.*, 333 F.3d 572, 586 (5th Cir. 2003) (citing *Brunnemann v. Terra Int'l., Inc.*, 975 F.2d 175, 178 (5th Cir. 1992)). On the other hand, "[w]hen a damage award is merely excessive or so large as to appear contrary to right reason, remittitur is the appropriate remedy." *Id.* (citing *Brunnemann*, 975 F.2d at 178). With that in mind, the Court's analysis splits into three parts. First, under the motion for new trial standard, the Court will evaluate Defendants' argument that the jury's noneconomic damages award resulted "from passion, prejudice, and bias with no anchor to the evidence" (Dkt. #342 at p. 23; Dkt. #345 at pp. 25–26). Second, the Court will analyze the weight of the evidence supporting the jury's damages award and whether the award warrants a new trial. Third, under the remittitur standard, the Court will examine the Fifth Circuit's "maximum recovery rule" to determine if a remittitur of compensatory or punitive damages is appropriate.

## A.    The Weight of the Compensatory and Punitive Damages Evidence

The Court begins by determining whether the evidence submitted at trial supports the jury's compensatory and punitive damages awards. Defendants submit that it does not and, therefore, a new trial is justified. They say so for two reasons. First, they assert that the jury improperly arrived at a compensatory damages award based upon passion, bias, and prejudice (Dkt. #342 at p. 23; Dkt. #345 at pp. 25–26). Second, they allege that the weight of the evidence at trial is insufficient to support the jury's compensatory and punitive damages award (Dkt. #342 at pp. 27–28; Dkt. #345 at p. 30; Dkt. #346 at pp. 24–25; Dkt. #348 at pp. 26–27). As explained below, neither argument compels a new trial.

"Jury verdicts on damages may be overturned only upon a clear showing of excessiveness or upon a showing that they were influenced by passion or prejudice." *Westbrook v. Gen. Tire & Rubber Co.*, 754 F.2d 1233, 1241 (5th Cir. 1985) (internal citations omitted). Defendants' first argument falls under the second prong. That is, they contend that the jury's $18 million compensatory damages award reflected its bias or prejudice against Defendants (Dkt. #342 at p. 23; Dkt. #345 at pp. 25–26). Specifically, they insist that Bevill improperly framed his case around his arrest, which encouraged the jury to award noneconomic damages caused by his arrest, instead of his termination (Dkt. #342 at p. 23; Dkt. #345 at pp. 25–26). But as the Court already explained in performing its balancing test under Federal Rule of Evidence 403, *see supra* at 66–69, evidence of Bevill's arrest was properly admitted. The Court need not revisit that argument simply because Defendants have repackaged it. Defendants would have this Court treat Bevill's termination as if it occurred in a vacuum, completely independent from his arrest. But the two events are inseparable.

One cannot tell the story of this retaliatory conspiracy without the termination and the arrest. The jury was permitted to hear the full timeline of events. There will be no new trial on these grounds.

The weight of the evidence similarly supports the jury's award. Downplaying Bevill's damages, the Quitman Defendants claim that "[h]urt feelings, anger and frustration are the most that resulted from Bevill's firing" (Dkt. #346 at p. 21). It would seem that Defendants still do not understand the gravity of their actions and have taken every opportunity to escape responsibility for them. Bevill exercised his First Amendment right to free speech to speak up about public corruption in a town he called home. And in return, he lost his livelihood. His identity in law enforcement. A badge that he trained and worked hard to earn. A job that he loved (Dkt. #335 at p. 167). He went from Texas peace officer one day to unemployed the next (Dkt. #335 at p. 188). He was blacklisted from Quitman PD, and lost friends as a result. He was promised that he would remain covered by his health insurance for three months after his termination, but he was not (Dkt. #335 at p. 191). And he found out about his lack of coverage at the worst time—during a doctor's appointment for his wife (Dkt. #335 at p. 190). He "had to look [his] wife in the eye and tell her [he] didn't have the money on [him] to cover th[e] bill," so they made the long drive from Dallas back to east Texas in silence (Dkt. #335 at p. 191). He had no money (Dkt. #335 at p. 191). His children paid his phone and electric bills (Dkt. #335 at p. 188). He even had to sell his belongings to get by (Dkt. #336 at p. 242). He was deeply embarrassed. He lost his good name.

But that was not enough for Defendants. They needed to teach Bevill a lesson. They needed "more steps . . . to be taken" so Bevill did not receive a "free pass" (Council Meeting Audio at 2:30–5:00; Dkt. #330 at pp. 165–68). So they had him arrested. They held the charges over his head for more than a year so that he got the message. His family called that time a "nightmare" (Dkt.

#336 at p. 233). Bevill had to explain to his family that after years of enforcing the law, he found himself on the wrong side of it. His family knew the truth, even if nobody else did (Dkt. #335 at p. 188). His mugshot made front page news. He could not get on Facebook without seeing his name dragged through the mud (Dkt. #335 at p. 188). He needed a job, but now he could not get one. Not even mowing yards nearby (Dkt. #335 at p. 188). He had tried to apply for a job with the Hopkins County Sheriff's Department, but his arrest made that impossible (Dkt. #335 at p. 173). His future was unknown. He had to prepare for the worst while charges loomed over his head. Despite her best efforts to shield her children from the news, eventually, Bevill's daughter had to explain to her children that their grandfather had been fired and arrested (Dkt. #336 at p. 237). They wondered if "Papaw [was] a bad guy now" (Dkt. #335 at p. 192). In the words of Bevill's daughter, Defendants "[t]ook [her] parents' life away and changed [their] world" (Dkt. #336 at p. 239). As a result, the physical toll caused Bevill to lose weight and appear visibly beaten down to his family. His mental state fared no better; he was suicidal (Dkt. #336 at p. 241). But to Defendants, Bevill just had his feelings hurt. The Court sees it much differently. And so did the jury.

But the Court need not take Bevill's word for it. And neither did the jury. Judge Fletcher's words speak for themselves. When he was asked at trial to put a price on freedom, he considered it to be "pretty much" priceless (Dkt. #336 at p. 44). He valued speech to be "priceless" (Dkt. #336 at p. 44). He struggled to value corruption but noted that "[i]t just shouldn't happen" (Dkt. #336 at p. 44). The price of integrity? "Absolute" (Dkt. #336 at p. 44). And when he was asked if he would accept $10 million to be illegally arrested, his answer was "no" (Dkt. #336 at p. 44).

All the evidence above suggests that the jury's award was not grossly disproportionate. *See Foradori v. Harris*, 523 F.3d 477, 504 (5th Cir. 2008) ("The jury's award is not to be disturbed unless

it is entirely disproportionate to the injury sustained."). It was commensurate with the deprivation Bevill suffered at the hands of Defendants. Defendants have a steep mountain to climb to convince the Court to reverse the jury's award and grant a new trial. *See Wood v. Diamond Drilling Co.*, 691 F.2d 1165, 1168 (5th Cir. 1982) ("[A] jury's award is not to be disturbed unless it is so large as to shock the judicial conscience, indicated bias, prejudice, corruption, or other improper motive on the part of the jury, or is contrary to all reason.") (internal quotations omitted). They are far from the summit. The same is true for Defendants' punitive damages argument. Bevill stumbled into a three-headed buzzsaw comprising Judge Fletcher, DA Wheeler, and Sheriff Castloo, and saw his career and reputation eviscerated as a result. The overwhelming weight of the evidence demonstrates that Defendants' retaliatory conduct involved, at a minimum, "reckless or callous indifference" to Bevill's federally protected rights. *See Smith v. Wade*, 461 U.S. 30, 56 (1983). The Court denies Defendants' request for a new trial on these grounds.

### B.    The "Maximum Recovery Rule"

Having determined that Defendants are not entitled to a new trial based upon the jury's damages award, the Court's next task is to examine whether remittitur is in order based upon the application of the Fifth Circuit's "maximum recovery rule." Defendants invoke the maximum recovery rule, citing twelve allegedly analogous cases where courts in this Circuit have remitted a jury's damages award (Dkt. #342 at p. 25; Dkt. #345 at p. 28; Dkt. #346 at pp. 22–23; Dkt. #348 at pp. 27–28).[18] The Court reviews each case below to determine if remittitur is appropriate.

---

[18] Defendants' Motions deviate slightly on the authority cited to invoke the maximum recovery rule (*Compare* Dkt. #342 at p. 25, *with* Dkt. #346 at pp. 22–24, *and* Dkt. #348 at pp. 27–29). But for the avoidance of doubt, the Court will take the conservative approach and briefly review all twelve cases that Defendants cite.

To determine whether a damages award is excessive to warrant remittitur, the Fifth Circuit uses the "maximum recovery rule." *See Lebron v. United States*, 279 F.3d 321, 326 (5th Cir. 2002). "'This judge-made rule essentially provides that we will decline to reduce damages where the amount awarded is not disproportionate to at least *one factually similar* case from the relevant jurisdiction.'" *Id.* (quoting *Douglass v. Delta Air Lines, Inc.*, 897 F.2d 1336, 1344 (5th Cir. 1990)). The rule "permits a verdict at 150% of the highest inflation-adjusted recovery in an analogous, published decision." *Longoria v. Hunter Express, Ltd.*, 932 F.3d 360, 365 (5th Cir. 2019) (citing *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 298 n.12 (5th Cir. 2019); *Thomas*, 297 F.3d at 369 n.8)).[19] But "[b]ecause the facts of each case are different, prior damages awards are not always controlling; a departure from prior awards is merited 'if unique facts are present that are not reflected within the controlling caselaw.'" *Lebron*, 279 F.3d at 326 (quoting *Douglass*, 897 F.2d at 1344).

Defendants cite twelve employment retaliation cases that they claim are analogous enough to these facts to serve as an anchor to which the Court should remit Bevill's damages (Dkt. #342 at p. 25; Dkt. #345 at p. 28; Dkt. #346 at pp. 22–23; Dkt. #348 at pp. 27–28). Accordingly, the maximum recovery analysis requires the Court to survey potentially comparable decisions from this Circuit affirming or remitting jury awards. The parallels that Defendants attempt to draw between their cited cases and these facts leave much to be desired. The Court explains below.

As mentioned, maximum recovery jurisprudence requires a published factual analog to trigger the 150% cap on damages. *Longoria*, 932 F.3d at 365. Defendants claim to have identified twelve cases to which Bevill's damages should be reduced. *Miniex v. Houston Hous. Auth.*, 400 F.

---

[19] As the Fifth Circuit recognized in *Longoria*, "[o]ne of the inconsistencies in maximum recovery caselaw is whether a 150% or 133% multiplier applies." *Longoria*, 932 F.3d at 365 n.3. The Fifth Circuit resolved that inconsistency by applying the 133% multiplier to bench trials and the 150% multiplier to jury trials. *Id.* (citing *Thomas*, 297 F.3d at 369 n.8). Accordingly, the 150% multiplier applies here.

Supp. 3d 620 (S.D. Tex. 2019) (remitting noneconomic damages award from $317,750 to $217,070.34 in case involving general counsel's retaliatory termination from public housing authority); *Salinas v. O'Neill*, 286 F.3d 827 (5th Cir. 2002) (remitting noneconomic damages award from $300,000 to $150,000 in case involving the Customs Service declining to promote employee in retaliation for filing claims with the Equal Employment Opportunity Commission ("EEOC")); *Minter-Smith v. Mukasey*, No. CIVA303CV1057DPJJCS, 2008 WL 2164565 (S.D. Miss. May 22, 2008) (remitting $300,000 award down to $150,000 in case involving Title VII claim for retaliatory constructive discharge); *Faulk v. Duplantis*, No. CIV.A. 12-1714, 2014 WL 7006002 (E.D. La. Dec. 10, 2014) (remitting noneconomic damages award from $75,000 to $30,000 because plaintiff's "uncorroborated" testimony merely involved complaints of "inconvenience" and plaintiff failed to mitigate damages); *Forsyth v. City of Dall.*, 91 F.3d 769 (5th Cir. 1996) (awarding two plaintiffs $100,000 and $75,000, respectively, in emotional anguish damages resulting from retaliatory transfer of two police officers from intelligence unit to night uniformed patrol); *Decorte v. Jordan*, 497 F.3d 433 (5th Cir. 2007) (upholding a noneconomic damages award of $10,500 and $13,500 in termination case that did not involve a First Amendment violation); *Hitt v. Connell*, 301 F.3d 240 (5th Cir. 2002) (remitting a compensatory damages award from $300,000 to $76,000 due to the commingling of pecuniary and non-pecuniary damages in the verdict form and the plaintiff's lack of evidence of non-pecuniary damages); *Sanchez v. Presidio Cnty., Tex.*, No. PE19CV00037DCDF, 2021 WL 9639630 (W.D. Tex. Nov. 3, 2021) (remitting $500,000 noneconomic damages award to $349,632.03 in retaliatory termination case); *Thomas*, 297 F.3d at 371–72 (remitting future emotional distress damages from $100,000 to $75,000 in retaliation case arising out of the Texas Department of Criminal Justice declining to promote the plaintiff in retaliation for filing complaints

to the EEOC); *Williams v. Trader Publ'g Co.*, 218 F.3d 481 (5th Cir. 2001) (upholding $100,000 emotional distress damages award in Title VII gender discrimination case); *Giles v. Gen. Elec. Co.*, 245 F.3d 474 (5th Cir. 2001) (remitting a damages award from $300,000 to $150,000 in claim brought under Americans with Disabilities Act); *Vadie v. Miss. St. Univ.*, 218 F.3d 365 (5th Cir. 2000) (remitting $300,000 mental anguish damages award down to $10,000 in Title VII case in which the only evidence of emotional injury was plaintiff's own testimony).

But none of these cases are a proper analog. Each is distinct, either because it involves different claims or involves the same claims with vastly different facts—far less egregious than those chronicled here. None of Defendants' cited cases involve damages resulting from widespread public corruption among elected officials across multiple branches of municipal government to conspire against a single individual for making inflammatory comments about them. They do not involve the wielding of power by conspiring public officials who exercised their authority to influence a third-party employer to terminate one of its employees for speaking up about public corruption. They do not involve those officials demanding more action to be done after that employee's termination. And they do not involve that additional action taking the form of an arrest and intentionally delayed prosecution, which prevented the employee from obtaining gainful employment after his termination. Thus, the deprivation of freedom and the resulting humiliation, embarrassment, and anguish that Bevill suffered are unique to this case. That there exists a body of retaliatory termination caselaw with lower damages awards does not require the Court to force a comparison where none exists. At bottom, this is a novel case comprised of "'unique facts . . . that are not reflected within the controlling caselaw.'" *Lebron*, 279 F.3d at 326 (quoting *Douglass*, 897 F.2d at 1344). The maximum recovery rule is not implicated by these facts. *See Vogler v. Blackmore*,

352 F.3d 150, 158 (5th Cir. 2003) ("Our review of the caselaw reveals that there is no factually

similar case in the relevant jurisdiction; therefore, the maximum recovery rule is not implicated.").

A departure from awards in prior, factually dissimilar termination cases is therefore warranted. *See*

*Lebron*, 279 F.3d at 326. The Court will exercise its discretion and rely on the "strong presumption

in favor of affirming a jury award of damages" and leave the jury's award untouched. *Eiland v.*

*Westinghouse Elec. Corp.*, 58 F.3d 176, 183 (5th Cir. 1995) (internal citations omitted).

### *Motion to Alter/Amend Judgment*

The Court is not out of the woods just yet; one loose end remains. That is Bevill's Motion

to Modify Final Judgment (Dkt. #341). A court may amend a final judgment in four situations:

(1) to address an intervening change in controlling law, (2) to consider new evidence not available

previously, (3) to correct a clear error of law or fact, or (4) to prevent a manifest injustice. *Schiller*,

342 F.3d at 567. Bevill's Motion requests two changes: (1) that the Final Judgment observe

Defendants' joint and several liability for the damages awarded to Bevill; and (2) that the Final

Judgment reflect Wood County's responsibility for the Judgment as the entity responsible for its

official policymaker, Sheriff Castloo (Dkt. #341 at pp. 2–3). The Court addresses each in turn.

### I.      Joint and Several Liability

Bevill first requests that the Court revise the Final Judgment to indicate that Defendants

are jointly and severally liable, as co-conspirators, for Bevill's damages (Dkt. #341 at p. 2).

Defendants do not oppose. Nor should they, as Bevill is correct that co-conspirators are jointly and

severally liable under § 1983. *See, e.g.*, *Bevill I*, 26 F.4th at 283 (quoting *Latiolais*, 484 F. App'x at

989 ("A conspiracy may be charged under [S]ection 1983 as the legal mechanism through which to

impose liability *on all of the defendants* without regard to who committed the particular act . . . .")

(emphasis added); *Edmonson v. Cnty. of Van Zandt*, 15 F.3d 180 (5th Cir. 1994) (affirming the district court's judgment finding § 1983 co-conspirators jointly and severally liable). Therefore, Defendants are jointly and severally liable for Bevill's damages.

## II.     Municipal Liability

Bevill's second request warrants more discussion. Bevill urges the Court to amend its Final Judgment to impose liability on Wood County as the entity responsible for its official policymaker, Sheriff Castloo (Dkt. #341). Bevill claims that doing so would not conflict with the jury's "no" answer on Bevill's *Monell* claim against Wood County (Dkt. #341). The Court disagrees.

In *Monell*, the United States Supreme Court limited municipal liability under § 1983 to "deprivations of federally protected rights caused by action taken 'pursuant to official municipal policy of some nature . . . .'" *Pembaur*, 475 U.S. at 471 (quoting *Monell*, 436 U.S. at 691). Two circumstances can give rise to § 1983 municipal liability for the conduct of an official. *Turner v. Upton Cnty., Tex.*, 915 F.2d 133, 136 (5th Cir. 1990). First, "a municipality's final policymakers are held effectively to have made policy or condoned creation of a custom by ratifying the unconstitutional or illegal actions of subordinate officers or employees." *Id.* Second, "the municipality may be held liable for the illegal or unconstitutional actions of its final policymakers themselves as they engage in the setting of goals and the determination of how those goals will be achieved." *Id.* (citing *Pembaur*, 475 U.S. at 469). Bevill chose the second and brought a claim against Wood County based on the actions of its final policymaker, Sheriff Castloo (Dkt. #38 at ¶¶ 69–70) (Bevill's Complaint alleging that "Sheriff Castloo was the final policymaker for law enforcement in Wood County. . . . [T]he acts of Sheriff Castloo as the official policymaker for law enforcement in Wood County amount to a violation of 42 U.S.C. § 1983 for which Wood County is liable").

Accordingly, the Court submitted that question to the jury as a municipal liability question against Wood County (Dkt. #312 at p. 2). The jury answered in the negative (Dkt. #312 at p. 2).

Bevill now seeks to pave a third avenue—one in which Sheriff Castloo's *individual* liability would be imputed to Wood County (Dkt. #341 at pp. 2–3). Doing so would work an end-run around the jury's verdict on Bevill's municipal liability claim against Wood County and *Monell*'s categorical bar on vicarious liability claims against municipalities. *Monell*, 436 U.S. at 691 ("[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory."). In an attempt to reconcile his theory with *Monell*, Bevill cites two Fifth Circuit cases (Dkt. 341 at pp. 2–3) (citing *Pippin*, 74 F.3d at 584; *Turner*, 915 F.2d at 137). In *Pippin*, the Fifth Circuit observed that, "[w]hen a plaintiff sues a county or municipal official *in her official capacity*, the county or municipality is liable for the resulting judgment and, accordingly, may control the litigation on behalf of the officer *in her official capacity*." *Pippin*, 74 F.3d at 584 (emphasis added). And in *Turner*, the Fifth Circuit determined that "[t]he sheriff's and district attorney's alleged participation in the conspiracy, if proven, will suffice to impose liability on the county." *Turner*, 915 F.2d at 137. Bevill avers that *Pippin* and *Turner* lay the foundation for the imposition of municipal liability on Wood County due to Sheriff Castloo's participation in the conspiracy against him.

A proper reading of *Pippin* unravels Bevill's entire theory. There, the liability that the court imposed on the county stemmed from the acts that the sheriff took in his official capacity. *Pippin*, 74 F.3d at 584. In other words, the sheriff's acts were the county's acts. Thus, the court determined that "[a] suit against the [s]heriff *in his official capacity* is a suit against the [c]ounty"—and *only* against the county. *Id.* (emphasis added). In making that determination, the Fifth Circuit stressed that the defendants had "apparently equated the interests of the [s]heriff individually with the

94

interests of the [s]heriff officially." *Id.* Accordingly, the Fifth Circuit treated the official capacity claim against the sheriff as a claim against the county. *Id.* Bevill makes the same mistake here. Like the defendants in *Pippin*, Bevill has apparently considered this litigation as involving three parties: (1) Sheriff Castloo individually; (2) Sheriff Castloo in his official capacity; and (3) Wood County (Dkt. #360 at p. 5) ("Bevill asserted claims against Wood County . . . and brought claims against Sheriff Castloo, both in his individual and official capacities . . . ."). *See id.* But under *Hafer v. Melo*, that cannot be the case. *Id.* (citing 502 U.S. 21 (1991)). It is legally impossible to bring a separate official capacity claim *and* a municipal liability claim under *Monell* based upon that official's conduct. They are not two distinct claims; they are one and the same. The official capacity claim against the official *is* the municipal liability claim against the county. Thus, Bevill's conspiracy claim against Sheriff Castloo sought to hold him *individually* liable, while his municipal liability claim against Wood County sought to hold the county (by virtue of acts that Sheriff Castloo took in his official capacity) liable. Those are the only two options that Bevill could have pursued.

Yet Bevill insists that the Court's instruction to the jury that Sheriff Castloo acted "under color" of state law somehow transforms his individual capacity conspiracy claim into a simultaneous official capacity claim (Dkt. #341 at p. 2 n.2; Dkt. #360 at pp. 2, 6) (citing Dkt. #306 at p. 8). Bevill's argument erroneously conflates acts committed "under color" of state law with official capacity claims. The United States Supreme Court has distinguished between individual and official capacity claims. Put simply, "an official-capacity suit is just another way of pleading an action against an entity of which an officer is an agent and are treated as suits against the State." *Latiolais*, 484 F. App'x at 989 (citing *Hafer*, 502 U.S. at 25). The Fifth Circuit has emphasized the United States Supreme Court's observation that:

> Personal-capacity suits, on the other hand, seek to impose individual liability upon a government officer for actions taken under color of state law. Thus, on the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right. While the plaintiff in a personal-capacity suit need not establish a connection to governmental policy or custom, officials sued in their personal capacities, unlike those sued in their official capacities, may assert personal immunity defenses such as objectively reasonable reliance on existing law.

*Id.* (quoting *Hafer*, 502 U.S. at 25) (citation modified). Thus, Bevill brought his § 1983 conspiracy claim against Sheriff Castloo in his *individual capacity* for actions that he took under color of state law. As if his Complaint was not enough, a look at how this litigation has progressed proves as much. Bevill's First Amended Complaint expressly states that "Sheriff Castloo . . . [was] not acting in the ordinary course and scope of [his] employment or [his] official capacit[y]" when he conspired against Bevill (Dkt. #38 at ¶ 67). Not only that, but the most contentious dispute throughout this entire case has been the question of qualified immunity (*See* Dkt. #89; Dkt. #245). *See Bevill I*, 26 F.4th at 275–83; *Bevill II*, 103 F.4th at 379–82. Had Bevill brought his conspiracy claim against Defendants in their official capacities, the qualified immunity defense would have been unavailable. *See, e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 166–67 (1985) (holding that officials in their individual capacities "may . . . be able to assert personal immunity defenses," such as qualified immunity, that are not available in official-capacity suits); *Sanders-Burns v. City of Plano*, 594 F.3d 366, 371 (5th Cir. 2010) (observing that qualified immunity is "a defense that is only relevant to individual capacity claims"); *Walker v. Howard*, 517 F. App'x 236, 237 (5th Cir. 2013) ("The defense of qualified immunity applies only to suits against defendants in their individual capacities."). Consequently, Bevill's argument that Sheriff Castloo's actions taken under color of state law constituted actions taken in his official capacity fails.

Hence, the Court will leave its Final Judgment undisturbed as it relates to Sheriff Castloo's personal liability as a § 1983 co-conspirator. Bevill had one opportunity to impose liability on Wood County—through his *Monell* claim, which the Court submitted to the jury in Question No. 4 (Dkt. #312 at p. 2). The jury answered "no" (Dkt. #312 at p. 2). Sheriff Castloo's individual liability will not serve as a predicate for municipal liability against Wood County. The Court's Final Judgment will remain unchanged regarding Wood County's liability.

*        *        *

In conclusion, after careful review of the trial record, the Court concludes that the evidence introduced at trial was legally sufficient to submit each question on the verdict form to the jury. It was also factually sufficient to support the jury's verdict. Consequently, the Court will leave the jury's verdict and damages award intact. The only change that the Court will make to its Final Judgment will be the inclusion of joint and several liability language for each Defendant that conspired against Bevill. That change will be reflected in a forthcoming, amended Final Judgment.

## CONCLUSION

The Court therefore **ORDERS** as follows:

1.  Defendant James Wheeler's Motion (Dkt. #342) is hereby **DENIED**;

2.  Defendant Tom Castloo's Motion (Dkt. #345) is hereby **DENIED**;

3.  City of Quitman and David Dobbs' Motion (Dkt. #346) is hereby **DENIED**;

4.  Defendant Judge Jeffrey Fletcher's Motion (Dkt. #348) is hereby **DENIED**; and

5.  Plaintiff's Motion (Dkt. #341) is hereby **GRANTED in part** and **DENIED in part.**

**IT IS SO ORDERED.**

**SIGNED this 11th day of August, 2025.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE